# EXHIBIT 2

# EXHIBIT 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
– – – – – – – – – – – – – – – – – –
                                                              x
Michael J. Katz M.D, Michael J. Katz, M.D., P.C

                              Plaintiff/Petitioner,

          -against-                                              Index No. __604649/2016_____

Travelers a/k/a Travelers Insurance Company a/k/a The
Travelers Companies, Inc., its relevant servants, agents

                              Defendant/Respondent.
                                                              x

## NOTICE REGARDING AVAILABILITY OF ELECTRONIC FILING
## SUPREME COURT CASES

PLEASE TAKE NOTICE that the matter captioned above has been commenced as an electronically filed case in the New York State Courts Electronic Filing System ("NYSCEF") as required by CPLR § 2111 and Uniform Rule § 202.5-b (consensual electronic filing). This notice is being served as required by that rule.

NYSCEF is designed for the electronic filing of documents with the County Clerk and the court and for the electronic service of those documents, court documents, and court notices upon counsel and unrepresented litigants who have consented to electronic filing

Electronic filing offers significant benefits for attorneys and litigants, permitting papers to be filed with the County Clerk and the court and served on other parties simply, conveniently, and quickly. NYSCEF case documents are filed with the County Clerk and the court by filing on the NYSCEF Website, which can be done at any time of the day or night on any day of the week. The documents are served automatically on all consenting e-filers as soon as the document is uploaded to the website, which sends out an immediate email notification of the filing.

The NYSCEF System charges no fees for filing, serving, or viewing the electronic case record, nor does it charge any fees to print any filed documents. Normal filing fees must be paid, but this can be done on-line.

1) **Parties represented by an attorney:** An attorney representing a party who is served with this Notice must promptly either consent or decline consent to electronic filing and service through NYSCEF for this case. Attorneys registered with NYSCEF may record their consent electronically in the manner provided at the NYSCEF site. Attorneys not registered with NYSCEF but intending to participate in e-filing must first create a NYSCEF account and obtain a user ID and password prior to recording their consent by going to www.nycourts.gov/efile. Attorneys declining to consent must file with the court and serve on all parties of record a declination of consent.

2) **Parties not represented by an attorney: Unrepresented litigants are exempt from e-filing. They can serve and file all documents in paper form and must be served with all documents in paper form.** However, an unrepresented litigant may consent to participate in e-filing.

For information on how to participate in e-filing, unrepresented litigants should contact the appropriate clerk in the court where the action was filed or visit www.nycourts. gov/efileunrepresented. Unrepresented litigants also are encouraged to visit www.nycourthelp.gov or contact the Help Center in the court where the action was filed. An unrepresented litigant who consents to e-filing may cease participation at any time. However, the other parties may continue to e-file their court documents in the case.

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: efile@nycourts.gov).

Dated: 06/22/2016

_____
Signature

RICHARD CHARLES ZISHOLTZ
Name

ZISHOLTZ & ZISHOLTZ LLP
Firm Name

170 Old Country Road
Address

Mineola, NY  11501
City, State, and Zip

5167412200
Phone

richard@zzllp.com
E-Mail

To: Travelers a/k/a Travelers Insurance Company a/k/a
The Travelers Companies
3 Huntington Quadrangle, Melville, NY  11747

ExamWorks, Inc.
1122 Franklin Avenue, Garden City, NY  11530

9/3/15

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-----------------------------------------------------------------X

MICHAEL J. KATZ, M.D. and
MICHAEL J. KATZ, M.D., P.C.,

                              Plaintiffs,

              -against-

TRAVELERS a/k/a TRAVELERS INSURANCE
COMPANY a/k/a THE TRAVELERS COMPANIES,
INC., its relevant servants, agents or employees and
relevant associated, affiliated or subsidiary corporations
and EXAM WORKS, INC., and its relevant servants,
agents or employees and relevant associated, affiliated
or subsidiary corporations,

                              Defendants.
-----------------------------------------------------------------X

To the above named Defendants:

Index No. 604609/16
Date Purchased: 06/22/16

Plaintiff designates
Nassau County as the
Place of trial

The basis of the venue
is Plaintiff's address

**SUMMONS WITH NOTICE**

Plaintiffs' address:
170 Pond Crossing
Lawrence, New York 11559

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a

copy of your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on the Plaintiff's Attorneys within 20 days after the service of this summons, exclusive

of the day of service (or within 30 days after the service is complete if this summons is not

personally delivered to you within the State of New York); and in case of your failure to appear or

answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: Mineola, New York
       June 21, 2016

                              ZISHOLTZ & ZISHOLTZ, LLP

                              By:_____
                              Gerald Zisholtz
                              Attorneys for Plaintiffs
                              Office and P.O. Address
                              170 Old Country Road
                              Mineola, New York 11501
                              (516) 741-2200

Defendants' Address:

TRAVELERS a/k/a TRAVELERS INSURANCE
COMPANY a/k/a THE TRAVELERS COMPANIES
3 Huntington Quadrangle
Melville, New York 11747

EXAM WORKS, INC.
1122 Franklin Avenue
Garden City, New York 11530

**Notice:**  The nature of this action is as set forth in the complaint.

The relief sought is as set forth in the complaint.

Upon your failure to appear, judgment will be taken against you by default for the relief set forth in the Complaint, together with interest, if any, thereon, and the costs and disbursements of this action.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-----------------------------------------------------------------X

MICHAEL J. KATZ, M.D. and
MICHAEL J. KATZ, M.D., P.C.,

                    Plaintiffs,

      -against-

TRAVELERS a/k/a TRAVELERS INSURANCE
COMPANY a/k/a THE TRAVELERS COMPANIES,
INC., its relevant servants, agents or employees and
relevant associated, affiliated or subsidiary corporations
and EXAM WORKS, INC., and its relevant servants,
agents or employees and relevant associated, affiliated
or subsidiary corporations,

                    Defendants.
-----------------------------------------------------------------X

Index No. 604609/16

**VERIFIED
COMPLAINT**

Plaintiffs, by Zisholtz & Zisholtz, LLP, their attorneys, complaining of the defendants,

respectfully allege:

## PARTIES

1.    Plaintiff, Michael J. Katz, M.D. ("Dr. Katz"), is a medical doctor duly licensed to

practice medicine in the State of New York and a resident in the County of Nassau, State of New

York.

2.    Plaintiff, Michael J. Katz, MD PC ("Michael J. Katz PC") is a professional

corporation duly organized and existing under and by virtue of the laws of the State of New

York.

3.    Upon information and belief, the defendant, Travelers a/k/a Travelers Insurance

Company a/k/a The Travelers Companies, Inc. ("Travelers") and its relevant servants, agents or

employees and its relevant associated, affiliated or subsidiary corporations were and still are either domestic or foreign corporations duly authorized to do business within the State of New York.

4. Upon information and belief, the defendant, ExamWorks, Inc. ("ExamWorks") and its relevant servants, agents or employees, and its relevant associated, affiliated or subsidiary corporation are domestic or foreign corporations duly authorized to do business within the State of New York.

5. That at all times herein mentioned, Travelers acted by and through its relevant servants, agents or employees and relevant associated, affiliated or subsidiary corporations.

6. Defendant, Travelers, is in the business of, including but not limited to, issuing insurance policies and defending their assureds on claims for alleged damages resulting in personal injuries allegedly sustained through alleged negligence of their assureds.

7. At all times herein mentioned, ExamWorks was in the business of providing physicians or names of physicians to conduct independent medical examinations (IME) in connection with claims for personal injury that were instituted against clients and customers of Travelers and other insurance companies.

8. In effect, ExamWorks was a clearinghouse for eligible and ineligible physicians in the field of IME and medical testimony in liability and workers' compensation cases.

9. To enable ExamWorks to provide qualified physicians to conduct IME examinations and to testify in Court or Workers' Compensation hearings, Exam Works maintained lists of physicians who were qualified or not qualified for such purposes.

2

## FACTS

10.    Michael Katz, M.D. is an accomplished, well-known and, until events recountered herein, a well-respected, physician who spent decades building a substantial successful orthopedic practice and gradually transitioned that practice into a career as an expert witness in the area of orthopedic medicine.

11.    Dr. Katz has testified in countless personal injury and medical malpractice cases as an expert witness, most often for defendants, over a period of more than twenty years and developed a unique ability to communicate his medical findings to juries.

12.    At one point, Dr. Katz was one of the most sought after expert witnesses in the field of orthopedic medicine.

13.    Dr. Katz's long and successful career was destroyed virtually overnight by the defendants herein.

14.    In July, 2013, the case entitled *Bermejo v. Amsterdam & 76th Associates, LLC, et. al.*, Index No. 23985/2009 appeared for trial in the Supreme Court, Queens County, before the late Justice Duane Hart.

15.    One of the defendants in that action was a corporation known as Ibex Construction Inc., insured by the defendant, Travelers.

16.    Travelers, through ExamWorks, engaged Dr. Katz, who conducted an IME of the plaintiff.

17.    Dr. Katz conducted two IME examinations.  The first lasted approximately 45 minutes and the time consumed by the second became an issue.

3

18.     At the trial, it was revealed that on the second IME examination, Patrick J. Hackett, Esq., counsel for the plaintiff, Bermejo, surreptitiously, illegally and unethically videotaped the second IME.

19.     When Dr. Katz was called upon to testify, Mr. Hackett asked Dr. Katz how much time he spent conducting the second IME.

20.     Dr. Katz testified to the effect that he could not remember, at which point the late Justice Duane Hart intervened and pressed Dr. Katz claiming he could not accept Katz's answer of "I don't know."

21.     Justice Hart demanded that Dr. Katz put a time limit or time frame on how much time was spent on the second IME and despite repeated statements by Dr. Katz that he did not know, Justice Hart insisted on receiving a number.

22.     Justice Hart, however, interrupted Dr. Katz's testimony stating "I cannot accept an 'I don't know.' You have been doing this for awhile[sic]. I will have to insist on what your custom and practice would be as to what type of, the length of an exam of this type." Dr. Katz replied, "I think a range of between ten and 20 minutes would be appropriate."

23.     Mr. Hackett then disclosed that he had secretly recorded the second IME and claimed that it showed that the IME, lasted only one minute and fifty-six seconds. Bermejo's counsel argued that Dr. Katz perjured himself even though Dr. Katz never testified concerning the length of the second IME, and only testified concerning his custom and practice generally.

24.     Mr. Hackett not only misconstrued the nature of Dr. Katz's testimony, but also misrepresented the length of the recording. The recording lasted for five minutes and four seconds, not one minute and fifty-six seconds. The video also begins some time after the

4

Bermejo entered the exam room. It is also not clear how much longer Dr. Katz and Bermejo remained in the exam room together after the video terminated.

25.    The surreptitious and misleading videotape should have resulted in an immediate mistrial, but Justice Hart inexplicably concluded that Dr. Katz lied concerning the length of the examination despite the fact that he clearly testified he could not remember how long the examination took. Justice Hart proceeded to berate Dr. Katz both on and off the record during numerous subsequent proceedings and inexplicably demanded indirectly that Dr. Katz contribute money reportedly $750,000 towards a settlement with plaintiff. Justice Hart called Dr. Katz, among other things, a"no good liar" and a"thief" and implied that he was a "spy" with "little beady eyes."

26.    Justice Hart threatened to commence contempt proceedings against Dr. Katz and to refer him to the Administrative Judge, the Queens County District Attorney and the Office of Professional Medical Conduct if Dr. Katz did not contribute hundreds of thousands of dollars towards settlement. Justice Hart also warned Dr. Katz that if word of the proceedings ever spread to the insurance companies Dr. Katz's reputation as an expert witness would be ruined. Justice Hart told Dr. Katz that he would unseal the record in Bermejo if Dr. Katz didn't contribute to the settlement.

27.    Dr. Katz adamantly refused to contribute to the settlement because he had done nothing wrong and there was certainly no basis for him to pay any money to a plaintiff in an action in which he was not even a party. Justice Hart then demanded that Dr. Katz agree to retire from his work as an expert witness if he would not contribute to the settlement. Justice Hart suggested that he would commence a special proceeding against Dr. Katz to force him to give up

his license to practice medicine. Justice Hart suggested that he could act as the plaintiff and the trier of fact in such a proceeding.

28.     Dr. Katz again refused to contribute to the settlement or to retire from his work as an expert witness because he did not perjure himself.

29.     Justice Hart would later change his strategy and suggest that he was "not making a big thing" out of the length of the exam and that the real issue was whether Dr. Katz could have performed all of the tests he testified to during the second IME.

30.     The bottom line is that Dr. Katz cannot be prosecuted for civil contempt or criminal perjury because the record clearly shows that he did not perjure himself. Justice Hart, however, proceeded to unseal the record in the Bermejo matter and invited the attorneys in the Courtroom to spread the word that Dr. Katz had been caught lying. The defendants in this case gladly accepted Justice Hart's invitation and in so doing spread false and malicious lies concerning Dr. Katz.

31.     Justice Hart plainly threatened to ruin Dr. Katz's career, but the real damage to Dr. Katz's career was inflicted by defendants herein.

32.     Dr. Katz has been repudiated, ostracized and completely shut out of the insurance defense industry directly as a result of defendants' improper and unlawful conduct.

## DR. KATZ'S FACTUAL BACKGROUND

33.     Dr. Katz had established himself as one of the premier expert witnesses in the field of orthopedic medicine by the time he was retained in the Bermejo case. Dr. Katz graduated from Queens College of the City University of New York with honors, and then attended the Albert Einstein College of Medicine, where he similarly graduated with honors. While in medical

6

school, Dr. Katz was recognized in the area of biomedical research and was a Jonas Salk Scholar.

34.     After successfully completing his residency program at the Hospital of the University of Pennsylvania, Dr. Katz went on to build a successful orthopedic practice in Flushing, Queens. He remains a board certified orthopedic surgeon and continues to maintain his private orthopedic practice.

35.     Dr. Katz's research in the area of bone loss has been used by the National Aeronautics and Space Administration (NASA) in its space travel programs.  His research has also been instrumental in the development of osteoporosis medications.

36.     Dr. Katz began to supplement his orthopedic practice in 1992 by accepting forensic consulting assignments in the federal court system and he quickly became a highly regarded expert witness in the area of orthopedic medicine. Dr. Katz provided his services as an expert witness by and through plaintiff Michael J. Katz MD PC.

37.     For two decades, Dr. Katz frequently appeared as an expert witness in personal injury and medical malpractice litigations. During this time, approximately 80% of his expert testimony was done on behalf of defendants and he was most often retained on behalf of insurance companies. He earned a reputation as a professional expert witness.

### The Proceedings Before Justice Duane Hart

38.     In the Bermejo case the first IME took place on May 23, 2011 and, according to Dr. Katz's testimony at trial, the first examination lasted approximately forty-five minutes, due in part to the fact that plaintiff's attorney, Patrick Hackett, Esq., became "explosive" and "highly combative" during the examination.

7

39.     Mr. Hackett apparently took issue with the amount of time documented by Dr. Katz for the first IME and, during the next scheduled IME, on March 4, 2013, he secretly recorded the examination.

40.     Dr. Katz specifically asked Mr. Hackett to turn off all recording devices at the March 4, 2013 examination. Mr. Hackett, however, surreptitiously recorded a portion of the examination despite Dr. Katz's request.

41.     The Bermejo case did not settle and a jury trial commenced in March, 2013. When called to testify before a jury at the trial on April 12, 2013, Dr. Katz described various tests that he conducted on Bermejo. Dr. Katz examined the plaintiff *twice* and described certain tests that he completed on two different occasions, nearly two years removed from each other.

42.     As to his first examination, Dr. Katz testified that he performed at least fourteen tests of the plaintiff.

43.     During the first IME, Dr. Katz examined the plaintiff's back, right shoulder, right elbow, right leg, right knee, right ankle and right foot.

44.     With respect to the plaintiff's back, Dr. Katz performed a proactive test where the plaintiff lay flat and lifted his leg to determine whether there was any sciatic nerve damage. Dr. Katz also tested his range of motion bending forward, backward and to each side.

45.     Moving to the plaintiff's shoulder, Dr. Katz further tested the plaintiff's range of motion for lifting upward, lifting forward, backward extension, and internal and external rotations.

46.   He also tested the tendency of the plaintiff's shoulder to dislocate and performed two proactive tests: the O'Brien Test to determine whether there was a torn labrum and the Hawkins Kennedy Test for impingement of the shoulder.

47.   Dr. Katz individually tested the range of motion, as well as the physical formation, of the plaintiff's elbow, leg, knee, foot, and ankle. He additionally tested the stability and condition of the three major ligaments of the knee, took and compared the pulses of both feet, and noted various physical observations throughout the examination.

48.   During a portion of the direct examination related to the length of the first IME, Justice Hart inexplicably called a brief recess and told the attorneys that he observed a strange look upon the face of a person sitting in the gallery and opined that Mr. Hackett may want to call her as a rebuttal witness based upon her expression.

49.   Dr. Katz testified that during the second IME, that he completed seven tests, focusing on the plaintiff's right shoulder.

50.   Dr. Katz tested the plaintiff's range of motion as he had in the first IME and also repeated the O'Brien and Hawkins Kennedy Tests.

51.   He additionally performed the Hornblower and lift-off tests, which involve motion of the shoulder joint against light resistance, and took measurements for atrophy and force generation.

52.   During cross examination by Mr. Hackett, Dr. Katz was questioned about both examinations and particularly about the length of time he spent examining the plaintiff on both occasions.

53.     Mr. Hackett pressed Dr.Katz concerning the length of the second examination. As he was continually pressed for a definitive length of time, Dr. Katz answered: "Tha's uncertain.";  "I don't think I have a record. I don't think I have it recorded, no. I don't think it's recorded."; "I don't really recall at this point."; "I don't really have, you know, an allocated time"; and "Quite frankly, I don't know."

54.     Dr. Katz thus essentially stated, five separate times, that he did not and could not recall the amount of time he spent with the plaintiff during the second IME.

55.     Nonetheless, Justice Hart intervened and told Dr. Katz, "I cannot accept an 'I don't know. ' You have been doing this for awhile[sic]. I will have to insist on what your custom and practice would be as to what type of, the length of an exam of this type." Dr. Katz replied, "I think a range of between ten and 20 minutes would be appropriate." Dr. Katz completed his testimony and left the courtroom without further incident.

56.     Upon the completion of Dr. Katz's testimony, Mr. Hackett called an employee from his law office, Yury Ramirez, who was present during both IME's in her capacity as a translator for the plaintiff s attorneys. Ms. Ramirez, the same woman whose facial expression in the gallery caused Justice Hart to interrupt the proceedings earlier, contradicted Dr. Katz's accounts of the examinations he performed, particularly as to the time of the IME's.

57.     Ms. Ramirez described in particular the length of the "exam" as approximately three minutes and the length of the "total evaluation" as approximately five minutes.

58.     At the end of Ms. Ramirez's testimony, through re-direct, Mr. Hackett brought the existence of the video to the attention of the court and defendant's trial counsel. Justice Hart dismissed the jury for the day and Michael Reilly, Esq., counsel to defendant, Ibex Construction,

Travelers insured, made an application for a mistrial. Justice Hart called a recess to offer the attorneys an opportunity to review the video.

59. Upon information and belief, after the recess, Mr. Hackett alleged off-the-record that the video showed that Dr. Katz's examination lasted only one minute and fifty-six seconds and further alleged that Dr. Katz had perjured himself.

60. The video of the IME lasts five minutes and four seconds, not the one minute and fifty-six seconds as alleged by Mr. Hackett.

61. Furthermore, the video obviously begins some time after Mr. Bermejo, Mr. Hackett and Ms. Ramirez entered the room and it is not clear how much longer Dr. Katz and Mr. Bermejo remained in the room together after the video terminated.

62. Justice Hart, however, resolutely adopted Mr. Hackett's representation that the examination lasted one minute and fifty-six seconds throughout all future proceedings despite the fact that Mr. Hackett's conclusions was demonstrably and factually wrong.

63. Justice Hart also proceeded to mischaracterize Dr. Katz's prior testimony concerning the length of the second IME. At the end of the proceedings on April 12, 2013, Justice Hart stated the following about the surreptitious recording of the IME: "Well, I've got to admit. . . if anyone had dealt with Dr. Katz in the past based on his testimony it would of [sic] been reasonable for them to have a tape because he is testifying [to] a 45 minute IME. What universe does he live in? If I ever see a doctor do a 45 [minute] IME it will be the first time."

64. That weekend, Dr. Katz was contacted by Mr. Reilly, Travelers trial attorney, who advised him that he should return to court Monday, April 15, because after his testimony, the

clandestine video had been produced. Dr. Katz appeared, as requested, the following Monday, April 15, 2013.

65.     Justice Hart suggested that the parties should settle the matter and in a bizarre twist called for Dr. Katz to contribute money towards a settlement as well, stating, off-the-record, that Dr. Katz's career doing IME work might be over, calling him a "no good liar," and told him to retain a lawyer.

66.     Dr. Katz left the court and contacted the firm of Kern Augustine Conroy Schoppmann, P.C., who dispatched David Vozza, Esq. to meet him at court.

67.     Prior to Mr. Vozza's arrival, Justice Hart indicated several more times, off-the-record, that Dr. Katz should contribute to a settlement to avoid punishment for the perceived perjury. He threatened Dr, Katz with criminal prosecution and imprisonment multiple times, off-the-record, throughout the morning.

68.     Justice Hart did not commence any criminal proceedings or incarcerate Dr. Katz despite these threats.

69.     Justice Hart told Dr. Katz that he needed to contribute to the settlement or his career would be ruined. He stated, on the record, that:

> So the question is, do you want to settle it? I would suggest, and that's why everybody's here and even if the doctor wants to contribute because clearly...The doctor's career doing IME's might be over. If he gets caught in a lie on something that's material at trial his future use to anyone is useless, correct? That will follow the doctor forever.

70.     Justice Hart continued, on the record, noting that:

> So this is truly a pox on everybody's house because I'm going to grant a mistrial unless you can settle it. And unless you can settle it, and this goes - I put in a call for the third-party

for the D/J action because they might be part of this, unless
you can figure out a way to settle it I will declare a mistrial
and post mistrial I will have a sanctions hearing and I will,
Doctor, be turning the record over to the district attorney. So,
you got a choice. You can collectively get yourselves out of
this problem or I will do what I will do.

71.     Upon information and belief, Justice Hart did not turn the record of the

proceedings before him over to the district attorney despite this threat.

72.     During a brief recess, Justice Hart continued to berate Dr. Katz and invited the

attorneys present to do the same. Back on-the-record, Justice Hart told Dr. Katz that he needed an

attorney "right now" and went on to say:

I would strongly suggest you do not do anything because you're in
more trouble than you think. It's probably that your career doing
IME's is over. It's possible, unless this case is settled, that I might
be taking more - the attorneys have a duty basically not to do
anything with regards to the district attorney. If I find out or if I
even suspect  something is going on I have a duty to get in touch
with the district attorney and getting in touch with the district
attorney is not a good thing for you in this case. Understood?

73.     Upon information and belied Justice Hart did not contact the District Attorney

despite this threat.

74.     Upon Mr. Vozza's arrival, Justice Hart announced, in open court, but off-the-

record, "Your client is a liar and a thief." Justice Hart continued to berate Dr. Katz off-the-record

in the presence of his attorney before instructing the court reporter to begin transcribing again

75.     Back on-the-record, Justice Hart stated:

I'm going to second call this while you figure out how you
can settle this case so I can seal this record so that I don't
have to send things over to the district attorney, so that I don't
have to remove counsel from this case, so that defendant isn't
put in a position where they have to go forward on the RSD

13

case with no orthopedist and so the disclaiming carrier for the third-party defendant isn't caught holding a three to six million dollar bag. All of those are occurring not without the realm of happening, correct. They can all happen in this case. Parties can be sanctioned, people can go to jail. Am I making it up? No.

76.    Upon information and belief, Justice Hart did not send the transcript of the proceedings to the District attorney despite the fact that the record was subsequently unsealed.

77 .    Thereafter, Mr. Vozza and Dr. Katz met in the hallway with Richard Mendelsohn, Esq., counsel for the co-defendant, Amsterdam &.76th Associates, LLC.,who asked for a monetary contribution of $750,000 from Dr. Katz. When Mr. Vozza asked him to identify a legal basis for Justice Hart's demand that Dr. Katz contribute to the settlement, Mr. Mendelsohn responded by asking how much the loss of Dr. Katz's career would cost.

78.    After the parties and Dr. Katz returned to the courtroom, Justice Hart declared:

So you got until really about 4:00 o'clock[sic] this afternoon to try and settle this because if I have to deal with this case tomorrow stuff will start happening... Because again, I am not making the determination at this point if he is lying or not but if someone determines that the doctor was lying or if I think that there is a hint that he was lying I'm going to be the least of his problems. My friends in my former office in the district attorney they might have a conversation with you, [Mr.Vozza], his malpractice carrier will have a conversation, the State Department of Health would have a conversation with him, the other the[sic] defendants would have a conversation with him and I don't think arry of these conversations are going to be beneficial to him...

79.    Upon information and belief Justice Hart did not contact District Attorney's office, Dr. Katz's malpractice carrier or the State Department of Health despite these threats.

14

80.	Furthermore, upon information and belief, none of the defendants in the Bermejo case have commenced any action or lodged any complaints against Dr. Katz based on his testimony.

81.	The parties and Dr. Katz were ordered to return before Justice Hart the following day, April 16, 2013.

82.	Justice Hart, as he had the previous day, continued to exert a great deal of pressure upon Dr. Katz to provide a personal contribution to settle the Bermejo case, stating that if the matter was settled, he would seal the record. The amount suggested by Justice Hart was in the hundreds of thousands of dollars.

83.	Justice Hart wondered, on the record, "whether to blame Dr. Katz for his profound inability to tell time when he's doing an IME" despite the fact that Dr. Katz never testified concerning the specific length of the second IME'

84.	Justice Hart further stated:

> And Dr. Katzf's] inability to successfully tell time might be the biggest problem of all. I would strongly suggest though, I am not in anybody else's courtroom, but since I have Dr. Katz['s] counsel here I would strongly suggest that they reassess his future testimony at any trials until this issue and a few others are resolved.

85.	During the court appearance, despite stating that he would seal the record in exchange for a settlement, Justice Hart actively invited other attorneys who were present, or even in the courtroom on unrelated business, to order copies of the transcript in order to "spread the word" concerning Dr. Katz's alleged perjury.

86.	Despite the immense pressure placed upon Dr. Katz by Justice Hart, Dr. Katz

adamantly refused to agree to contribute to the parties' settlement.

87.　　Justice Hart adjourned the matter to July 12,2013 for trial. Dr. Katz was represented that day by another attorney from Mr. Vozza's office, Sean Lenihan, Esq. Justice Hart again repeated his position that Dr. Katz " might want to contribute to this to get out of my way, because I'm not thrilled with him."

88.　　After Justice Hart referred to Dr. Katz as "Typhoid Mary" and accused him of "getting caught red-handed in an out-and-out lie," Mr. Lenihan repeatedly attempted to direct the court's attention to Dr. Katz's trial testimony, as well as to the video itself, to correct the judge's mischaracterization. However, Justice Hart consistently ignored Mr. Lenihan's efforts and persisted.

89.　　When Mr. Lenihan countered that "the characterization of Dr. Katz's testimony as an outright lie...is unfair" because "after [Dr. Katz] originally testified,...he did not know [how long the second examination took], he did not remember, your Honor was not satisfied with that and wouldn't let that go. You pressed him to give an answer.. ,He told you what he thought the time frame was," Justice Hart stated, "I'm sorry, when did you learn how to tell time?" and went on to say, "And he gave a laundry list of tests that he did...Did he perform those tests in whatever time he did [sic] that he testified to? No."

90.　　Then, in an attempt to illustrate to Justice Hart that Dr. Katz had initially answered that he could not recall the length of time he spent conducting the second IME and that the ten to twenty minute estimation came from Justice Hart's leading question, Justice Hart took

exception and oddly claimed that Mr. Lenihan was accusing Justice Hart of causing the perjury by requiring Dr. Katz to tell the truth.

91.     Prior to July 22, 2013,the parties and Dr. Katz were ordered to appear before Justice Hart, though due to a clerical error, Dr. Katz was not informed that the time of the appearance had been changed from the afternoon's calendar to a morning appearance.

92.     Without Dr. Katz or his attorney present, Justice Hart stated:

> The worst thing is that we have a doctor who clearly lied about the length of time he took to do an IME, clearly. No matter how you slice it, 10, 15,20 minutes. It turns out he took 1 minute and 56 seconds...
>
> He testified to findings that he obviously could not have had in a minute and 56 seconds. But if he did 10, 20 IME he could have had. And he could have done it, but he didn't do the test...
>
> We are wasting our time trying cases over and over and over again because a doctor who is making millions of dollars doing IME's decides that he is going to lie.

93.     Justice Hart then stated that he would sanction the attorneys who had retained Dr. Katz in the amount of $10,000 apiece and noted:

> I can only sanction a party or the attorneys. Since I can't sanction Dr. Katz for lying and let the record reflect, I am withdrawing my sealing of any prior record in this case. Dr. Katz lied. I am finding that he lied. He clearly, his clear unequivocal testimony that his testimony that his IME took 10, 20 minutes, correct Mr. Hackett?"

94.     Upon receiving an information from Mr. Hackett and further finding that the second IME only took one minute and fifty-six seconds, Justice Hart went on:

> I can blame the attorneys and the carrier who hired him to do an IME on this case because they should have known what this guy was doing. They should have known. And again the

17

man is literally making millions of dollars doing IME's. Now
he gets caught lying. There is no other way to put it. He lied.
There is no other way to make it nice. He said the IME took
between 10 to 20 minutes. It took a minute and 56 seconds'..

So, I will and you can do whatever you want to appeal this
record. Mr. Mendelsohn, I am sanctioning your law firm
$10,000. You can appeal this. But clearly, for this reason, I
can't sanction Dr. Katz. You can appeal this. I want you to
appeal it. I want the Appellate Division to make a finding
that I am right or wrong, but there is no doubt about the
finding that Dr. Katz lied. I want you to appeal that finding
so that every lawyer in the state that looks at the Law Journal
and looks at the record will be able to see what went on
during this trial.

Right or wrong, they are going to come out with a statement
of fact. They are going to come out with my finding that he
lied. Now, I can't sanction him pursuant to the Court rules,
but I can hold him in contempt. I will have to have a hearing
for that.

95.     Justice Hart, again characterized Dr. Katz's testimony about the second

IME as a "lie" and then stated:

I am less interested in the money. .. *It is the scarlet letter* I am
interested in. This gentleman is still doing IME's. He is still
being used by defense firms. We have gotten calls to get the
record of what went on when Dr. Katz testified...

I can't imagine the amount of extra trials and extra litigation
and extra costs and extra everything that is occasioned by
having this gentleman part of the system. I don't know if he
is a spy with little beady eyes and goes away because he is
not here and neither is his attorney. He is going literally on
because I can't sanction him. I can't sanction him, but I can
hold him in civil contempt after a hearing.

96.     Justice Hart did not hold a contempt hearing let alone hold Dr. Katz in

contempt despite his threats.

18

97.     Justice Hart again addressed the sanctions that he was levying against the two firms and again invited them to appeal his not-yet-made ruling.

98.     That morning, July 1, 2013, Justice Hart, without Dr. Katz present, called Dr. Katz a liar no less than 25 times and went so far as to tell the attorneys of record, "[You] should almost sue Dr. Katz for causing this problem. I would suggest that you do that. . ."

99.     Upon information and belief, none of the parties to the proceedings before Justice Hart have commenced any action against Dr. Katz.

100.    Justice Hart, once again, threatened to commence a contempt hearing against Dr. Katz:

> I would like to sanction l)r. Katz. I would like to put Dr. Katz out of the business of doing IME's period. But I can't do that in this type of proceeding. I can order an eventual [contempt hearing] when they are before me, a civil contempt hearing to be done by another Judge. I am not going to do it. I will discuss with the powers that be in this building a civil contempt hearing with regards to Dr. Katz. That is Michael Katz, an orthopedist.

101.    Upon information and belief, Justice Hart did not discuss bringing a civil contempt proceeding against Dr. Katz with the Administrative Judge or commence any such proceedings despite this threat.

102.    Justice Hart also inaccurately stated that Dr. Katz's own legal counsel admitted that Dr. Katz had committed perjury:

> ...I have to again parrot that Dr. Katz' attorney [Mr. Lenihan] said probably the stupidest thing that I have ever heard in Court, I caused him to perjure himself by forcing him to tell the truth. That is quite possibly the dumbest thing I have ever heard. That I caused the witness to perjure himself by forcing him to tell the truth. So, I want the Appellate Division and the Court of Appeals to get that guy's number.

19

103. Justice Hart repeatedly indicated that he wanted the Appellate Division to review his determinations concerning Dr. Katz, but, upon information and belief, Justice Hart never reduced his comments or conclusions concerning Dr. Katz to an order which would be appealable as of right.

104. Just before the midday break, Justice Hart said, "By the way it is noted that [Dr. Katz] is not here or his attorney." One of the attorneys present then reminded Justice Hart that in the previous proceeding he had not called for the parties or Dr. Katz to be present until two o'clock in the afternoon.

105. In closing the morning's proceedings, in the absence of Dr. Katz and his counsel, Justice Hart continued:

> I am not finished with Dr. Katz. I am still not finished with
> Dr. Katz. Make sure that he and his attorney can find their
> way here. Because I have to see what I am going to do with
> him. I would suggest that your carriers reinforce their efforts
> to never use him again.

106. Upon information and belief, Justice Hart did not take any further action against Dr. Katz other than continue to make additional threats against him.

107. Dr. Katz and Mr. Vozza arrived shortly before the originally-scheduled afternoon calendar call. During the afternoon's proceedings on July 1, Justice Hart informed Mr. Vozza, on-the-record, that "at least one of the defense attorneys agreed that Dr. Katz lied."

108. When Mr. Vozza took issue with Justice Hart's determination that Dr. Katz lied about the length of time that he spent examining the plaintiff, Justice Hart immediately changed course, telling Mr. Yozza,"I am not making a big thing out of 10, 20 minutes...," now suggesting

that the real issue was that Dr. Katz could not have completed all of the tests that he testified he had completed.

109.    Upon information and belief an additional proceeding, of which there is no record, occurred on July 2,2013, where Justice Hart essentially repeated the same or similar statements concerning Dr. Katz.

110.    By this time, Mr. Vozza had made it clear that Dr. Katz would not be contributing money in any amount towards a settlement. Justice Hart then demanded that Dr. Katz retire instead of providing money for the settlement. Off-the-record, Justice Hart continually pressured Dr. Katz to state on the record he would no longer practice "medical-legal" examinations, repeatedly berated Dr, Katz, stating that "his career was over."

111.    Justice Hart also persistently repeated that Dr. Katz had "lied" and the transcript was being circulated so that no one would ever hire him again.

112.    As Mr. Vozza continued to object to the court's characterization of Dr. Katz's testimony, Justice Hart made the following comments from the bench:

> Again, I will refer this, unless I don't think Dr. Katz, you
> know, we have enough problems doing trials. It is a strain on
> the system, but unless I get some sort of representation from
> you [Mr, Vozza,] on behalf of Dr. Katz that he is out of the
> medical/legal business, I am going to refer this to the
> Administrative Judge and the District Attorney of Queens
> [County [sic] so they can do whatever they want to do.
> Perjury is a D felony.

113.    When Mr. Vozza asked if he could speak with Dr. Katz, Justice Hart continued:

> I would strongly suggest that you talk to Dr. Katz. As it is,
> and I can say this because it has already been said on the
> record. He will not be doing business with Travelers or AIG
> anymore. I have a feeling that any attorney or adjuster within
> earshot or who reads this transcript will not be dealing with

Dr. Katz much anymore. It might be an easy way for him to bow out gracefully from harm's way. I would imagine that his number is not going to be called too much in the foreseeable future. It might be a nice way out.

114. After the recess, Justice Hart continued stating:

Let the record reflect that I gave Dr. Katz the option of and I would institute a special proceeding to retire from the medical/legal business. Retire at the time and he has declined. What I am now going to do, I am going to order a full transcript of everything, the trial and the subsequent proceedings. I will present that to both the administrative judge of Queens and the District Attorney. I would recommend to the District Attorney that they explore prosecuting Dr. Katz for perjury."

115. Upon information and belief, Justice Hart was allegedly contemplating a contempt hearing. Justice Hart announced in open court, but off-the-record, that he would be instituting a special proceeding under Article 4 of the CPLR and called the Supreme Court Clerk's Office to demand that someone from the office come and facilitate its filing.

116. Justice Hart stated that he would handwrite a complaint; that he would additionally serve as judge during the proceeding; that the purpose of the proceeding would be to determine whether Dr. Katz committed perjury; and that the penalty imposed would be the revocation of Dr. Katz's license to practice medicine.

117. Justice Hart offered no statutory authority supporting his threat to institute a special proceeding against Dr. Katz while acting as both complainant and judge.

118. Justice Hart continued on the record noting:

Again counsel, it is not the time so much if the doctor thinks he can explain the time. It is not the time problem. It is that there are tests that he testified to that he didn't do. That is the perjury. You might want to speak to your client again. You can interpret the entire thing however many ways you want.

22

He testified to things that didn't happen. That is a problem.
They call that perjury. Again, I am making it very clear on
the record, the insurance companies here are not going to go
near him.

I unsealed the record. Everybody from now on when he
testifies as to the tests that he performed, it is always going to
be questioned from now on. After about a month or two,
nobody is going to go near him anyway. So he is not giving
up much. What he is giving up is me referring it to the
District Attorney and to the Administrative Judge. I would
think that he wants to consider it again. Nobody is going to go
near him.

119. Upon information and belief, Justice Hart did not commence any special

proceedings or contact the District Attorney or Administrative Judge despite these threats.

120. Justice Hart later demanded to know whether Dr. Katz was continuing to perform

IME's. Upon receiving an answer in the affirmative, Justice Hart continued:

It is like a wound that is festering. Every time he does
another IME. When is it going to stop? He is making 7
figures a year doing IME's. Then he comes to my part and
lies. I will give you five more minutes. Trust me, I will go to
the Administrative Judge, not that the administrative judge or
the acting administrative judge doesn't already know about it,
but I will go to the district attorney. It is not the time.

It is that the tape shows that he didn't do the tests that he
spent a considerable amount of time talking about that he did.
That is the perjury. Yes, he didn't do the tests. It is not just
me saying it. It is not just the plaintiff saying it. The
defendants are saying it too. Does your client really think if
the insurance industry or some of the insurance companies
that hired him before when they find out he lied, do you really
think they will go near him?

As they distribute the transcript, certainly this morning's
transcript, certainly the last transcript, certainly the transcript
where his own attorney admitted that he perjured himself, but
he only perjured himself because I told him to tell the truth.

Imagine his own attorney said: Yes, he perjured himself. But he only perjured himself because I forced him to tell the truth.

121. There is nothing in the record to support Justice Hart's claims that Dr. Katz's attorneys admitted that Dr. Katz perjured himself.

122. The parties were again ordered to appear before Justice Hart on July 8, 2013. Justice Hart opened the proceeding on-the-record by saying:

Firstly, I made a prior ruling that is [a]greed to by at least one defendant that Dr. Katz lied on the stand. Again, the tape of the IME is part of the record. It has been explored ad nauseam. I don't have to go into the ruling or the findings again, but pursuant to that, defendants [ ] have asked for a new IME because of the fact that the expert that they had retained was found to have lied on the stand.

123. Justice Hart then addressed Dr. Katz's attorney directly:

Dr. Katz has already testified in this action. He has no further right to claim the 5th Amendment. If he is subpoenaed in here by any party, he must come or else he will be subject to contempt of this Court...
If they [subpoena Dr. Katz], he must come in. I don't [w]ant any games. I am telling you right now, no games. If he is subpoenaed, he will come in...

124. Justice Hart's comments about Dr. Katz alleged waiver of his 5th Amendment rights are baseless.

125. Afterwards, Justice Hart said the following, over the course of several minutes:

He lied. He lied. I would imagine to help either [the defendants] or his carrier. I don't know which one...

I caused him to commit perjury by forcing him to tell the truth. All I want him to do is have him tell the truth...
All he has to do is tell the truth...

I don't want him to testify in the future in any other trials. I am stuck with him...

24

If he comes and tells the truth, which means he would say
instead of the exam taking 10,20 minutes, it took 1 minute 56
seconds. His finding might have been shall we say
exaggerated. The amount of tests that he did might have been
somewhat exaggerated. . .
This might help a settlement of some sort, but, hey, that might
be my opinion.

126.    Justice Hart also made clear that if Dr. Katz did not come to court when

subpoenaed, that the Court would direct the "appropriate sheriff" to "help him" come to court.

127.    Justice Hart did not direct a sheriff or any other court officer to bring Dr. Katz to

Court despite this threat.

128.    Justice Hart continued:

Maybe I will have the contempt hearing here. He is denying
that he lied. He should be happy to get away with me just
saying that he lied. Let it go at that. Yes, we will have a
finding forever more that a Justice for the Supreme Court of
the state of New York said that he lied because he did it. I
would suggest you let it go at that.

129.    Justice Hart did not commence any contempt proceedings against Dr. Katz

despite this threat.

### Roles Played By The Defendants Herein

130.    As indicated herein, ExamWorks is a clearinghouse which provides insurance

companies and trial counsel for the insurance companies in negligence cases, the names and

information of physicians who can conduct IME's and testify in liability and workers'

compensation cases.

131.    Upon information and belief, ExamWorks maintains two lists, one for eligible

physicians and one under a category of "Do Not Use".

132. On the eligible list, ExamWorks indicates which physicians are available to conduct the IME and to testify on the liability and workers' compensation cases. On the "Do Not Use" list, ExamWorks notifies prospective users as to which physicians listed there were not qualified to testify for whatever reasons they may be.

133. For well over 20 years, Dr. Katz was on the ExamWorks eligible list while conducting hundreds of IME's, testifying in hundreds of liability and workers' compensation cases to clients referred to him or approved by ExamWorks, and, indeed, generating over one million dollars per year in income.

134. Upon information and belief, Travelers is ExamWorks most important and influential client fully capable and, in fact, dictating to ExamWorks terms and conditions of maintaining their relationship and directing ExamWorks to post Dr. Katz's name on the "Do Not Use List" to all existing and future prospective clients seeking the services of Dr. Katz in accordance with the plan and scheme devised herein against Dr. Katz.

135. When the fiasco developed with Justice Hart, Travelers was placed in a very precarious position. Travelers was compelled to defend its insured, IBEX, without the benefit of an IME and without the benefit of a medical expert.

136. Justice Hart had denied Travelers and its co-defendant the right to conduct another IME of the plaintiff.

137. Thus, Travelers was at the mercy of the plaintiff.

138. Travelers instead of supporting Dr. Katz and defending his position that he did not commit perjury and instead of challenging the findings of Justice Hart, succumbed to Justice Hart's intimidation and joined in trying to destroy Dr. Katz.

139. The defendants, jointly and severally, devised a plan and scheme to ruthlessly and aggressively disseminate throughout the negligence defense industry, the false and irresponsible allegations and accusations leveled against Dr. Katz by Justice Hart so that anyone and everyone in the industry knew that Dr. Katz was on the "Do Not Use List".

140. At the time that the defendants, jointly and severally, made the decision to join Justice Hart in trying to destroy Dr. Katz believing that such action would be beneficial to Travelers, Dr. Katz had on its books hundreds of scheduled IME's and scores of scheduled liability and workers' compensation cases cleared through ExamWorks.

141. The gross value of the IME examinations and the scheduled trial and workers' compensation testimony at the time that Dr. Katz was blacklisted was in excess of approximately 1.5 million dollars all of which were cancelled with the possible exception of one or two exceptions.

142. The conduct of the defendants, jointly and severally, following the lead established by Justice Hart, reduced Dr. Katz's income to virtually zero.

## The Appellate Division Decision

143. The defendants alignment against Dr. Katz following the lead of Justice Hart is most unfortunate.

144. As a result of the rulings by Justice Hart, in his incomprehensible, reckless and irresponsible false allegations against Dr. Katz, the parties in the Bermejo case took appeals.

145. By a decision dated November 18, 2015, a copy of which is annexed hereto and made a part hereof marked Exhibit "A", the Appellate Division, Second Judicial Department, wholly exonerated Dr. Katz.

146. In spite of this unanimous exoneration, the defendants, herein, jointly or severally, failed and refused to recall, recant or otherwise withdraw the vile, venomous and vicious false allegations that they so quickly circulated in July, 2013.

147. ExamWorks has not restored Dr. Katz to the eligibility list and neither defendant has issued statements to the defense industry that the Appellate Division declared Dr. Katz to be innocent of any wrongdoing.

### Defendants Could Have Mitigated Damages

148. By an Order dated November 18, 2015, the Appellate Division, Second Judicial Department totally exonerated Dr. Katz.

149. Instead of adopting the holdings of the Appellate Division and recalling the defamatory statements of Justice Hart, the defendants continued to blacklist and maintain Dr. Katz on the "Do Not Use List" maintained by ExamWorks.

150. The defendants could have reinstated Dr. Katz to the eligibility list and could have restored his reputation with the defense industry.

151. In spite of the ability and opportunity to do so, the defendants continued to list Dr. Katz on the "Do Not Use List" to the date of these presents.

### AS AND FOR A FIRST CAUSE OF ACTION
#### (Tortious Interference with Contract)

152. Plaintiffs repeat, reiterate and reallege each and every allegation heretofore had herein contained in paragraphs "1" through "151" with the same force and effect as if fully set forth at length herein.

153. On or about July 15, 2013, Justice Hart declared a mistrial in the Bermejo case.

154. The defendants, jointly and severally, entered into a plan and scheme to follow the lead established by Justice Hart and to destroy the career, reputation and contractual rights and interests of Dr. Katz.

155. In furtherance of that scheme and plan, the defendants, jointly and severally, instead of quietly and gradually phasing Dr. Katz's services out of participation in IME and workers' compensation programs, wilfully, deliberately and maliciously extensively transmitted and disseminated throughout the entire negligence defense industry, the vile, reckless and irresponsible allegations and accusations made by Justice Hart.

156. The information clearly and unequivocally indicated that Dr. Katz was no longer eligible to conduct IME's or to testify in negligence case or on workers' compensation cases and was on the "Do Not Use List".

157. The defendants were aware of and knew who had engaged Dr. Katz to conduct IME reports and who had engaged to Dr. Katz to testify at either a liability or workers' compensation trial.

158. Immediately upon the dissemination of the information, hundreds of scheduled IME's were cancelled and scores of appointments for schedule testimony were terminated.

159. Virtually every scheduled appointment for an IME's and for testimony was cancelled.

160. Plaintiffs' contracts with insurance carriers and third party independent medical companies were economically and materially valuable.

161. Virtually all insurance carriers and third party independent medical companies immediately terminated and/or suspended their contractual relationships with Plaintiffs based on the false and misleading statements made by the defendants herein.

162. Plaintiffs have been unable obtain the full benefit and advantage of their existing contracts and/or renew such contracts based on defendants' false and misleading statements.

163. As a direct consequence of the false and misleading statements made by defendants, as set forth more fully above, Dr. Katz has been unable to work as an expert witness as contemplated by Plaintiffs numerous contractual relationships with insurance carriers and third party independent medical examination companies .

164. Plaintiffs allege that but for defendants' false and misleading statements as set forth more fully above, Plaintiffs would have benefitted from their ongoing contractual relationships with the insurance carriers and third party independent medical examination companies.

165. The intentional, malicious and wrongful acts of defendants include, but are not limited to false statements and misrepresentations concerning civil and criminal proceedings commenced against Dr. Katz and his suitability as an expert witness.

166. Upon information and belief, defendants were at all times acting on behalf of, or at the direction of, or in active participation with each other, who are jointly and severally liable for the tortious conduct described herein.

167. Plaintiffs have been damaged by defendants' tortious interference with their existing contracts in an amount to be determined at trial but in no event less than $10,000,000.

168.   In addition, because defendants' tortious interference was willful, wanton and malicious, Plaintiffs should be awarded punitive damages as determined at trial but in no even less than $30,000,000.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Tortious Interference with Business Advantage)

169.   Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "151" with the same force and effect as if fully set forth at length herein.

170.   Defendants were aware, based on their experience with the insurance defense industry and with Plaintiff, that Plaintiffs had substantial business relationships with insurance carriers and third party independent medical examination companies as set forth more fully above.

171.   Plaintiffs' relationships with insurance carriers and third party independent medical examination companies were economically and materially valuable.

172.   Defendants knowingly, maliciously and intentionally interfered with Plaintiffs' business relationships with the insurance carriers and third party independent medical examination companies solely out of malice, or alternatively, by using dishonest, unfair or improper means to interfere with those business relationships.

173.   Defendants' interference caused injury and the termination of to the relationship between Plaintiffs and the insurance carriers and third party independent medical examination companies all of whom were and are known to the defendants by virtue of the lists maintained by ExamWorks.

174. As a direct consequence of defendants' interference, Dr. Katz has been unable to work as an expert witness despite Plaintiffs long standing relationship with insurance carriers and third party independent medical examination companies and has been denied assignments in hundreds of cases from the insurance carriers who had been employing Dr. Katz for 20 to 25 years.

175. Upon information and belief, defendants were at all times acting on behalf of, or at the direction of, or in active participation of each other which is jointly and severally liable for the tortious conduct described herein.

176. Plaintiffs' have been damaged by defendants' tortious interference with long standing business relationship in an amount to be determined at trial but in no event less than $10,000,000.

177. In addition, because defendants' tortious interference was willful, wanton and malicious, Plaintiffs should be awarded punitive damages as determined at trial but in no even less than $30,000,000.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Prima Facie Tort)

178. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs "1" through " 151" with the same force and effect as if fully set forth at length herein.

179. Defendants intentionally inflicted harm on Plaintiffs as described above without excuse or justification by their acts of abuse and harassment and by maliciously publishing defamatory, false and derogatory statements about Dr. Katz.

180. Defendants knowingly and intentionally set out to destroy Dr. Katz's career as a defense expert as set forth more fully above.

181. Defendants' actions were willful, malicious and were taken without any reasonable cause or justification.

182. Defendants took such actions with the deliberate intent of injuring Plaintiffs.

183. As a direct result of defendants' conduct, Dr. Katz's lucrative career as an expert witness has been destroyed and Plaintiffs have suffered damages including but not limited to special damages consisting of not only termination of existing assignments but black listing Dr. Katz and preventing insurance companies and independent defendants from employing his services in future cases as they had been doing from 20 to 25 years and reduction of income to virtually zero from at least one million dollars annually.

184. Upon information and belief, defendants were at all times acting on behalf of, or at the direction of, or in active participation with each other, who are jointly and severally liable for the tortious conduct described herein.

185. Plaintiffs have been damaged by defendants' tortious conduct in an amount to be determined at trial but in no event less than $10,000,000.

186. In addition, because defendants' tortious interference was willful, wanton and malicious, Plaintiffs should be awarded punitive damages as determined at trial but in no even less than $30,000,000.

### AS AND FOR A THIRD CAUSE OF ACTION AGAINST
### TRAVELERS A/K/A TRAVELERS INSURANCE COMPANY A/K/A
### TRAVELERS COMPANIES, INC.
#### (Breach of Contract)

187.    That heretofore and on  April 12, 2013, April 15, 2013, April 16, 2013, June 12,

2013, July 1, 2013 and July 8, 2013, Dr. Katz was engaged by the defendant, Travelers to

conduct IME examinations and to testify in various trials being defended by Travelers.

188.    That fees generated for such services rendered and testimony given was $93,000

no part of which as been paid, although payment has been duly demanded.

189    That by virtue of the foregoing, the plaintiff is entitled to judgment against

Travelers in the sum of $93,000 with interest thereon, or what is appropriate.

**WHEREFORE,** Plaintiff demands judgment on the First Cause of Action against the

defendants, jointly and severally, in a compensatory sum of not less than $10,000,000  in

punitive damages in a sum of not less than $30,000,000 for such other sum or sums that may be

determined at the trial of this action; on the Second Cause of Action in a sum of not less than

$10,000,000 in compensatory damages and not less than $30,000,000 in punitive damages or

such sum or sums that may be ultimately determined at the trial of this action; on the Third Cause

of Action in the sum of not less than $10,000,000 in compensatory damages and not less than

$30,000,000 in punitive damages or such other sum or sums as may be determined by the

triers of fact; on the Fourth Cause of Action against the defendant, Travelers a/k/a Travelers

Insurance Company, a/k/a The Travelers Companies, Inc., in the sum of $93,000, together with

together with interest thereon and the costs and disbursements of this action.

                                        ZISHOLTZ & ZISHOLTZ, LLP

                                By: _____
                                        Gerald Zisholtz
                                        Attorneys for Plaintiffs
                                        Office & P. O. Address
                                        170 Old Country Road, Suite 300
                                        Mineola, New York 11501
                                        (516) 741-2200

md
W:\Katz, Michael\FINAL VERSION.2.wpd

35

# VERIFICATION

STATE OF NEW YORK     )
                             ss.:
COUNTY OF NASSAU     )

       Michael Katz, being duly sworn, deposes and says that deponent is the Plaintiff in the within action; that deponent has read the foregoing Complaint and knows the contents thereof, and that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters deponent believes them to be true.

                                            _____
                                          Michael Katz

Sworn to before me this
2? day of June, 2016

_____
  -Notary Public

GERALD ZISHOLTZ
Notary Public, State of New York
No. 30-9808500
Qualified in Nassau County
Commission Expires Oct. 31,

GERALD ZISHOLTZ
Notary Public, State of New York
No. 30-9808500
Qualified in Nassau County
Commission Expires Oct. 31,

# EXHIBIT A

135 A.D.3d 116

Supreme Court, Appellate Division,
Second Department, New York.

Manuel BERMEJO, respondent,

v.

NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION, et al., defendants, Ibex
Construction, LLC, et al., appellants (and
another action and third-party actions).

Nov. 18, 2015.

## Synopsis

**Background:** Personal injury action was brought, and mistrial was declared during trial on damages after plaintiff's counsel revealed for the first time, during redirect examination of his own paralegal, that he had surreptitiously videotaped an independent medical examination (IME) of the plaintiff. The Supreme Court, Queens County, Duane A. Hart, J., denied defendants' motions for leave to have plaintiff undergo an additional IME, for an award of costs against plaintiff's counsel, and to have plaintiff's counsel disqualified. Defendants appealed.

**Holdings:** The Supreme Court, Appellate Division, Roman, J., held that:

[1] unusual and unanticipated circumstances justified additional IME;

[2] plaintiff's counsel was required to obtain court's permission to videotape the IME;

[3] plaintiff's counsel was required to disclose the videotape to defense counsel;

[4] conduct of plaintiff's counsel supported award of costs for defendants; and

[5] disqualification of plaintiff's counsel was not warranted.

Reversed and remitted.

## West Headnotes (10)

**[1]** **Damages**
⬤ Necessity for examination and grounds of objection

If a plaintiff's physical condition is in controversy, the defendant may require the plaintiff to submit to a physical examination. McKinney's CPLR 3121.

Cases that cite this headnote

**[2]** **Damages**
⬤ Successive examinations

There is no restriction limiting the number of examinations to which a party in a personal injury action may be subjected, and a subsequent examination is permissible provided the party seeking the examination demonstrates the necessity for it. McKinney's CPLR 3121.

Cases that cite this headnote

**[3]** **Damages**
⬤ Successive examinations

After a note of issue has been filed in a personal injury action, a defendant must demonstrate that unusual and unanticipated circumstances developed subsequent to the filing of the note of issue to justify an additional medical examination of the plaintiff. McKinney's CPLR 3121; N.Y.Ct.Rules, § 202.21.

Cases that cite this headnote

**[4]** **Damages**
⬤ Successive examinations

Unusual and unanticipated circumstances justified an additional independent medical examination (IME) of plaintiff in personal injury action, where plaintiff's counsel secretly recorded IME without permission from trial court or disclosure to defense counsel, the recording was brought to court's attention only after paralegal's visible reaction to testimony of defendant's medical expert in presence of jury,

trial court interfered with cross-examination of expert, resulting in testimony regarding length of IME that court mistakenly characterized as perjury, and court repeatedly threatened to recommend that expert be prosecuted for perjury and to end his career performing IMEs, leading to expert's refusal to voluntarily testify before the court at a retrial. McKinney's CPLR 3101(i), 3121; N.Y.Ct.Rules, § 202.21.

Cases that cite this headnote

[5] **Pretrial Procedure**
    ⇐ Proceedings, order, and examination
A plaintiff will normally be entitled to have his or her attorney present at an independent medical examination (IME), but permission to employ the additional measure of videotaping the examination will be granted only where the plaintiff establishes the existence of special and unusual circumstances. McKinney's CPLR 3121; N.Y.Ct.Rules, § 202.21.

Cases that cite this headnote

[6] **Pretrial Procedure**
    ⇐ Proceedings, order, and examination
Failure of plaintiff's counsel in personal injury action to seek and obtain trial court's permission to videotape independent medical examination (IME) of plaintiff was sufficient reason to prohibit the use of the recording at trial; surreptitious videotaping of IMEs, without court approval or even notice to the court or opposing counsel, was not appropriate, and plaintiff's contention that he was recording the examination to protect himself from false attacks by the defendant's expert was belied by the fact that he did seek to utilize the recording at trial to attack the exam's validity and effectiveness. McKinney's CPLR 3121; N.Y.Ct.Rules, § 202.21.

Cases that cite this headnote

[7] **Pretrial Procedure**
    ⇐ Proceedings, order, and examination
**Pretrial Procedure**

⇐ Failure to submit to examination; sanctions

Failure of plaintiff's counsel in personal injury action to disclose videotape depicting plaintiff's independent medical examination (IME) to defense counsel violated statute directing full disclosure of any recordings involving a party; even if video was made with the intent to record defendant's medical expert, the plaintiff was the person being examined and was the individual who was most prominently depicted in the recording. McKinney's CPLR 3101(i).

Cases that cite this headnote

[8] **Pretrial Procedure**
    ⇐ Photographs; X rays; sound recordings
Statute governing disclosure of films, photographs, video tapes, or audio tapes involving a party to litigation requires full disclosure, without regard to whether the party in possession of the recording intends to use it at trial. McKinney's CPLR 3101(i).

Cases that cite this headnote

[9] **Attorney and Client**
    ⇐ Liability for costs; sanctions
Conduct of plaintiff's counsel in personal injury action, in surreptitiously recording independent medical examination (IME) of plaintiff without providing any notice to trial court or defense counsel, constituted frivolous conduct supporting defendants' motions for award of costs against plaintiff's counsel; mistrial in case would not have occurred if plaintiff's counsel had obtained approval, or at least provided notice, of the videotaping, plaintiff's counsel chose to reveal the existence of the recording to the jury in a way that maximized its dramatic effect, and mistrial was not caused by defense expert's testimony on cross-examination, as he did not lie, and even if he did, that act was not the proximate cause of the mistrial. McKinney's CPLR 3101(i); N.Y.Ct.Rules, § 130–1.1.

Cases that cite this headnote

[10]  **Attorney and Client**

⟜ Acting in different capacities; counsel as witness

Disqualification of plaintiff's counsel with respect to retrial of personal injury action, based on the premise that he would be required to authenticate recording he made of plaintiff's independent medical examination (IME), was not warranted in light of determination that the recording was inadmissible; even if plaintiff could still provide adequate notice of the recording in time for a retrial, the fact that it was improperly made in the first instance would require its exclusion from evidence. McKinney's CPLR 3101(i).

Cases that cite this headnote

**Attorneys and Law Firms**

**80 Andrea G. Sawyers (Shaub, Ahmuty, Citrin & Spratt, LLP, Lake Success, N.Y. [Timothy R. Capowski and Deirdre E. Tracey], of counsel), for appellant Ibex Construction, LLC.

London Fischer, LLP, New York, N.Y. (Richard L. Mendelsohn of counsel), for appellant Amsterdam & 76th Associates, LLC.

Constantinidis & Associates, P.C. (Lynn, Gartner, Dunne & Covello, LLP, Mineola, N.Y. [Joseph Covello and Kenneth L. Gartner], of counsel), for respondent.

WILLIAM F. MASTRO, J.P., SHERI S. ROMAN, ROBERT J. MILLER, and JOSEPH J. MALTESE, JJ.

**Opinion**

ROMAN, J.

*118 Prior to the trial on the issue of damages in this personal *119 injury action, the plaintiff's trial attorney surreptitiously videotaped an independent medical examination (hereinafter IME) conducted by an orthopedist retained by the defendant Ibex Construction, LLC (hereinafter Ibex). The attorney failed to disclose the existence of that recording to defense counsel, and then revealed its existence for the first time at trial, during redirect examination of his own paralegal, who took the witness stand to testify as to the

brevity of the orthopedist's examination of the plaintiff. This resulted in the declaration of a mistrial, and the orthopedist subsequently declared that he was not willing to testify at the new trial. Since Ibex and the defendant Amsterdam & 76th Associates, LLC (hereinafter Amsterdam, and together the appellants), would be required to serve a subpoena upon the orthopedist to secure his testimony at the new trial, they separately moved, inter alia, for leave to have **81 the plaintiff re-examined by an orthopedist of their own choosing, and for an award of costs against plaintiff's counsel pursuant to 22 NYCRR 130–1.1. Justice Duane A. Hart of the Supreme Court, Queens County, denied those branches of the appellants' separate motions.

These appeals require us to determine whether a plaintiff's attorney must obtain approval from the court before making a video recording of an IME of the plaintiff, and whether CPLR 3101 requires that such a recording be disclosed to opposing counsel before trial. We answer both questions in the affirmative. We further conclude that the declaration of a mistrial in this case was attributable to the conduct of the plaintiff's trial attorney. Moreover, we find that the orthopedist was unwilling to testify voluntarily at the new trial because of that conduct and because the Supreme Court repeatedly, without any basis in fact, accused the orthopedist of lying during his cross-examination. The court also repeatedly threatened to recommend that the District Attorney's office prosecute the orthopedist for perjury. Accordingly, those branches of the appellants' separate motions which were for leave to have the plaintiff re-examined by an orthopedist of their own choosing and for an award of costs against plaintiff's counsel pursuant to 22 NYCRR 130–1.1 should have been granted, and we remit the matter to the Supreme Court, Queens County, before a different Justice, for further proceedings consistent herewith.

*Background*

The plaintiff, Manuel Bermejo, commenced the underlying action to recover damages for personal injuries sustained by him when he fell from a scaffold at a construction site located *120 at premises owned by Amsterdam. Ibex was the general contractor for the construction project. The plaintiff was awarded summary judgment against the appellants on the issue of liability on the cause of action alleging a violation of Labor Law § 240.

Prior to the trial on the issue of damages, Ibex retained an orthopedic physician, Michael J. Katz, who conducted an IME of the plaintiff in May 2011. The plaintiff was

accompanied at the IME by his trial attorney, Patrick J. Hackett, who was of counsel to Constantinidis & Associates, the law firm representing the plaintiff, as well as Yury Ramirez, a paralegal employed by Constantinidis & Associates, who served as a Spanish language interpreter for the plaintiff. In the report he prepared after conducting the IME, Dr. Katz noted that "[t]he evaluation took place between the hours of 6:00 p.m. and 6:45 p.m." Dr. Katz interviewed the plaintiff, took various measurements, examined his lumbosacral spine and his right foot and ankle, and reviewed approximately 30 medical reports relating to the plaintiff generated by various physicians since the time of his accident. Dr. Katz's report stated that Mr. Hackett "had a series of nasty outbursts regarding the history of this injury." The report asserted that Mr. Hackett refused to allow the plaintiff to answer any questions relating to the happening of the accident, the medical treatment he received afterward, or his present complaints, and instead advised Dr. Katz, among other things, that he should get the information from defense counsel. The report also contained the following comments:

> "Mr. Hackett presented quite a nasty and obstructive front toward getting a proper history .... Mr. Hackett just became nastier as questions were asked. ... It is highly unusual for an individual's attorney to behave as Mr. Hackett did in order to mislead the examiner and try to get them [sic] to believe that these changes were acute and not chronic."

**\*\*82** In March 2013, after surgery on the plaintiff's shoulder, Dr. Katz performed a second IME, which focused on the plaintiff's shoulder. Once again, Mr. Hackett and Ms. Ramirez were with the plaintiff in the examining room.

In April 2013, the damages trial commenced in the Supreme Court. The plaintiff was represented at the trial by Mr. Hackett and Gus J. Constantinidis, and Ms. Ramirez was also present in the courtroom. Ibex was represented by Michael T. Reilly, **\*121** and Amsterdam was represented by Richard L. Mendelsohn. Dr. Katz testified regarding the IMEs he performed and the findings he made. During his direct examination by Mr. Reilly, the proceedings were interrupted. Although the transcript of that portion of the proceedings does not reflect exactly what occurred, it appears, based on subsequent colloquy, that Ms. Ramirez had a visible reaction to certain testimony given by Dr. Katz. What the transcript does reflect is the following exchange [1]:

"Q: We're talking about the first examination, Doctor. How long did that first examination of Mr. Bermejo take in May of 2011?

"A: 45 minutes.

"Q: Could you describe the examination that was done?

"A: First a history done.

"THE COURT: Excuse me. Send the jury out.

"(Whereupon the jury exited the courtroom and the following occurred)

"THE COURT: Doctor, step out.

"(Witness complies)

"THE COURT: Everybody be seated. In the spirit of the witness' stay outside, I observed something. Mr. Hackett, Mr. Constantinidis, speak to your office person because she may be a potential witness. You could speak to her here, as long as you speak to her, because I have a feeling you are going to call her.

"(Short pause)

"THE COURT: Do you need me to explain what I just did?

"MR. HACKETT: Yes, that would be—

"THE COURT: It appears that, and because, you know, the jury is supposed to observe everything **\*122** that goes on in the courtroom. The young lady's name is Gina [Yury]?"

...

"THE COURT: Uri [sic]. She was the person who took Mr. Bermejo to see the doctor on at least one occasion?

"MR. HACKETT: Both.

"MR. CONSTANTINIDIS: Both occasions.

"THE COURT: She was—she might differ as to some of the testimony of the doctor, fair statement?

"MR. HACKETT: Yes, your Honor.

"THE COURT: That's why. I now, based upon what I observed, I have now-and you plan to call her, I would imagine?

"MR. HACKETT: I do believe I will be doing that, your Honor.

"THE COURT: Bring the jury back in. Get the doctor first.

"MR. REILLY: We have no notice of a witness like that, so I would just object at this point.

"THE COURT: Again—

"MR. HACKETT: It would be in the way of rebuttal, your Honor.

"THE COURT: Okay."[2]

**\*\*83** The direct examination of Dr. Katz then resumed, and was completed. During the cross-examination of Dr. Katz by Mr. Hackett, the testimony that lies at the heart of the controversy presented on these appeals was given. Dr. Katz was questioned as follows:

"Q: Doctor, on that first exam I believe you said you took 45 minutes; is that correct?

"A: Right.

**\*123** "Q: And on that second exam of the shoulder[,] how long did that take?

"A: That's uncertain.

"Q: Uncertain?

"A: I don't think I have a record. I don't think I have it recorded, no. I don't think it's recorded.

"Q: Or would you say it's more or less than 30 minutes?

"A: I don't really recall at this point.

"Q: Well, how long do you have a custom and practice when you're doing a shoulder exam as to how long you generally take?

"A: I don't really have, you know, an allocated time.

"Q: Well, would you believe in at least your experience that it would be more or less than 15 minutes?

"A: Quite frankly, I don't know.

"THE COURT: Excuse me, Doctor, I cannot accept an I don't know. You have been doing this for awhile. I will have to insist on what your custom and practice would be as to what type of, the length of an exam of this type.

"THE WITNESS: I think in the range of between ten and 20 minutes would be appropriate."

After Dr. Katz's testimony was concluded, Mr. Hackett called Ms. Ramirez as a witness. With regard to the first IME of the plaintiff, Ms. Ramirez was asked how much time transpired "from the time that Dr. Katz came into the room until Dr. Katz left the room," and she responded: "About ten minutes." According to Ms. Ramirez, several minutes were consumed by arguments between Mr. Hackett and Dr. Katz, and then the plaintiff "was examined. It was about three minutes or four minutes tops." When asked whether she recalled anything else about that IME, Ms. Ramirez testified: "I don't recall the details. I just know that he examined his foot. I'm not sure but I believe he examined his back. I'm not really sure. I can't tell you." With regard to the second IME, Ms. Ramirez testified as follows:

**\*124** "Q: And how long did that exam take?

"A: The actual exam was three minutes. The total evaluation was like five.

"Q: And how do you know that it was three minutes?

"A: I pretty much timed it.

"Q: And how did you time it?

"A: With my phone."

On cross-examination, Ms. Ramirez admitted that, when she attended the first IME, she was not present when Dr. Katz was reading the plaintiff's medical records, so she did not know "how long he spent reviewing any records or anything like that." No questions regarding the duration of the second IME were asked of Ms. Ramirez on cross-examination.

When the cross-examination of Ms. Ramirez concluded, Mr. Hackett stated that he had "[j]ust one" question to ask on redirect examination. That questioning proceeded as follows:

**\*\*84** "Q: [O]ther than using your phone to determine how much time Dr. Katz spent on the second exam[,] do you have any other information regarding how long that took?

"A: Yes.

"Q: And what is that?

"A: A video.

"Q: A video of the examination?

"A: Yes.

"MR. REILLY: Your Honor, objection."

At that point, the Supreme Court excused the jurors and sent them home for the weekend. The court asked Mr. Hackett when he had provided notice of the video to defense counsel, and Mr. Hackett responded: "We didn't because there's no need to do that, your Honor." Mr. Reilly moved for a mistrial, and Mr. Mendelsohn joined in that motion. The court directed Ms. Ramirez to return to the witness stand, and the following colloquy ensued:

**\*125** "THE COURT: Okay and for the record you're saying that you took this video?

"THE WITNESS: I didn't.

"THE COURT: Who took the video?

"MR. HACKETT: I did, your Honor."

The Supreme Court advised Mr. Hackett that "there is a prohibition from you acting as a witness or becoming a witness that I tried to skirt and that's a problem and the person who can certify that video is you Mr. Hackett." Mr. Hackett responded that the video could "be certified by itself because it's going to be clear the parties who are in the video[,] it's going to be clear it's a video of Mr. Bermejo and ... if it needs any other certification[,] to be done by Ms. Ramirez." Mr. Hackett further stated: "we frankly weren't intending to use it except when the doctor got on the stand and said that his examination [was] 20 minutes long when it clearly was not, then that became a situation."

The Supreme Court directed the attorneys to appear on the next business day to present arguments as to whether a mistrial should be declared. The court characterized the matter as "an issue of first impression," and remarked that:

"The specific packaging of this[,] well[,] publishing in this manner to the jury was surprising to say the least that while the witness who was a member of the plaintiff's law office blurted out in a planned manner that there was a tape of this. Notwithstanding there is a continuing order signed by both parties in our preliminary [conference] order .... There is a requirement not of the discovery but of disclosure that if you got a recording you've got to give it up[,] not when you're asked for it[,] without being asked for it."

When Mr. Hackett argued that disclosure of the video recording was not required in this case because "there was not a determination as to whether or not we were going to use it," the Supreme Court responded: "That's not your call .... [T]hat's my call .... If you got the tape it's—that's why we distinguish between disclosure and discovery. They don't know you have it so they don't know to ask for it."

The parties submitted memoranda of law addressing the appellants' motion for a mistrial. In support of their motion, the **\*126** appellants argued that a mistrial was necessitated by Mr. Hackett's misconduct in surreptitiously making a video recording of the second IME. Specifically, the appellants contended that Mr. Hackett failed to provide defense counsel with notice of the recording of the IME pursuant to CPLR 3121, failed to seek leave of the trial court to record the IME, failed to disclose a recording involving a party as **\*\*85** was required under both CPLR 3101(i) and the preliminary conference order, engaged in "an impermissible back-door attempt to introduce an otherwise impermissible day-in-the-life video," converted himself into a potential witness in violation of rule 3.7 of the Rules of Professional Conduct (22 NYCRR 1200.0), violated rule 8.4(c) of the Rules of Professional Conduct (22 NYCRR 1200.0) prohibiting attorney conduct involving "dishonesty, deceit, fraud or misrepresentation," and caused unfair prejudice to the appellants by purposefully eliciting the existence of the inadmissible video recording, which could not be remedied by any curative instruction. In opposition to the appellants' motion, Mr. Hackett argued that there was no obligation to disclose the video recording because it was a recording of a nonparty, Dr. Katz. Mr. Hackett also argued there was no obligation to disclose the recording because he

had no intention of using it until Dr. Katz "lied on the stand about the amount of time the physical examination took." Mr. Hackett further argued that the recording constituted work product, and was not introduced as evidence in chief. Mr. Hackett explained that he was motivated to record the second IME after Dr. Katz's first IME report was issued, which contained various untrue accusations that Mr. Hackett had engaged in obstructionist behavior during the examination.

When the parties appeared before the Supreme Court to present arguments on the mistrial motion, the court made the following statement:

> "Under Section 3101 ... the tape should have been turned over .... All tapes are supposed to be turned over. The question is, who caused the problem? Is it the plaintiff for not turning over the tape? Is it the defendants for hiring this doctor in the first place who evidently, if the tape are to be believed[,] and I don't know if they're to be believed[,] conducting an examination that didn't last the length of what he said it was supposed to last, it was shorter than it was and that might put into *127 question the first examination that he said lasted 45 minutes? Or was it the doctor who, if you are to believe the tape conducting an examination that was short of what the tape indicates? Who caused the mistrial? Was it one or two or three? My belief is all three parties caused the mistrial. All three caused the mistrial."

The Supreme Court then encouraged the parties to avoid the need for a new trial by settling the case. Addressing itself first to the appellants' attorneys, the court stated that

> "all discovery is over[,] you are now stuck with this doctor even in a retrial. You are stuck with this doctor. You, the plaintiffs, are stuck in a retrial with the cost of bringing the case. The other parties have associated issues of time and costs that now cause a problem. So the question is, do you want to settle it? I would suggest, and that's why everybody's here and even if the doctor

wants to contribute because clearly, and I believe I left a message with you that the doctor should come by with his own attorney .... I'm not letting the doctor take the stand again unless he has counsel. The doctor's career doing IMEs might be over. If he gets caught in a lie on something that's material at trial his future use to anyone is useless, correct? That will follow the doctor forever .... So, this is truly a pox on everybody's house because ... unless you can figure out a way to settle it I will declare the mistrial and post mistrial I will have a sanctions hearing and I will, Doctor, be turning the record over to the district attorney. So, you got a choice. You **86 can collectively get yourselves out of this problem or I will do what I will do."

The Supreme Court then called a recess, and when the parties returned to the courtroom, the court advised Dr. Katz as follows:

> "I suggest you not say anything until you are dealing with an attorney .... I would strongly suggest you not do anything because you're in more trouble than you think. It's probably that your career doing IMEs is over. It's possible, unless this case is settled, that I might be taking more—the attorneys have a duty basically not to do anything with *128 regards to the district attorney. If I find out or if I even suspect something is going on I have a duty to get in touch with the district attorney[,] and getting in touch with the district attorney is not a good thing for you in this case. Is that understood?"

After another recess, Mr. Reilly asked the court to reconsider allowing the appellants to have another IME performed by a different orthopedist, in light of the "exceptional circumstance" presented in this case, but the court declined to do so. After the court ascertained that David Vozza,

an attorney representing Dr. Katz, was now present in the courtroom, the following exchange occurred:

"THE COURT: Counsel, is it likely that based upon the little you know about [,] you would let your client continue to offer testimony in this trial?

"MR. VOZZA: Absolutely not, Judge.

...

"THE COURT: But I could declare a mistrial and if the mistrial—like I said, you still have this doctor who will now not testify. The plaintiff—I'm not going to say the plaintiff didn't do anything wrong because the plaintiff shouldn't have taped the IME firstly and then if they taped the IME they should have told the defendant that they [taped] the IME and the doctor shouldn't [have] lied about the length of the IME to cause the plaintiff to come up with the tape of the IME."

Mr. Reilly and Mr. Mendelsohn both made additional arguments as to why the appellants should be permitted to have a new IME conducted by a different doctor. They also made an application to disqualify Mr. Hackett and Constantinidis & Associates as counsel for the plaintiff, on the ground that Mr. Hackett, as the person who had made the recording, was now a potential witness. Thereafter, the Supreme Court, addressing itself first to Mr. Vozza, stated:

"I think it would be prudent again, Counsel, if for you to explore Dr. Katz participation in future court matters whether they be workers comp, whether they be in this building or any other building where somebody has to take an oath .... I'm going to second call this while you figure out how you can settle this case so I can seal this record so that I don't have to send things over to the district attorney, *129 so that I don't have to remove counsel from this case, so that the defendant isn't put in a position where they have to go forward on the RSD case with no orthopedist and so the disclaiming carrier for the third-party defendant isn't caught holding a three to six million dollar bag .... They can all happen in this case. Parties can

be sanctioned, people can go to jail. Am I making it up? No."

The matter was adjourned to the following day, and when Mr. Vozza asked whether Dr. Katz's appearance would be necessary, the Supreme Court responded:

"I would think you and the doctor would be the first ones to open up this building in the morning ... [b]ecause, again, I **87 am not making the determination at this point if he is lying or not[,] but if someone determines that the doctor was lying or if I think that there is a hint that he was lying [,] I'm going to be the least of his problems. My friends in my former office in the district attorney[,] they might have a conversation with you, Counsel, his malpractice carrier will have a conversation, the State Department of Health would have a conversation with him, the other the defendants would have a conversation with him[,] and I don't think any of these conversations are going to be beneficial to him."

After settlement negotiations proved unsuccessful, the Supreme Court granted the motion for a mistrial and advised the jury that it was declaring a mistrial. After excusing the jury, the court announced: "I'm also scheduling a sanctions hearing against plaintiff's law firm or plaintiff's counsel, the defendants and the carriers for hiring Dr. Katz[,] and Dr. Katz." The court noted that it would "vacate the sanctions and the trial date" if the case were settled that day. The case was not settled that day.

The appellants subsequently filed separate written motions seeking (1) a re-examination of the plaintiff by an orthopedist designated by the appellants, (2) to direct plaintiff's counsel to pay the costs incurred by the appellants for the first trial, (3) to disqualify Mr. Hackett and Constantinidis & Associates as counsel for the plaintiff, and (4) to quash certain subpoenas duces tecum served by the plaintiff after the mistrial was declared upon Dr. Katz and another physician retained by the appellants.

**\*130** In support of their motions, the appellants argued, among other things, that, due to the misconduct of plaintiff's counsel, Dr. Katz now refused to testify voluntarily at a retrial, thereby making him a hostile witness to the defense and requiring the appellants to serve him with a subpoena in order to obtain his testimony. In a supporting affirmation, an attorney for Ibex averred that he had been advised by Dr. Katz and Mr. Vozza that Dr. Katz "would not voluntarily testify before Your Honor" at a retrial. The appellants further argued that, since the mistrial was necessitated by the misconduct of plaintiff's attorneys, those attorneys should be required to pay the costs incurred by the appellants in the first trial, and that, since Mr. Hackett had made himself a potential witness in the case by making the video recording, he and the law firm should be disqualified as counsel for the plaintiff under the advocate-witness rule.

In opposition to the appellants' motion, the plaintiff argued, among other things, that "the issues before the court arose as a result of the perjury by Dr. Katz on the witness stand." The plaintiff reasoned that "[i]t is Dr. Katz' [s] behavior, specifically lying to this court and jury[,] that necessitated the questioning pertaining to the digital recording at trial." In an affirmation submitted in opposition to the appellants' motions, Mr. Hackett asserted that: "I had never used [my] iPhone to record a physical examination in the past. However, I think that in the future, it would be an appropriate tool to see if an examining doctor is truthful." Mr. Hackett further averred that:

> "During the break before [Ms. Ramirez] testified, Gus Constantinidis and myself called four different prominent trial attorneys to discuss the situation. Each one of them advised us that we did not need to exchange the digital recording and that it was absolutely appropriate to use the digital recording as rebuttal evidence. Two of the attorneys actually stated that I had a duty to use the digital recording to expose Dr. Katz as a **\*\*88** liar and to do otherwise would have been an abrogation of my duties as an officer of the court."

The Supreme Court conducted a hearing on the appellants' motions on multiple dates in June and July 2013. At the outset of the hearing, the court asserted that: "During the trial ... it was determined that the expert witness, one Dr. Katz, lied about a material fact, i.e., the length of his second IME, which **\*131** was recorded by plaintiff's counsel Mr. Hackett, not disclosed, but it basically required that I declare a mistrial." When Mr. Mendelsohn argued that the events that led to the mistrial were set in motion by Mr. Hackett's improper recording of the second IME, the court responded: "And what is the bigger problem? Mr. Hackett's recording or your witness lying his whatever off?" The court later remarked that "nothing beats a witness getting caught red-handed in an out-and-out lie. Always always everybody's favorite." At that point, the following exchange took place between the court and Sean P. Lenihan, of Mr. Vozza's office, who was appearing for Dr. Katz:

"MR. LENIHAN: Your Honor, if I may, the characterization of Dr. Katz's testimony as an outright lie I think is unfair.

"THE COURT: I'm sorry, when did you learn how to tell time?

"MR. LENIHAN: Your Honor, I reviewed the—

"THE COURT: When did you learn that a minute fifty-six is nowhere near ten minutes?

"MR. LENIHAN: Well, with respect to the—I reviewed the videos before I came today.

"THE COURT: Yeah, how long is it?

"MR. LENIHAN: It lasted five minutes. So I don't know where the minute fifty-six came, and he testified—

"THE COURT: Okay, so let's go with five minutes. Where does five minutes come close to twenty minutes?

"MR. LENIHAN: He testified—after he originally testified, your Honor, he did not know, he did not remember, your Honor was not satisfied with that and wouldn't let that go. You pressed him to give an answer.

"THE COURT: Because he—Counsel, because he was specific as to what he did.

"MR. LENIHAN: That's true.

"THE COURT: And he gave a laundry list of tests that he did that would have taken more than two **\*132** minutes, it would have taken more than five minutes, and that the paralegal said didn't happen; is that correct?

"MR. HACKETT: (Indicating.)

"MR. LENIHAN: All I'm saying, your Honor, is that he testified—

"THE COURT: Excuse me. Did he perform those tests in whatever time he did that he testified to? No.

"MR. LENIHAN: Was the doctor asked that on the record?

"THE COURT: Yes. No.

...

"MR. LENIHAN: He estimated ten to fifteen minutes; it was actually five.

"THE COURT: Then let me replace the lie with the length of his examination with what he did in his examination. Oh, that gets him off the list.

"MR. LENIHAN: With respect to your characterization of it as a lie, I think it's unfair. When he originally when asked said I don't remember, so now you're forcing him to create an answer that he doesn't have a memory of. He had no memory of it.

"THE COURT: Counsel, he's a witness. He's specific as to what tests he performed.

**89 "MR. LENIHAN: If anything, you forced him to perjure himself, if you're going to characterize it.

"THE COURT: By asking him what happened?

...

"MR. LENIHAN: When asked the question, your Honor, he said he didn't remember. You weren't satisfied with that. You said he had to give an answer.

"THE COURT: Because he is a witness at trial. So by asking him what happened, that's forcing him to perjure himself?

"MR. LENIHAN: If what he is saying is not from his own memory, yes.

*133 "THE COURT: Now I've heard everything. I thought I heard everything. But asking the witness what happened and him lying, that's forcing him to perjure himself.

"MR. LENIHAN: He told what he thought the time frame was. He told you I have no recollection of that."

During a discussion of whether Dr. Katz would be testifying at the retrial, the Supreme Court commented that "Dr. Katz might not come in, because if Dr. Katz comes in somebody might call the district attorney and say indict this guy for perjury. Why would I do that? Oh, because he's not telling the truth." Later, the court advised Mr. Mendelsohn that "[i]f Dr. Katz wants to come in at the risk of his future freedom, you're stuck with him."

At the next court appearance, the Supreme Court opened the proceedings with the following remarks:

"I cannot sanction Dr. Katz. He is not a party. I can sanction the attorneys that called him up to $10,000.00, which is my plan because you called him. Based on what the conduct that he displayed in doing this not IME, somebody should have known. The interesting thing is if I sanction the attorneys that called him, they will appeal it. There will be a public record. Dr. Katz' future doing IMEs because he lied in this one will probably be finished. I can and it is a shame Dr. Katz's attorney is not here. I can hold him in civil contempt for [causing] the state to expend thousands of dollars on a trial and then coming in here to lie about what he did, causing a mistrial .... On the other hand, again I am not happy with the non-notice of recording. I can sanction the plaintiff, but it would only be a nominal sanction .... [T]he worst thing is that we have a doctor who clearly lied about the length of time he took to do an IME, clearly. No matter how you slice it, 10, 15, 20 minutes. It turns out he took 1 minute and 56 seconds. He testified as to findings that he obviously could not have had in a minute and 56 seconds .... We are wasting our time trying cases over and over and over again because a doctor who is making millions of dollars doing IMEs decides that he is going to lie. I would hope frankly *134 that the Law Journal and everybody else that covers the news sees this .... Dr. Katz lied. I am finding that he lied. He clearly, his clear unequivocal testimony that his IME took 10, 20 minutes .... Now, he gets caught lying. There is no other way to put it. He lied. There is no other way to make it nice. He said the IME took between 10 to 20 minutes. It took a minute and 56 seconds .... Mr. Mendelsohn, I am sanctioning your law firm $10,000.00 .... [T]here is no doubt about the finding that Dr. Katz lied. I want you to appeal that finding so that every lawyer in the state that looks at the Law Journal and

looks at the record will be able to see what went on during this trial."

**90 Mr. Reilly and Mr. Mendelsohn argued that they and their law firms and their clients did not suborn perjury, had no way of knowing that Dr. Katz would give any untruthful testimony, and should not be held responsible for any untruthful testimony he may have given. The Supreme Court inquired as to how frequently the attorneys' firms and the insurance carriers with which they worked had retained Dr. Katz. The attorneys responded that although they had retained Dr. Katz from time to time in the past, they had no reason to believe that he would give untruthful testimony. The court remarked that there had been "one lie here, a huge lie." The court then made the following comments:

> "THE COURT: I am less interested in the money. I will eventually order your firm and Mr. Mendelsohn's firm to pay. It is the scarlet letter that I am interested in. This gentleman is still doing IMEs. He is still being used by defense firms .... I can't imagine the amount of extra trials and extra litigation and extra costs and extra everything that is occasioned by having this gentleman part of the system .... I can't sanction him, but I can hold him in civil contempt after a hearing. Your firm because you called him and you are responsible for him and you relied on him. That I could sanction .... I want you to appeal me. I want you to appeal the finding that two of the carriers caused this gentleman to testify and he lied. And he lied. And he lied badly."

Mr. Reilly argued that, contrary to the position being taken by the Supreme Court, the mere fact that the appellants called *135 Dr. Katz as a witness did not make them responsible for what the court characterized as Dr. Katz's lies. Mr. Reilly further argued that it was not the purported lies, but the conduct of Mr. Hackett, that caused the mistrial. The court remarked that the only person it was unhappy with was Dr. Katz, and that it "would like to put Dr. Katz out of the business of doing IMEs period." The court then stated: "I will sanction [Mr. Reilly's law firm] $10,000.00, and [Mr. Mendelsohn's law firm] $10,000.00."

The Supreme Court thereafter addressed the sanction to be imposed upon Mr. Hackett. The court heard argument from Kevin P. Connolly, of counsel to Constantinidis & Associates, who had previously had the following exchange with the court on the issue of Mr. Hackett's conduct:

"THE COURT: How long have you been an attorney?

"MR. CONNOLLY: A few years, your Honor.

"THE COURT: And how many times have you filmed the IME?

"MR. CONNOLLY: A few times.

"THE COURT: And how many times have you filmed the IME without telling anybody?

MR. CONNOLLY: All the time.

"THE COURT: And how many times have you tried to use it in court?

"MR. CONNOLLY: Never."

Mr. Connolly argued that it was necessary for Mr. Hackett to make the video recording "in order to protect his reputation" from being assailed by Dr. Katz, a "known purveyor of falsehood," and that to prevent the recording from being brought out at trial, "[a]ll Dr. Katz has to do is tell the truth." The Supreme Court noted that "I know the sanction for Mr. Hackett is going to be significantly less than that for the defendants because I believe Mr. Hackett acted, I don't want to say in good faith, but in our system there is just nothing worse than lying." The court then heard argument from Mr. Hackett, who **91 argued that he believed that his actions were permissible under the CPLR, and that the case law that he had presented to the court indicated that his conduct was appropriate. In response, the court stated:

> *136 "Give me a case that says what you did was appropriate. Taping an IME, sitting on the tape until you can cross-examine the witness, getting the witness to lie which I have to, I have to again parrot that Dr. Katz'[s] attorney said probably the stupidest thing that I have ever heard in court, I caused him to perjure himself by forcing him to tell the truth. That is quite possibly the dumbest thing I have ever heard."

Mr. Hackett made further arguments, including the observation that a sanction against him may need to be

reported to the Appellate Division and bar associations, and may affect his legal malpractice insurance. After hearing from Mr. Hackett, the Suprme Court stated: "I am sanctioning your firm $250. I want you to appeal."

Mr. Mendelsohn then argued that "the reporting requirements, the marks against Mr. Hackett, those are marks that go against Mr. Reilly and myself as well. We didn't even do these acts and we are having the mark against us." Mr. Mendelsohn emphasized that the stigma associated with the sanction against him would follow him for the rest of his career. The Supreme Court then stated: "You can stop. You are right." The court asked the attorneys what alternative course of action they would propose, and Mr. Mendelsohn suggested that it should be sufficient that the court had unsealed the record and that Dr. Katz, therefore, "will not be able to testify ever again in Court." The following colloquy then occurred:

"THE COURT: I tell you what. Will you agree that Dr. Katz lied on the record, yes or no?

"MR. MENDELSOHN: I can't say that he lied on the record. From what he said, he agreed it would take 10, 20 minutes. The tape says otherwise. I wasn't there. From the facts that are before the Court—

"THE COURT: Step up. Off the record.

"(Whereupon, an off the record discussion was held at this time and the following ensued:)

"THE COURT: Mr. Mendelsohn, do you have any objection to my finding that Dr. Katz lied on the record?

"MR. MENDELSOHN: If that is the Court's determination, *137 I have no objection based upon the facts before the Court.

"THE COURT: Mr. Reilly, do you have any objection to my findings that Dr. Katz lied on the record?

"MR. REILLY: I don't have that standing, your Honor.

"THE COURT: You are a person in this trial. Do you object? If you don't object for whatever reason, do you object yes or no?

"MR. REILLY: I can't say I am in a position that I object, you Honor. Your Honor is characterizing it. That is you Honor's finding .... I cannot be in a position where I am there to argue. I don't represent Dr. Katz.

"THE COURT: Even if you don't have the standing?

"MR. REILLY: If that is your Honor's determination, that is your Honor's determination. End of story, your Honor. Whatever happens, happens. I cannot say anything further on that. I don't know that the consequences would be or **92 anything else. I don't represent the man, but your Honor made a finding."

The Supreme Court then decided to vacate the $10,000 sanction it had imposed upon each of the appellants' attorneys for calling Dr. Katz as a witness, as well as the $250 sanction it had imposed upon plaintiff's counsel for failing to disclose the video recording of the IME. However, the court noted that it was "still not finished with Dr. Katz," and suggested that counsel's insurance carriers "reinforce their efforts to never use him again." Later that day, Dr. Katz appeared before the Supreme Court with his attorney, Mr. Vozza, and the court had the following discussion with Mr. Vozza:

"THE COURT: Counsel, so that you know, I made a determination with Dr. Katz. The plaintiff's attorneys agreed that Dr. Katz lied. At least one of the defense attorneys agreed that Dr. Katz lied. It is not my guess that Dr. Katz lied. There is a difference between 1 minute 56 which was the recorded *138 time of the IME that Dr. Katz performed and the 10, 20 minutes that Dr. Katz testified to.

"MR. VOZZA: I ... want to note my continuing objection, characterization.

"THE COURT: How do you confuse a minute 56 with ten minutes?

...

"MR. VOZZA: Just to make one point, your Honor. The 10, 20 minute time range was not specifically for a specific—

"THE COURT: No. You see this is the part that you are missing. I am not making a big thing of 10, 20 minutes. Witnesses confuse time all the time but he didn't do the tests that he said he did in the minute 56 seconds. That is the problem .... He didn't do the tests that he said he did. How do you screw that one up? You either do the test

or you don't do the test.

"MR. VOZZA: Your Honor is assuming that the examination lasted 1 minute and 56 seconds.

"THE COURT: I am talking about what is on the film.

"MR. VOZZA: The film is different. It doesn't take into account the different things that Dr. Katz needs to perform in performing IMEs other than having actual physical contact with the plaintiff. There are records to review and conversations that he must have had with Dr. Katz. What we are doing is dissecting to the actual time that he is actually touching the patient. If that time is 1 minute 56 seconds and I have not seen it since counsel supplied it to me. That appears to be the physical exam. It ends and starts abruptly. There are portions that we don't know what actually occurred in the examination.

...

"THE COURT: ... [Y]ou might confuse two minutes with ten minutes in a manner of speech but how do you confuse two minutes with 20 minutes?

"MR. VOZZA: I don't think there was confusion, Judge.

*139 "THE COURT: I don't think there was confusion either. I think he lied.

"MR. VOZZA: I would like to note my objection.

"THE COURT: You have an objection. Again, I will refer this, unless I don't think Dr. Katz, you know, we have enough problems doing trials. It is a strain on the system, but unless I get some sort of representation from you on behalf of Dr. Katz that he is out of the medical/legal business, I am going to refer this to the Administrative Judge and the District Attorney of Queens **93 County so that they can do whatever they want to do. Perjury is a D felony.

"MR. VOZZA: Can I talk to Dr. Katz?

"THE COURT: I would strongly suggest that you talk to Dr. Katz. As it is, and I can say this because it has already been said on the record. He will not be doing business with Travelers or AIG anymore. I have a feeling that any attorney or adjustor within earshot or who read this transcript will not be dealing with Dr. Katz much anymore. It might be an easy way for him to bow out gracefully from harm's way. I would imagine that his number is not going to be called too much in the foreseeable future. It might be a nice way out. Second call.

"(Whereupon, a recess was taken and the following ensued:)

"THE COURT: Let the record reflect that I gave Dr. Katz the option of and I would institute a special proceeding to retire from the medical/legal business. Retire at the time and he has declined. What I am now going to do, I am going to order a full transcript of everything, the trial and the subsequent proceedings. I will present that to both the administrative judge of Queens County and the District Attorney. I would recommend to the District Attorney that they explore prosecuting Dr. Katz for perjury. Again counsel, it is not the time so much if the doctor thinks that he can explain the time. It is not the time problem. It is that there are tests that he testified to that he didn't do. That is the perjury *140 .... Again, I am making it very clear on this record, the insurance companies here are not going to go near him. I unsealed the record. Everybody from now on when he testifies as to the tests that he performed, it is always going to be questioned from now on.

...

"MR. VOZZA: I would ask for an opportunity to consult with our criminal department in our firm.

"THE COURT: Sir, you have five minutes to do whatever you are going to do. This part of the matter has been going on a month. In the meantime is Dr. Katz still doing IMEs?

"DR. KATZ: Yes.

"THE COURT: That is the problem. He is still doing IMEs .... It is like a wound that is festering. Every time he does another IME. When is it going to stop? He is making 7 figures a year doing IMEs. Then he comes to my part and lies .... Does your client really think if the insurance industry or some of the insurance companies that hired him before when they find out that he lied, do you really think they are going near him? As they distribute the transcript, certainly this morning's transcript, certainly the last transcript, certainly the transcript where his own attorney admitted that he perjured himself, but he only perjured himself because I told him to tell the truth .... Counsel, you have five minutes to talk to your client."

At the next court appearance, the Supreme Court opened the proceedings with the following statement:

"Firstly, I made a prior ruling that is agreed to by at least one defendant that Dr. Katz lied on the stand .... [The appellants] have asked for a new IME because of the fact that the expert that they had retained was found to have lied on the stand. That application is denied. You retained him. You are stuck with him."

When Mr. Reilly argued that Dr. Katz, in light of his refusal to testify voluntarily at the retrial, was now an adverse witness **94 to his client, the following exchange occurred:

*141 "THE COURT: All he has to do is tell the truth.

"MR. REILLY: Well, your Honor doesn't want him in here.

"THE COURT: No. I don't want him to testify in the future in any other trials. I am stuck with him .... If he comes and tells the truth, which means he would say instead of the exam taking 10, 20 minutes, it took 1 minute and 56 seconds. His finding might have been shall we say exaggerated. The amount of the tests that he did might have been somewhat exaggerated. Of course, he might be cross-examined."

The Supreme Court subsequently stated that it was sending a copy of Dr. Katz's testimony in this case to an assistant district attorney, and then remarked: "The man is basically out of the business of testifying .... $500,000 to a million dollar income that he got doing IMEs and the like, that is over. As soon as the State finds out about it, he is not going to do any Worker's Comp exam." The court then engaged in the following colloquy with Mr. Vozza:

"MR. VOZZA: Yes. I just want to reiterate my client's general objection to your Honor's assessment that he perjured himself.

"THE COURT: What did I miss?

...

"MR. VOZZA: Your Honor, I have an ethical obligation to my client. I have been authorized by the Court [sic] that he objects to your Honor's characterization of his testimony.

"THE COURT: Then let him come in and tell me himself.

"MR. VOZZA: Well your Honor, like I said if he is subpoenaed, he will be here.

"THE COURT: Maybe I will have the contempt hearing here. He is denying that he lied. He should be happy to get away with me just saying that he lied. Let it go at that. Yes, we will have a finding forever more that a Justice of the Supreme Court of the State of New York said that he lied because he did it. I would suggest that you let it go at that."

The Supreme Court determined the appellants' motions in an order, an amended order, and a second amended order. In *142 the second amended order, dated July 26, 2013, the court granted those branches of the motions which were to quash the subpoenas duces tecum served on the physicians retained by the appellants, but denied those branches of the motions which were for a re-examination of the plaintiff by an orthopedist designated by the appellants, an award of costs against plaintiff's counsel, and disqualification of plaintiff's counsel. These appeals ensued.

*Discussion*

*1. The Request for a New IME*

[1] [2] [3] Pursuant to CPLR 3121(a), if a plaintiff's physical condition is in controversy, the defendant may require the plaintiff to submit to a physical examination (*see Orsos v. Hudson Tr. Corp.*, 95 A.D.3d 526, 526, 944 N.Y.S.2d 514; *Torelli v. Torelli*, 50 A.D.3d 1125, 1125, 857 N.Y.S.2d 615; *Anonymous v. Anonymous*, 5 A.D.3d 516, 517, 772 N.Y.S.2d 866). There is no restriction in CPLR 3121 limiting the number of examinations to which a party may be subjected, and a subsequent examination is permissible provided the party seeking the examination demonstrates the necessity for it (*see Rinaldi v. Evenflo Co., Inc.*, 62 A.D.3d 856, 856, 881 N.Y.S.2d 104; *Huggins v. New York City Tr. Auth.*, 225 A.D.2d 732, 733, 640 N.Y.S.2d 199; *Young v. Kalow*, 214 A.D.2d 559, 559, 625 N.Y.S.2d 231). Furthermore, **95 after a note of issue has been filed, as in this case, a defendant must demonstrate that unusual and unanticipated circumstances developed subsequent to the filing of the note of issue to justify an additional examination (*see* 22 NYCRR 202.21; *Giordano v. Wei Xian Zhen*, 103 A.D.3d 774, 775, 959 N.Y.S.2d 545; *Schissler v. Brookdale Hosp. Ctr.*, 289 A.D.2d 469, 470, 735 N.Y.S.2d 412).

[4] In the present case, unusual and unanticipated circumstances warranting a new IME abound. Foremost

among them is Dr. Katz's unavailability to the appellants as a witness at a retrial, due to his refusal to appear voluntarily, which, in turn, resulted from the Supreme Court's repeated accusation that Dr. Katz "lied" or committed "perjury" at the first damages trial. These extraordinary circumstances were set in motion when the plaintiff's attorney chose to surreptitiously videotape Dr. Katz's second IME of the plaintiff, and chose to withhold that recording from defense counsel despite the requirements of CPLR 3101(i). Thus, at the outset, we address whether that conduct was appropriate or justifiable.

As appellate courts in other departments have recognized, there is no express statutory authority for the videotaping of medical examinations, either in the discovery statute authorizing *143 physical examinations of parties (CPLR 3121) or in the court rule governing such examinations (22 NYCRR 202.17) (SEE FLORES V. VESCERA, 105 A.D.3D 1340, 963 n.Y.S.2D 884; Lamendola v. Slocum, 148 A.D.2d 781, 538 N.Y.S.2d 116). Indeed, the Appellate Division, Third Department, has commented that "authorization of videotaping was intentionally left out of [22 NYCRR 202.17] and such intent should be accorded deference" (Lamendola v. Slocum, 148 A.D.2d at 781, 538 N.Y.S.2d 116). Requests for permission to videotape IMEs have been made on a case-by-case basis, and "videotaping has not been allowed in the absence of 'special and unusual circumstances' " (Flores v. Vescera, 105 A.D.3d at 1340, 963 N.Y.S.2d 884, quoting Lamendola v. Slocum, 148 A.D.2d at 781, 538 N.Y.S.2d 116).

In Lamendola v. Slocum, for example, the Supreme Court denied the plaintiffs' motion for a protective order permitting them to videotape the physical examination of the injured plaintiff, and granted the defendants' cross motion for an order compelling the injured plaintiff to submit to the examination without her attorney being present. The Third Department concluded that the Supreme Court should not have granted the defendants' cross motion, since, as our Court and others have held, a plaintiff is generally entitled to have his or her attorney present at a physical examination (see Ponce v. Health Ins. Plan of Greater N.Y., 100 A.D.2d 963, 964, 475 N.Y.S.2d 102; Jakubowski v. Lengen, 86 A.D.2d 398, 401, 450 N.Y.S.2d 612). The Lamendola court noted that, although counsel should be permitted to be present at the examination, "the attorney's function is 'limited to the protection of the legal interests of his client' and in regard to the 'actual physical examination ... he has no role' " (Lamendola v. Slocum, 148 A.D.2d at 782, 538 N.Y.S.2d 116, quoting Jakubowski v. Lengen, 86 A.D.2d at 401, 450 N.Y.S.2d 612).

With respect to the plaintiff's request for permission to videotape the examination, however, the Third Department determined that the Supreme Court had providently exercised its discretion in denying the motion. The Third Department found a decision relied upon by the plaintiff, Mosel v. Brookhaven Mem. Hosp., 134 Misc.2d 73, 509 N.Y.S.2d 754 (Sup.Ct., Suffolk County), to be distinguishable. In Mosel, counsel for the plaintiffs sought the Supreme Court's **96 the permission to videotape the physical examination of the incompetent injured plaintiff, who had been in a semicomatose state for five years. In its decision on the plaintiffs' motion, the Supreme Court explained that: "Normally, this court would not be inclined to permit the videotaping of a physical examination of a plaintiff in a medical *144 malpractice action. The facts herein, however, are unusual and not typical of other negligence or medical malpractice actions" (134 Misc.2d at 75, 509 N.Y.S.2d 754). The court noted that the injured plaintiff "appears to be unaware of his environment and unresponsive to the actions of individuals in his presence" (id.). The court reasoned that:

"The ordinary plaintiff is usually aware of the presence of the physician and his surroundings when he is being examined and would therefore be capable of describing the examination to his attorney, reviewing it with him and, thereafter, if necessary, testifying at trial regarding the events of the examination. Because of his infirmity, [the injured plaintiff] surely will be unable to communicate to anyone his feelings and reactions to the examination .... Generally, the plaintiff's interests can be protected simply by having his attorney present. However, in the case at bar, this alone may not be sufficient to protect the interests of the plaintiff. If only the attorney for the plaintiff were present at the examination and a controversy arose concerning the manner in which the examination had been conducted and its efficacy, the attorney for the plaintiff might be forced into the difficult position of being compelled to testify concerning the conduct of the examining physician because the incompetent plaintiff would not have the capacity to testify in his own behalf" (id. at 75–76, 509 N.Y.S.2d 754 [citations omitted] ).

In Lamendola, the Third Department found that, unlike the plaintiffs in Mosel, the plaintiffs in the case before it had not identified any "such special and unusual circumstances," and thus their request for permission to videotape the examination of the injured plaintiff was properly denied (148 A.D.2d at 781, 538 N.Y.S.2d 116).

The denial of requests for permission to videotape physical examinations has been upheld by various appellate courts in this State (see Cooper v. McInnes, 112 A.D.3d 1120, 1121, 977 N.Y.S.2d 767 ["Supreme Court acted well within its discretion in prohibiting video or audio recording of the psychological examinations since plaintiffs failed to establish sufficient special or unusual circumstances justifying such recording"]; Flores v. Vescera, 105 A.D.3d at 1340, 963 N.Y.S.2d 884 ["plaintiff failed to establish the requisite special and unusual circumstances"]; *145 Savarese v. Yonkers Motors Corp., 205 A.D.2d 463, 463, 614 N.Y.S.2d 4 [plaintiff's request to videotape or audiotape court-ordered psychiatric examination was properly denied "in light of the fact that counsel will be present during the examination to protect plaintiff's interests"] ).

[5] [6] Thus, the foregoing case law contemplates that a plaintiff will normally be entitled to have his or her attorney present at an IME, but that permission to employ the additional measure of videotaping the examination will be granted only where the plaintiff establishes the existence of special and unusual circumstances. The latter proposition presupposes that a request for the court's permission to engage in videotaping will be made. What the law of this state does not contemplate is plaintiffs' attorneys taking it upon themselves to surreptitiously videotape an IME, without the knowledge of the examining physician, without notice to the defendants' counsel, and without seeking permission **97 from the court. Contrary to the assertions made by the plaintiff's attorneys in the Supreme Court, surreptitious videotaping of IMEs, without court approval or even notice to the court or opposing counsel, cannot be regarded as an "appropriate tool" or an activity that attorneys should feel free to engage in "all the time."

The plaintiff contends that it was permissible for counsel to videotape the second IME in this case without seeking permission from the Supreme Court because counsel was not recording "the examination qua examination," such that "the examination's validity, effectiveness, and in general the conduct of the examination itself, could be preserved and later utilized." Rather, the plaintiff argues, the recording was made "to preserve the statements and actions of the plaintiff's counsel, so as to protect him from the same sort of false attacks previously made by the defendants' expert." However, the plaintiff's attorney was not a party to this action, and was not in need of "protection." In any event, this argument is belied by the fact that plaintiff's counsel did seek to utilize the

recording at trial, precisely for the purpose of attacking the examination's validity and effectiveness and "the conduct of the examination itself." The record reveals that the attorney contemplated that the recording would be used at trial.

[7] For the foregoing reasons, the failure of plaintiff's counsel to seek and obtain the Supreme Court's permission to videotape the second IME was, by itself, a sufficient reason to prohibit the use of the recording at trial. Further compounding the improper conduct of plaintiff's counsel in making the recording *146 without procuring the court's approval in advance was the failure to disclose the recording to defense counsel prior to trial, which was a clear violation of CPLR 3101. Subsection (a) of that statute provides that: "There shall be full disclosure of all matter material and necessary in the prosecution or defense of an action, regardless of the burden of proof, by: (1) a party, or the officer, director, member, agent or employee of a party" (CPLR 3101[a] [emphasis added] ). Subsection (i) provides, in relevant part, as follows:

"In addition to any other matter which may be subject to disclosure, there shall be full disclosure of any films, photographs, video tapes or audio tapes, including transcripts or memoranda thereof, involving a person referred to in paragraph one of subdivision (a) of this section. There shall be disclosure of all portions of such material, including out-takes, rather than only those portions a party intends to use" (CPLR 3101[i] ).

[8] While CPLR 3101(i) was enacted for the primary purpose of preventing unfair surprise in situations where a defendant uses surveillance video in an attempt to reveal that a plaintiff's injuries are not as severe as the plaintiff claims they are, the statute employs broad language, which is not limited to such a scenario, but instead requires disclosure of "any films, photographs, video tapes or audio tapes" of a party, regardless of who created the recording or for what purpose (CPLR 3101[i] [emphasis added]; see Sgambelluri v. Recinos, 192 Misc.2d 777, 779–780, 747 N.Y.S.2d 330 (Sup.Ct., Nassau County). Notably, CPLR 3101(i) requires "full disclosure," without regard to whether the party in possession of the recording intends to use it at trial (see Tai Tran v. New Rochelle Hosp. Medical Center, 99 N.Y.2d 383, 388, 756 N.Y.S.2d 509, 786 N.E.2d 444).

On appeal, the appellants point out that the video recording of the second IME involved a party, namely the plaintiff, and therefore disclosure of the recording was required under CPLR 3101(i). The plaintiff **98 does not address this observation, and instead argues that, "since the digital

recording here was made of a nonparty, whether it is viewed as having primarily been made of the defendant's medical expert or of Mr. Hackett, disclosure was not required." The plaintiff's premise is incorrect. The videotape is a recording of a medical examination, and the person being examined is the plaintiff. Indeed, the individual who is most prominently depicted in the *147 recording, and toward whom the recording device is directed for the greatest amount of time, is the plaintiff. Thus, the recording featured, or, at the very least, "involv[ed]" (CPLR 3101[i] ), the plaintiff, "a party" (CPLR 3101[a][1] ) to the action.

Thus, the failure of the plaintiff's attorneys to disclose to defense counsel the videotape depicting the plaintiff being examined by Dr. Katz violated CPLR 3101. It also violated the spirit of New York's open disclosure policy, which, to a large extent, "was intended to mark an end to the presentation of totally unexpected evidence and to substitute honesty and forthrightness for gamesmanship" (*DiMichel v. South Buffalo Ry. Co.,* 80 N.Y.2d 184, 193, 590 N.Y.S.2d 1, 604 N.E.2d 63).

The circumstances under which the existence of the secret recording was revealed at trial were unusual and unanticipated. When Dr. Katz testified, based on his notes, that the first IME of the plaintiff (including "a history [being] done") lasted 45 minutes, Ms. Ramirez, the paralegal who attended the IME, apparently had a reaction that was visible to the Supreme Court, and presumably to the jury as well. The usual response would have been for the court to instruct the jury that it should disregard any reactions to a witness's testimony by any other person in the courtroom, and perhaps to admonish the paralegal that such behavior in the presence of the jury is inappropriate. The Supreme Court, however, did not take this approach. Instead, the court stopped the proceedings, excused the jury, and invited plaintiff's counsel to call the paralegal as a witness, since it appeared to the court that "she might differ as to some of the testimony of the doctor." This response to the paralegal's conduct drew open the curtains on Mr. Hackett's improper video recording, leading to the recording being brought to the jury's attention and all of the subsequent events that are at issue on these appeals.

The next unusual and unanticipated event in this case was the cross-examination of Dr. Katz by Mr. Hackett, and the Supreme Court's interference with that cross-examination, which elicited the testimony from Dr. Katz that the plaintiff and the court have persistently characterized as perjury. Dr. Katz was asked how long the second IME took. His response

was "[t]hat's uncertain." Under further questioning by Mr. Hackett on that subject, Dr. Katz responded "I don't think I have it recorded," and then "I don't really recall," and then "[q]uite frankly, I don't know." At this point, the court interjected: "I cannot accept an I don't know." This remark was *148 improper, since it is beyond the province of a court to direct from the bench that a witness change an answer to a question because the court does not like the answer or does not find it believable. After stating that it could not accept Dr. Katz's answer, the court directed the following question to Dr. Katz: "I will have to insist on what your custom and practice would be." Dr. Katz's answer was: "I think in the range of between 10 and 20 minutes would be appropriate."

At this point, we dispel the premise that underlies the plaintiff's arguments on these appeals, and the actions taken by the Supreme Court after declaring the mistrial, namely, the notion that Dr. Katz **99 lied. The record does not reflect that Dr. Katz committed perjury. Dr. Katz was asked how long the second IME took, and his answer was that he did not know. There is no evidence in this record that, at the time Dr. Katz gave that testimony, he actually did know how long the second IME took. Thus, that answer (or series of answers) has not been shown to be untruthful. When Dr. Katz was then asked, by the court, "what [his] custom and practice would be" as to the length of an examination of this type, as noted, Dr. Katz's answer was that he thought that "in the range of between 10 and 20 minutes would be appropriate." There is no support in this record for the proposition that this answer was false. Moreover, even aside from the fact that the Supreme Court did not actually ask Dr. Katz about the length of the particular IME in question, it was improper to force him to specify an exact duration when his answer repeatedly was "I don't know" (*see e.g. People v. Samuels,* 284 N.Y. 410, 417, 31 N.E.2d 753). Accordingly, the record does not reflect a lie that would support a declaration of perjury by the Supreme Court.

The plaintiff's attorneys insist that Mr. Hackett's video recording shows that the examination lasted one minute and 56 seconds. However, the recording is approximately five minutes in length, and it cannot be determined, from a viewing of the recording, whether the recording captured the entire examination. In other words, it cannot be determined what happened before Mr. Hackett turned his recording device on, and what happened after he turned it off. Moreover, the recording does not account for the time Dr. Katz spent reviewing the plaintiff's fairly extensive medical records, which could arguably be considered part of the IME. In any

event, Dr. Katz did not testify as to the actual duration of the second IME, but only as to what his custom and practice would be.

*149 At the hearing on the appellants' post-mistrial motions, the Supreme Court apparently shifted its theory as to what was false about Dr. Katz's testimony, advancing a new theory that Dr. Katz had lied about the quantity or nature of the tests he had performed. This theory had never been proffered by plaintiff's counsel, either as a justification for revealing the secret video recording for the first time in the presence of the jury, or for any other purpose. In any event, this alternate theory was likewise not supported by the video recording.

Furthermore, unusual and unanticipated circumstances warranting a new IME certainly arose from the Supreme Court's accusation, repeated more than 60 times on the record before us, that Dr. Katz "lied" or committed "perjury" during his cross-examination, the court's repeated threats to refer Dr. Katz to the District Attorney's office with a recommendation that he be prosecuted for perjury, and the court's extraordinary efforts to end Dr. Katz's career in the "medical/legal business." The court's efforts in this regard intensified to the point that it apparently resorted to the unorthodox measure of conditioning the vacatur of a $10,000 sanction against each of the appellants' attorneys upon their willingness to adopt the court's view that Dr. Katz had committed perjury. The court also represented to Dr. Katz's counsel that at least one of the appellants' attorneys had "agreed" with the court's view that the doctor had lied, when, in fact, the attorney stated only that he had "no objection" to the court's finding, and that statement was made under circumstances in which the court had been threatening that attorney with sanctions. Under these conditions, it is not surprising that Dr. **100 Katz refuses to testify voluntarily at a retrial.

These circumstances, particularly when viewed collectively, clearly satisfy the requirement that a party seeking an additional IME after the filing of a note of issue must demonstrate the development of unusual and unanticipated circumstances subsequent to the filing of the note of issue. The appellants have been effectively deprived of their expert orthopedic witness in the event of a retrial. Indeed, the Supreme Court's conduct toward Dr. Katz was so thoroughly intimidating, and the manner in which the video recording was made, concealed, and then revealed to the jury had such a chilling effect, that regardless of any corrective measures that might be taken at a retrial, it is likely that Dr. Katz will remain

unwilling to testify. Neither the appellants nor their counsel are in any way *150 responsible for the occurrence of these events, which could not possibly have been anticipated.

The plaintiff, in support of his argument that an additional examination by another orthopedist is not warranted, relies upon this Court's decisions in Giordano v. Wei Xian Zhen, 103 A.D.3d at 775, 959 N.Y.S.2d 545 and Carrington v. Truck-Rite Dist. Sys. Corp., 103 A.D.3d 606, 959 N.Y.S.2d 258. In both Giordano and Carrington, the defendants sought to compel the plaintiff to submit to an additional orthopedic examination because the defendants' respective examining physicians were arrested and temporarily surrendered their medical licenses subsequent to their examination of the plaintiffs and the filing of the note of issue. This Court held that these circumstances did not justify an additional examination by another physician, as the defendants' concern that the plaintiffs might impeach the examining physicians' credibility with this information was not a sufficient basis to direct a second examination (see Giordano v. Wei Xian Zhen, 103 A.D.3d at 775, 959 N.Y.S.2d 545; Carrington v. Truck-Rite Dist. Sys. Corp., 103 A.D.3d at 607, 959 N.Y.S.2d 258; Schissler v. Brookdale Hosp. Ctr., 289 A.D.2d at 470, 735 N.Y.S.2d 412 ["The defendants' concern that the plaintiff may impeach the examining physician's credibility with the information that he was disciplined (subsequent to his examination of the plaintiff) is not a sufficient basis to direct a second examination (by another physician)"]; Futersak v. Brinen, 265 A.D.2d 452, 697 N.Y.S.2d 89 [same]).

However, the circumstances of the present case are distinguishable from the cases on which the plaintiff relies. The primary concern in Carrington and Giordano was that the plaintiffs therein might impeach the credibility of the defendants' examining physicians. By contrast, the concern in the present case primarily involves the unavailability of Dr. Katz, who has indicated that he will not voluntarily testify before the court at a retrial. Additional examinations have been permitted where the prior examining physician has become unavailable. For instance, in Galdi v. Kaliya, 32 Misc.3d 128[A], 2011 N.Y. Slip Op. 51256[U] (App.Term, 1st Dept.), the Appellate Term held that the unexpected death of the defendants' orthopedist subsequent to his examination of the plaintiff constituted an unusual and unanticipated condition warranting a further physical examination of the plaintiff. In Rosado v. A & P Food Store, 26 Misc.3d 935, 940, 891 N.Y.S.2d 636 (Sup.Ct., Westchester County), the court concluded that the abrupt retirement and relocation out of state of the defendants' examining physician, which

occurred after the filing of the note of issue, was an *151 unanticipated circumstance warranting a further physical examination of the plaintiff by a new physician.

**101 Although Dr. Katz is physically available to testify, his unwillingness to testify voluntarily renders him effectively unavailable to the appellants. Dr. Katz's unwillingness to appear at a retrial is the direct result of the Supreme Court's conduct, which included repeatedly and baselessly accusing him of being a liar, insisting that he retain an attorney, threatening to refer him to the District Attorney's office with a recommendation that he be prosecuted for perjury, and expressly stating that it was the court's objective to end his career in the "medical/legal business." Under these circumstances, where Dr. Katz is not at fault—and the appellants and their attorneys are most certainly not at fault —for his unwillingness to testify, Dr. Katz must be deemed unavailable to the appellants, and the circumstances must be deemed unusual and unanticipated, thus warranting a new IME by a different orthopedist of the appellants' choosing.

Furthermore, while the appellants could seek to subpoena Dr. Katz to testify, this would place Dr. Katz in an adversarial posture with the appellants. In this regard, this Court has also permitted an additional medical examination where there was evidence of hostility between the examining physician and the defendant's attorney (see *Miocic v. Winters,* 75 A.D.2d 887, 428 N.Y.S.2d 44). In *Miocic,* the defendant sought an additional examination of the plaintiff by a different physician after learning that the first physician allegedly was a close friend of plaintiff's counsel, and had animosity toward defense counsel. This Court held that "[n]o matter how objectively and thoroughly [the physician] might now act, such actions would necessarily be tainted with the appearance of bias and partiality," and that the defendants "should not be compelled to rely upon a physician who is openly hostile to defense counsel and is a personal friend of plaintiffs' counsel" (*id.* at 888, 428 N.Y.S.2d 44).

Notably, as the Supreme Court anticipated, its condemnation of Dr. Katz has had an effect on other cases. In several recent cases in which Dr. Katz was retained to perform IMEs, courts have been presented with requests for new IMEs based on the events that transpired in the present case. In *Atchison v. Metropolitan Enters., Inc.,* 43 Misc.3d 1207[A], 2014 N.Y. Slip Op. 50521[U] (Sup.Ct., Kings County), the plaintiff had submitted to an orthopedic examination conducted by Dr. Katz at the request of the insurance carrier of one of the defendants. After subsequently learning of Justice Hart's

remarks regarding *152 Dr. Katz in the present case, the defendants in *Atchison* moved to compel the plaintiff to submit to a further independent orthopedic examination, arguing, among other things, that "Justice Hart's broad comments about Dr. Katz have significant repercussions," and that "it is impossible to receive a fair trial if [the defendants] have no choice but to rely solely on Dr. Katz's orthopedic examination results and his opinion" (43 misc.3d 1207 [a], 2014 slip op. 50521[u], *3). They further noted that " Justice Hart's comments have 'permeated the legal community and ... garnered ... media attention' " (*id.*). The Supreme Court, in denying the defendants' motions, cited *Carrington v. Truck–Rite Dist. Sys. Corp.,* 103 A.D.3d 606, 959 N.Y.S.2d 258 and *Giordano v. Wei Xian Zhen* (103 A.D.3d 774, 959 N.Y.S.2d 545), and held that the "defendants' fear that jurors will be more concerned with the integrity or credibility of Dr. Katz than with the truth of plaintiff's injury allegations is not a sufficient reason for this court to order plaintiff to submit to an additional IME over a year after filing a note of issue" (*Atchison v. Metropolitan Enters., Inc.,* 43 Misc.3d 1207[A], 2014 N.Y. Slip Op. 50521[U], *6). In *Rios v.* **102 *1146 Ogden LLC,* 2014 N.Y. Slip Op. 32097[U] (Sup.Ct., Bronx County), the defendants, on whose behalf Dr. Katz had conducted an IME of the plaintiff therein, similarly moved to compel the plaintiff to submit to an additional physical examination based on Justice Hart's comments in the present case. However, the Supreme Court, relying on this Court's decision in *Carrington,* denied the defendants' motion (see id.; *Lorentty v. Muniz,* 2013 WL 7806421 [Sup.Ct., Queens County] [denying the defendant's motion for an order permitting a second orthopedic independent medical examination of the plaintiff where the defendant's initial orthopedist, Dr. Katz, who previously examined the plaintiff, "was severely criticized by the Honorable Duane A. Hart, J.S.C."] ).

In sum, given the avalanche of errors that occurred in this case, we find that the appellants satisfied their burden of demonstrating unusual and unanticipated circumstances justifying an additional medical examination of the plaintiff by an orthopedist to be designated by them. Under the particular circumstances of this case, a second examination by a different physician is necessary "to ensure that the focus of the medical testimony will be on the nature and extent of plaintiff's alleged injuries, rather than on any taint or irregularity [surrounding] the [prior] examination" (*Orsos v. Hudson Tr. Corp.,* 95 A.D.3d at 526, 944 N.Y.S.2d 514).

*153 Accordingly, the Supreme Court abused its discretion in denying those branches of the appellants' motions which were to compel the plaintiff to submit to an additional orthopedic examination.

## 2. *Imposition of Costs Against Plaintiff's Counsel*

[9] As the appellants correctly contend, the necessity for a mistrial was created by the conduct of plaintiff's counsel, and was not to any extent attributable to any conduct of the appellants or their counsel. First, as discussed above, plaintiff's counsel surreptitiously created a video recording of the second IME without providing any notice to the court or defense counsel, much less obtaining the court's approval, as is required. Had counsel obtained approval, or at least provided notice, of the videotaping, the mistrial would not have occurred. Second, as discussed above, plaintiff's counsel compounded the prejudice to the appellants by improperly failing to disclose the video recording to defense counsel, as was clearly required under CPLR 3101(i). Had counsel disclosed the recording, the mistrial would not have occurred. Third, plaintiff's counsel chose to reveal the existence of the recording to the jury in a way that maximized its dramatic effect, and was unfair to the appellants. Notably, Mr. Hackett admitted that he consulted with other attorneys prior to his paralegal's testimony regarding the admissibility of the undisclosed video recording. Mr. Hackett waited until his re-direct examination of his paralegal to reveal the recording's existence, even though Ms. Ramirez had not been asked any questions on cross-examination regarding the duration of the second IME. This was improper.

In opposing those branches of the appellants' motions which sought an award of costs against plaintiff's counsel pursuant to 22 NYCRR 130–1.1, the plaintiff's only argument as to why the appellants should be held accountable for precipitating the mistrial, and plaintiff's counsel should not be, is that the mistrial was caused by Dr. Katz's act of lying during his cross-examination. The Supreme Court appears to have ultimately adopted this view. This position is unsupportable since, as discussed above, Dr. Katz did not lie. Moreover, even if Dr. Katz had lied, that act would not be the proximate cause of the mistrial.

**103 Thus, we conclude that the conduct of plaintiff's counsel was frivolous within the meaning of 22 NYCRR 130–1.1, and that the Supreme Court abused its discretion in denying those branches of the appellants' motions which were for an award of *154 costs against plaintiff's counsel. The appellants are entitled to recover from Patrick J. Hackett

and Constantinidis & Associates the costs they incurred in participating in the first trial on the issue of damages, as well as the costs they incurred in making and litigating the motions at issue on these appeals and in pursuing these appeals. Upon remittal, the Supreme Court should conduct a hearing to determine the total amount of such costs, as well as the proper apportionment of those costs as between Mr. Hackett and Constantinidis & Associates (*see Preferred Equities Corp. v. Ziegelman,* 190 A.D.2d 659, 660, 593 N.Y.S.2d 535).

## 3. *Disqualification of Plaintiff's Counsel*

[10] That branch of Amsterdam's motion which was to disqualify Mr. Hackett and Constantinidis & Associates as counsel for the plaintiff was based on the premise that, as the videographer who made the recording of the second IME, Mr. Hackett would be required to authenticate the recording, and thus he had become a potential witness in the case. As part of our determination of the other branches of the appellants' motions, however, we have concluded that it was improper to make the recording and to fail to disclose it. Accordingly, that recording was not admissible at the original trial, and would not be admissible at any retrial. Indeed, even if the plaintiff could still provide adequate notice of the recording, as required by CPLR 3101(i), in time for a retrial, the fact that the recording was improperly made in the first instance would require its exclusion from evidence.

Thus, since the video recording would not be admissible at any retrial, there is no possibility that Mr. Hackett would be called upon to authenticate the recording. Accordingly, that branch of Amsterdam's motion which was to disqualify plaintiff's counsel should have been denied as academic.

## *Conclusion*

The mistrial that was declared in this case, as well as the effective unavailability of Dr. Katz as a witness for the appellants at a retrial, was caused by the conduct of plaintiff's counsel in making and failing to disclose the video recording of the second IME, as well as the conduct of the Supreme Court, and was not caused, to any extent, by any conduct of the appellants or their counsel. Consequently, the appellants are entitled to an additional medical examination of the plaintiff, to be conducted by an orthopedist designated by them, as well as the costs they incurred in the first trial, and the costs they incurred *155 in making and litigating the motions at issue on these appeals and in pursuing these appeals, to be paid by Patrick J. Hackett and Constantinidis

& Associates. All further proceedings in this case should be conducted before a different Justice of the Supreme Court.

Accordingly, the appeals by the defendant Ibex Construction, LLC, from the order and the amended order are dismissed, as those orders were superseded by the amended order and the second amended order, respectively, the second amended order is reversed insofar as appealed from, on the law, the order and the amended order are vacated, those branches of the motion of the defendant Ibex Construction, LLC, and the separate motion of the defendant Amsterdam & 76th Associates, LLC, which were for leave to have the plaintiff re-examined by an orthopedist of their own choosing, and for an award of costs against plaintiff's counsel **104 pursuant to 22 NYCRR 130–1.1, are granted, that branch of the motion of the defendant Amsterdam & 76th Associates, LLC, which was to disqualify plaintiff's counsel based on a violation of rule 3.7 of the Rules of Professional Conduct is denied as academic, and the matter is remitted to the Supreme Court, Queens County, before a different Justice, for further proceedings consistent herewith.

ORDERED that the appeals by the defendant Ibex Construction, LLC, from the order and the amended order are dismissed, as those orders were superseded by the amended order and the second amended order, respectively; and it is further,

ORDERED that the second amended order is reversed insofar as appealed from, on the law, the order and the amended order are vacated, those branches of the motion of the defendant Ibex Construction, LLC, and the separate motion of the defendant Amsterdam & 76th Associates, LLC, which were for leave to have the plaintiff re-examined by an orthopedist of their own choosing, and for an award of costs against plaintiff's counsel pursuant to 22 NYCRR 130–1.1, are granted, that branch of the motion of the defendant Amsterdam & 76th Associates, LLC, which was to disqualify plaintiff's counsel based on a violation of rule 3.7 of the Rules of Professional Conduct is denied as academic, and the matter is remitted to the Supreme Court, Queens County, before a different Justice, for further proceedings consistent herewith; and it is further, .

ORDERED that the appellants are awarded one bill of costs.

MASTRO, J.P., MILLER and MALTESE, JJ., concur.

**All Citations**

135 A.D.3d 116, 21 N.Y.S.3d 78, 2015 N.Y. Slip Op. 08374

Footnotes
1    Except as indicated by bracketed material, portions of the trial transcript are quoted herein as they were transcribed, and all grammatical errors are in the original.
2    The Supreme Court subsequently recounted that "I only observed [Ramirez's] reaction to a certain answer the doctor gave. Based on that I assume-because this isn't my first day doing this, that she was going to have a discussion with Mr. Hackett and Mr. Constantinidis ... and she could become a witness."

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---

MICHAEL J. KATZ, M.D. and
MICHAEL J. KATZ, M.D., P.C.,

                Plaintiffs,

    -against-

TRAVELERS a/k/a TRAVELERS INSURANCE
COMPANY a/k/a THE TRAVELERS COMPANIES,
INC., its relevant servants, agents or employees and
relevant associated, affiliated or subsidiary corporations
and EXAM WORKS, INC., and its relevant servants,
agents or employees and relevant associated, affiliated
or subsidiary corporations,

                Defendants.

---

## SUMMONS and VERIFIED COMPLAINT

---

**ZISHOLTZ & ZISHOLTZ, LLP**
*Attorneys for Plaintiffs*
***SPEEDY LIEN INC. and MARK NASH***
*Office Address & Tel. No.:*
170 Old Country Road
Suite 300
Mineola, New York 11501
(516) 741-2200

---

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.*

*Dated:*                *Signature*_____

                        *Print Signer's name*_____

---

*Service of a copy of the within*          *is hereby admitted.*

*Dated:*

                    _____

                    *Attorneys for*