SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – x

MICHAEL J. KATZ, M.D. and MICHAEL J. KATZ
MD PC

                           Plaintiffs,

                -against-

LESTER SCHWAB KATZ & DWYER, LLP, PAUL
L. KASSIRER, THE TURKEWITZ LAW FIRM,
ERIC TURKEWITZ , SAMSON FREUNDLICH,
JOHN DOE No. 1 through JOHN DOE No. 10, and
ABC CORP. No. 1 through ABC CORP. No. 10

                     Defendants.

– – – – – – – – – – – – – – – – – – – – – – – – – – – – x

**VERIFIED
COMPLAINT**

Index No.:

Date of Purchase:

      Plaintiffs, Michael J. Katz, M.D. and Michael J. Katz MD PC ("Plaintiffs"), by

their attorneys Ruskin Moscou Faltischek, P.C., as and for their verified complaint

against defendants Lester Schwab Katz & Dwyer, LLP, Paul L. Kassirer, The Turkewitz

Law Firm, Eric Turkewitz, Samson Freundlich, John Doe No. 1 though John Doe No. 10,

and ABC Corp. No. 1 through ABC Corp. No. 10 ("Defendants"), allege as follows:

### THE PARTIES

      1.     Plaintiff, Michael J. Katz, M.D. ("Dr. Katz"), is a resident of the State of

New York with an address located at 170 Pond Xing Road, Lawrence, New York 11559.

      2.     Plaintiff, Michael J. Katz MD PC ("Michael J. Katz PC") is a professional

corporation with its principle place of business located at 4 Brower Avenue, Suite 4,

Woodmere, New York 11598.

3.      Upon information and belief, Lester Schwab Katz & Dwyer, LLP ("Lester Schwab") is a domestic limited liability partnership with its principal place of business located at 120 Broadway, New York, New York 10271.

4.      Upon information and belief, Paul L. Kassirer ("Kassirer") is a resident of the State of New Jersey residing at 54 Cambridge Drive, Short Hills, New Jersey 07078.

5.      Upon information and belief, The Turkewitz Law Firm is a domestic professional corporation with its principal place of business located at 228 E. 45th St., 17th Floor, New York, New York 10017.

6.      Upon information and belief, Eric Turkewitz is a resident of the State of New York residing at 50 Avon Road, New Rochelle, New York 10804.

7.      Upon information and belief, Samson Freundlich is a resident of the State of New York residing at 675 Ibsen Street, Woodmere, New York 11598.

8.      Upon information and belief, John Doe No. 1 through John Doe No. 10 and ABC Corp. No. 1 through ABC Corp. No. 10 are individuals and corporate entities whose full identities will be uncovered during discovery, each of whom actively aided, abetted and/or conspired with the defendants identified herein to violate plaintiffs' rights by, *inter alia*, engaging in defamatory and other tortious conduct directed towards plaintiffs.

## PRELIMINARY STATEMENT

9.      Michael Katz, M.D. is an accomplished, well-known and, until recently, well respected, physician.  Dr. Katz spent decades building a successful orthopedic practice located in Flushing, New York.  Dr. Katz gradually transitioned into a lucrative career as an expert witness in the area of orthopedic medicine.

10.    Dr. Katz has testified in countless personal injury and medical malpractice cases as an expert witness, most often for defendants, over the past twenty years.  He has a unique ability to communicate his medical findings to juries, and was, at one point, one of the most sought after expert witnesses in his field.

11.    Dr. Katz was universally regarded as a professional and unflappable witness who was diligently prepared and effective on the witness stand.  Dr. Katz's long and successful career, however, was destroyed overnight by an overzealous state court judge and the defendants in this action.

12.    This action arises out of Dr. Katz's retention as an expert witness for the defense in *Bermejo v. Amsterdam & 76th Associates, LLC, et. al.*, Index No. 23985/09.  The *Bermejo* case was a relatively straight forward personal injury action pending before Justice Duane Hart in Queens County, Supreme Court.

13.    Dr. Katz conducted two Independent Medical Examinations ("IME's") in furtherance of his anticipated testimony as an expert witness in *Bermejo*.  The case went to trial on April 12, 2013 and Dr. Katz testified concerning the tests he conducted during both IME's.  Dr. Katz also testified that the first IME lasted approximately 45 minutes because plaintiff's counsel became "explosive" and "highly combative" during the exam.

14.    Plaintiff's counsel proceeded to question Dr. Katz concerning the length of the second IME.  Dr. Katz testified no less than five separate times that he could not remember the length of the second exam and his records did not show how long the exam lasted.

15.     Justice Hart, however, interrupted Dr. Katz's testimony stating "I cannot accept an 'I don't know.' You have been doing this for awhile[sic]. I will have to insist on what your custom and practice would be as to what type of, the length of an exam of this type." Dr. Katz replied, "I think a range of between ten and 20 minutes would be appropriate."

16.     The Plaintiff's counsel then disclosed that he secretly recorded the second IME and claimed that it showed that the IME lasted only one minute and fifty-six seconds. Plaintiff's counsel argued that Dr. Katz perjured himself even though Dr. Katz never testified concerning the length of the second IME. He only testified concerning his custom and practice generally.

17.     Plaintiff's counsel not only misconstrued the nature of Dr. Katz's testimony but also misrepresented the length of the recording. The recording lasted for five minutes and four seconds, not one minute and fifty-six seconds. The video also begins some time after the plaintiff entered the exam room and it is not clear how much longer Dr. Katz and the plaintiff remained in the exam room together after the video terminated.

18.     The surreptitious (and misleading) videotape should have resulted in an immediate mistrial, but Justice Hart inexplicably concluded that Dr. Katz lied concerning the length of the examination despite the fact that he clearly testified he could not remember how long the examination took. Justice Hart proceeded to berate Dr. Katz both on and off the record during numerous subsequent proceedings and inexplicably demanded that Dr. Katz contribute money towards a settlement with plaintiff. Justice

Hart called Dr. Katz, among other things, a "no good liar" and a "thief" and implied that he was a "spy" with "little beady eyes."

19. Justice Hart threatened to commence contempt proceedings against Dr. Katz and to refer him to the Administrative Judge, the Queens County District Attorney and the Office of Professional Medical Conduct if Dr. Katz did not contribute hundreds of thousands of dollars towards settlement with the plaintiff. Justice Hart also warned Dr. Katz that if word of the proceedings ever spread to the insurance companies that Dr. Katz's reputation as an expert witness would be ruined. Justice Hart told Dr. Katz that he would unseal the record in *Bermejo* if Dr. Katz didn't contribute to the settlement.

20. Dr. Katz adamantly refused to contribute to the settlement because he had done nothing wrong and there was certainly no basis for him to pay any money to a plaintiff in an action in which he wasn't even a party. Justice Hart then demanded that Dr. Katz agree to retire from his work as an expert witness if he would not contribute to the settlement. Justice Hart suggested that he would commence a special proceeding against Dr. Katz to force him to give up his license to practice medicine. Justice Hart suggested that he could act as the plaintiff and the trier of fact in such a proceeding.

21. Dr. Katz again refused to contribute to the settlement agreement or retire from his work as an expert witness because he did not perjure himself.

22. Justice Hart, in fact, never brought contempt proceedings against Dr. Katz and there is no indication that the Justice Hart referred Dr. Katz to the Administrative Judge, the District Attorney or the Office of Professional Medical Conduct. Justice Hart himself, would later suggest that he was "not making a big thing" out of the length of the

5

exam and that the real issue was whether Dr. Katz could have performed all of the tests he testified to during the second IME.

23.     The bottom line is that Dr. Katz has not and will not be prosecuted for civil contempt or criminal perjury because the record clearly shows that he did not perjure himself. Justice Hart, however, proceeded to unseal the record in the *Bermejo* matter and invited the attorneys in the Courtroom to spread the word that Dr. Katz had been caught lying. The defendants in this case gladly accepted Justice Hart's invitation and in so doing spread false and malicious lies concerning Dr. Katz.

24.     Justice Hart plainly threatened to ruin Dr. Katz's career, but the real damage to Dr. Katz's career was inflicted by defendants Turkewitz and Kassirer.

25.     Turkewitz is a prominent attorney who primarily represents plaintiffs in personal injury cases. He also maintains a popular internet blog called the New York Personal Injury Law Blog. Turkewitz's blog routinely attacks the insurance defense industry including doctors who perform IME's such as Dr. Katz. Turkewitz attempts to generate interest in his site by posting seemingly provocative and/or scandalous material.

26.     Turkewitz has been named as a defendant in this action because he published a series of blog posts in July 2013 concerning the proceedings before Justice Hart. Turkewitz was not content to merely "report" on those proceeding and instead made gross misrepresentations and false statements of fact concerning the proceedings in an effort to destroy Dr. Katz's career.

27.     Turkewitz falsely stated and implied, among other things, that Dr. Katz had committed perjury, fraud and was guilty of racketeering. Turkewitz's blog posts were

intended to create the impression that Dr. Katz had been charged with and/or convicted of criminal perjury and other crimes which would make him unfit to act as an expert witness.

28.     Turkewitz's blog posts go so far as to expressly compare Dr. Katz to a "convicted felon" and a "prisoner." Dr. Katz was not charged with or convicted of any crimes.

29.     Turkewitz recently bragged that his false and misleading blog posts have been viewed over 18,000 times. He also gloated that he knew from certain unidentified sources that Dr. Katz would be "hard-pressed to ever take the witness stand again." Turkewitz also stated that he had done his part to publicize the proceedings before Justice Hart.

30.     Turkewitz's blog posts were devastating enough, but defendant Kassirer has caused even greater if not calamitous damage to Dr. Katz's career. Kassirer is a Senior Partner at the law firm of Lester Schwab Katz and Dwyer, LLP.

31.     Kassirer has been involved in several highly publicized litigations and is well known throughout the insurance defense industry. Kassirer also has long standing ties to several major insurance carriers and third party independent medical examination companies as well as insurance defense oriented associations such as the Defense Association of New York ("DANY").

32.     Kassirer has been named as a defendant in this action because he willfully and maliciously disseminated an email to key members of the insurance defense industry which included a link to one of Turkewitz's blog posts concerning Dr. Katz. Kassirer

therefore republished the false and misleading statements made in Turkewitz's blog posts and specifically directed those statements to entities and/or individuals that make determinations concerning whether or not to hire expert witnesses such as Dr. Katz.

33. Kassirer's email states "Please see the link below re: Orthopedist, DR. MICHAEL KATZ" and directs the recipient to the link to Turkewitz's July 8, 2013 Blog Post. The email continues "Needless to say, *we do not use Dr. Katz's services*, but <u>many</u> carriers and firms do, and what transpired in this case makes him *absolutely useless as an examining 'expert.'* " (emphasis added) (underlining in original)

34. Kassirer's email also states "More to the point, even if he is eventually arrested and convicted of perjury, NY law is clear that he is not legally 'unavailable'. Accordingly, whoever has retained him will not be entitled to another IME. As long as he was licensed and was competent at the time of the exam, he can testify and therefore is not 'unavailable.' The obvious issue is that he will be destroyed on cross-examination for the reasons set forth in the attached article, so that one's choice is to call him and have him crucified or not call him and receive a missing witness charge." Kassirer concluded stating "In short, *make sure that no one is retaining him on your companies' matters*. Regards. PLK." (emphasis added)

35. Kassirer's statement that "we do not use Dr. Katz" is patently false as Kassirer's law firm had specifically retained and relied on Dr. Katz as an expert witness both before and after Kassirer sent his July 9, 2013 email. In fact, one of Kassirer's partners planned to use Dr. Katz as an expert witness for a trial that was scheduled to go forward in August 2013.

36. Kassirer's email creates the impression that his law firm would not stoop to hire an expert witness such as Dr. Katz. The entire tone and impact of Kassirer's email would have changed if Kassirer had been truthful and stated that his firm has in fact used Dr. Katz and planned to use Dr. Katz in the future despite the allegations made in Turkewitz's blog posts.

37. Kassirer's statement that Dr. Katz was "absolutely useless as an examining expert" is also false and misleading. Upon information and belief, Kassirer never would have made such a statement if he had reviewed the actual transcript of the proceedings before Justice Hart rather than relying solely on Turkewitz's false and misleading characterization of those proceedings.

38. Kassirer's email has now been disseminated to virtually all major insurance carriers and third party independent medical examination companies. Dr. Katz's entire business came to a halt during the summer of 2013, almost immediately after Kassirer disseminated his email.

39. Dr. Katz has been informed time and again by insurance companies and third party independent medical examination companies that they can no longer use him as an expert witness specifically because of the Kassirer email and the Turkewitz blog posts.

40. Dr. Katz has been repudiated, ostracized and completely shut out of the insurance defense industry directly as a result of defendants' improper and unlawful conduct.

## FACTUAL BACKGROUND

41.     Dr. Katz had established himself as one of the premier expert witnesses in the field of orthopedic medicine by the time he was retained in the *Bermejo* case. Dr. Katz graduated Queens College of the City University of New York with honors, and then attended the Albert Einstein College of Medicine, where he similarly graduated with honors. While in medical school, Dr. Katz was recognized in the area of biomedical research and was a Jonas Salk Scholar.

42.     After successfully completing his residency program at the Hospital of the University of Pennsylvania, Dr. Katz went on to build a successful orthopedic practice in Flushing, Queens. He remains a board certified orthopedic surgeon and continues to maintain his private orthopedic practice.

43.     Dr. Katz's research in the area of bone loss has been used by the National Aeronautics and Space Administration (NASA) in its space travel programs. His research has also been instrumental in the development of osteoporosis medications.

44.     Dr. Katz began to supplement his orthopedic practice in 1992 by accepting forensic consulting assignments in the federal court system and he quickly became a highly regarded expert witness in the area of orthopedic medicine. Dr. Katz provided his services as an expert witness by and through plaintiff Michael J. Katz MD PC.

45.     For two decades, Dr. Katz frequently appeared as an expert witness in personal injury and medical malpractice litigations. During this time, approximately 80% of his expert testimony was done on behalf of defendants and he was most often retained

on behalf of insurance companies. He earned a reputation as a professional and unflappable expert witness.

**I.     The Proceedings Before Justice Duane Hart**

46.     Dr. Katz was retained as an expert witness for the defense in the *Bermejo* case on or about May 23, 2011. As noted above, the *Bermejo* case was pending before Justice Duane Hart in Queens County Supreme Court.

47.     Dr. Katz conducted two separate IME's of the plaintiff, Bermejo, over a nearly two year period.

48.     The first IME took place on May 23, 2011 and, according to Dr. Katz's testimony at trial, the first examination lasted approximately forty-five minutes, due in part to the fact that plaintiff's attorney, Patrick Hackett, Esq., became "explosive" and "highly combative" during the examination.

49.     Mr. Hackett apparently took issue with the amount of time documented by Dr. Katz for the first IME and, during the next scheduled IME, on March 4, 2013, he secretly record the examination.

50.     Dr. Katz specifically asked Mr. Hackettt to turn off all recording devices at the March 4, 2013. Mr. Hackett, however, surreptitiously recorded a portion of the examination despite Dr. Katz's request.

51.     The *Bermejo* case did not settle and a jury trial commenced in March, 2013. When called to testify before a jury at the trial on April 12, 2013, Dr. Katz described various tests that he conducted on Bermejo. Dr. Katz examined the plaintiff *twice* and

described certain tests that he completed on two different occasions, nearly two years removed from each other.

52.     As to his first examination, Dr. Katz testified that he performed at least fourteen tests of the plaintiff.

53.     During the first IME, Dr. Katz examined the plaintiff's back, right shoulder, right elbow, right leg, right knee, right ankle and right foot.

54.     With respect to the plaintiff's back, Dr. Katz performed a proactive test where the plaintiff laid flat and lifted his leg to determine whether there was any sciatic nerve damage. Dr. Katz also tested his range of motion bending forward, backward and to each side.

55.     Moving to the plaintiff's shoulder, Dr. Katz further tested the plaintiff's range of motion for lifting upward, lifting forward, backward extension, and internal and external rotations.

56.     He also tested the tendency of the plaintiff's shoulder to dislocate and performed two proactive tests: the O'Brien Test to determine whether there was a torn labrum and the Hawkins Kennedy Test for impingement of the shoulder.

57.     Dr. Katz individually tested the range of motion, as well as the physical formation, of the plaintiff's elbow, leg, knee, foot, and ankle. He additionally tested the stability and condition of the three major ligaments of the knee, took and compared the pulses of both feet, and noted various physical observations throughout the examination.

58.     During a portion of the direct examination related to the length of the first IME, Justice Hart inexplicably called a brief recess and told the attorneys that he

observed a strange look upon the face of a person sitting in the gallery and opined that Mr. Hackett may want to call her as a rebuttal witness, based upon her expression.

59.     Dr. Katz testified that during the second IME, that he completed seven tests, focusing on the plaintiff's right shoulder.

60.     Dr. Katz tested the plaintiff's range of motion as he had in the first IME and also repeated the O'Brien and Hawkins Kennedy Tests.

61.     He additionally performed the Hornblower and lift-off tests, which involve motion of the shoulder joint against light resistance, and took measurements for atrophy and force generation.

62.     During cross examination by Mr. Hackett, Dr. Katz was questioned about both examinations and particularly about the length of time he spent examining the plaintiff on both occasions.

63.     Mr. Hackett pressed Dr. Katz concerning the length of the second examination. As he was continually pressed for a definitive length of time, Dr. Katz answered: "That's uncertain."; "I don't think I have a record. I don't think I have it recorded, no. I don't think it's recorded."; "I don't really recall at this point."; "I don't really have, you know, an allocated time"; and "Quite frankly, I don't know."

64.     Dr. Katz thus essentially stated, five separate times, that he did not and could not recall the amount of time he spent with the plaintiff during the second IME.

65.     Nonetheless, Justice Hart intervened and told Dr. Katz, "I cannot accept an 'I don't know.' You have been doing this for awhile[sic]. I will have to insist on what your custom and practice would be as to what type of, the length of an exam of this type."

Dr. Katz replied, "I think a range of between ten and 20 minutes would be appropriate." Dr. Katz completed his testimony and left the courtroom without further incident.

66.     Upon the completion of Dr. Katz's testimony, plaintiff's counsel called an employee from his law office, Yury Ramirez, who was present during both IME's in her capacity as a translator for the plaintiff's attorneys. Ms. Ramirez, the same woman whose facial expression in the gallery caused Justice Hart to interrupt the proceedings earlier, contradicted Dr. Katz's accounts of the examinations he performed, particularly the length of the IME's.

67.     Ms. Ramirez described in particular the length of the "exam" as approximately three minutes and the length of the "total evaluation" as approximately five minutes.

68.     At the end of Ms. Ramirez's testimony, through re-direct, Mr. Hackett brought the existence of the video to the attention of the court and trial counsel. Justice Hart dismissed the jury for the day and Michael Reilly, Esq., counsel to defendant Ibex Construction, made an application for a mistrial. Justice Hart called a recess to offer the attorneys an opportunity to review the video.

69.     Upon information and belief, after the recess, Mr. Hackett alleged off-the-record that the video showed that Dr. Katz's examination lasted only one minute and fifty-six seconds and further alleged that Dr. Katz had perjured himself.

70.     The video of the IME lasts five minutes and four seconds, not the one minute and fifty-six seconds as alleged by Mr. Hackett.

14

71.     Furthermore, the video obviously begins some time after Mr. Bermejo, Mr. Hackett and Ms. Ramirez entered the room and it is not clear how much longer Dr. Katz and Mr. Bermejo remained in the room together after the video terminated.

72.     Justice Hart, however, resolutely adopted Mr. Hackett's representation that the examination lasted one minute and fifty-six seconds throughout all future proceedings despite the fact that Hackett's conclusions was demonstrably and factually wrong.

73.     Justice Hart also proceeded to mischaracterize Dr. Katz's prior testimony concerning the length of the second IME.  At the end of the proceedings on April 12, 2013, Justice Hart stated the following about the surreptitious recording of the IME:

> Well, I've got to admit... if anyone had dealt with Dr. Katz in the past based on his testimony it would of [sic] been reasonable for them to have a tape because he is testifying [to] a 45 minute IME.  What universe does he live in?  If I ever see a doctor do a 45 [minute] IME it will be the first time.

74.     That weekend, Dr. Katz was contacted by Mr. Reilly, who advised him that he should return to court Monday, April 15, because after his testimony, the clandestine video had been produced.  Dr. Katz appeared, as requested, the following Monday, April 15, 2013.

75.     Justice Hart suggested that the parties should settle the matter and in a bizarre twist called for Dr. Katz to contribute money towards a settlement as well, stating, off-the-record, that Dr. Katz's career doing IME work might be over, calling him a "no good liar," and told him to retain a lawyer.

76.     Dr. Katz left the court and contacted the firm of Kern Augustine Conroy Schoppmann, P.C., who dispatched David Vozza, Esq. to meet him at court.

77.     Prior to Mr. Vozza's arrival, Justice Hart indicated several more times, off-the-record, that Dr. Katz should contribute to a settlement to avoid punishment for the perceived perjury. He threatened Dr. Katz with criminal prosecution and imprisonment multiple times, off-the-record, throughout the morning.

78.     Justice Hart did not commence any criminal proceedings or incarcerate Dr. Katz despite these threats.

79.     Justice Hart told Dr. Katz that he needed to contribute to the settlement or his career would be ruined.  He stated, on the record, that:

> So the question is, do you want to settle it?  I would suggest, and that's why everybody's here and even if the doctor wants to contribute because clearly…The doctor's career doing IME's might be over.  If he gets caught in a lie on something that's material at trial his future use to anyone is useless, correct?  That will follow the doctor forever.

80.     Justice Hart continued, on the record, noting that:

> So this is truly a pox on everybody's house because I'm going to grant a mistrial unless you can settle it.  And unless you can settle it, and this goes – I put in a call for the third-party for the D/J action because they might be part of this, unless you can figure out a way to settle it I will declare a mistrial and post mistrial I will have a sanctions hearing and I will, Doctor, be turning the record over to the district attorney.  So, you got a choice.  You can collectively get yourselves out of this problem or I will do what I will do.

81.     Upon information and belief, Justice Hart did not turn the record of the proceedings before him over to the district attorney despite this threat.

82.    During a brief recess, Justice Hart continued to berate Dr. Katz and invited the attorneys present to do the same.  Back on-the-record, Justice Hart told Dr. Katz that he needed an attorney "right now" and went on to say:

> I would strongly suggest you do not do anything because you're in more trouble than you think.  It's probably that your career doing IME's is over.  It's possible, unless this case is settled, that I might be taking more – the attorneys have a duty basically not to do anything with regards to the district attorney.  If I find out or if I even suspect something is going on I have a duty to get in touch with the district attorney and getting in touch with the district attorney is not a good thing for you in this case.  Understood?

83.    Upon information and belief, Justice Hart did not contact the District Attorney despite this threat.

84.    Upon Mr. Vozza's arrival, Justice Hart announced, in open court, but off-the-record, "Your client is a liar and a thief."  Justice Hart continued to berate Dr. Katz off-the-record in the presence of his attorney before instructing the court reporter to begin transcribing again.

85.    Back on-the-record, Justice Hart stated:

> I'm going to second call this while you figure out how you can settle this case so I can seal this record so that I don't have to send things over to the district attorney, so that I don't have to remove counsel from this case, so that defendant isn't put in a position where they have to go forward on the RSD case with no orthopedist and so the disclaiming carrier for the third-party defendant isn't caught holding a three to six million dollar bag.  All of those are occurring not without the realm of happening, correct.  They can all happen in this case.  Parties can be sanctioned, people can go to jail.  Am I making it up?  No.

17

86. Upon information and belief, Justice Hart did not send the transcript of the proceedings to the District attorney despite the fact that the record was subsequently unsealed.

87. Thereafter, Mr. Vozza and Dr. Katz met in the hallway with Richard Mendelsohn, Esq., counsel for defendant Amsterdam & 76th Associates, LLC., who asked for a monetary contribution of $750,000 from Dr. Katz. When Mr. Vozza asked him to identify a legal basis for Justice Hart's demand that Dr. Katz contribute to the settlement, Mr. Mendelsohn responded by asking how much the loss of Dr. Katz's career would cost.

88. After the parties and Dr. Katz returned to the courtroom, Justice Hart declared:

> So you got until really about 4:00 o'clock[sic] this afternoon to try and settle this because if I have to deal with this case tomorrow stuff will start happening... Because again, I am not making the determination at this point if he is lying or not but if someone determines that the doctor was lying or if I think that there is a hint that he was lying I'm going to be the least of his problems. My friends in my former office in the district attorney they might have a conversation with you, [Mr. Vozza], his malpractice carrier will have a conversation, the State Department of Health would have a conversation with him, the other the[sic] defendants would have a conversation with him and I don't think any of these conversations are going to be beneficial to him...

89. Upon information and belief, Justice Hart did not contact District Attorney's office, Dr. Katz's malpractice carrier or the State Department of Health despite these threats.

90.    Furthermore, upon information and belief, none of the defendants in the *Bermejo* case have commenced any action or lodged any complaints against Dr. Katz based on his testimony.

91.    The parties and Dr. Katz were ordered to return before Justice Hart the following day, April 16, 2013.

92.    Justice Hart, as he had the previous day, continued to exert a great deal of pressure upon Dr. Katz to provide a personal contribution to settle the *Bermejo* case, stating that if the matter was settled, he would seal the record. The amount suggested by Justice Hart was in the hundreds of thousands of dollars.

93.    Justice Hart wondered, on the record, "whether to blame Dr. Katz for his profound inability to tell time when he's doing an IME" despite the fact that Dr. Katz never testified concerning the specific length of the second IME.

94.    Justice Hart further stated:

> And Dr. Katz['s] inability to successfully tell time might be the biggest problem of all. I would strongly suggest though, I am not in anybody else's courtroom, but since I have Dr. Katz['s] counsel here I would strongly suggest that they reassess his future testimony at any trials until this issue and a few others are resolved.

95.    During the court appearance, despite stating that he would seal the record in exchange for a settlement, Justice Hart actively invited other attorneys who were present, or even in the courtroom on unrelated business, to order copies of the transcript in order to "spread the word" concerning Dr. Katz's alleged perjury.

96.     Despite the immense pressure placed upon Dr. Katz by Justice Hart, Dr. Katz adamantly refused to agree to contribute to the parties' settlement.

97.     Justice Hart adjourned the matter to July 12, 2013 for trial.  Dr. Katz was represented that day by another attorney from Mr. Vozza's office, Sean Lenihan, Esq. Justice Hart again repeated his position that Dr. Katz "might want to contribute to this to get out of my way, because I'm not thrilled with him."

98.     After Justice Hart referred to Dr. Katz as "Typhoid Mary" and accused him of "getting caught red-handed in an out-and-out lie," Mr. Lenihan repeatedly attempted to direct the court's attention to Dr. Katz's trial testimony, as well as to the video itself, to correct the judge's mischaracterization.  However, Justice Hart consistently ignored Mr. Lenihan's efforts and persisted.

99.     When Mr. Lenihan countered that "the characterization of Dr. Katz's testimony as an outright lie…is unfair" because "after [Dr. Katz] originally testified,…he did not know [how long the second examination took], he did not remember, your Honor was not satisfied with that and wouldn't let that go. You pressed him to give an answer…He told you what he thought the time frame was," Justice Hart stated, "I'm sorry, when did you learn how to tell time?" and went on to say, "And he gave a laundry list of tests that he did…Did he perform those tests in whatever time he did [*sic*] that he testified to?  No."

100.    Then, in an attempt to illustrate to Justice Hart that Dr. Katz had initially answered that he could not recall the length of time he spent conducting the second IME and that the ten to twenty minute estimation came from Justice Hart's leading question,

Justice Hart took exception and oddly claimed that Mr. Lenihan was accusing Justice

Hart of causing the perjury by requiring Dr. Katz to tell the truth.

101.    On July 1, 2013, the parties and Dr. Katz were ordered to appear before

Justice Hart, though due to a clerical error, Dr. Katz was not informed that the time of the

appearance had been changed from the afternoon's calendar to a morning appearance.

102.    Without Dr. Katz or his attorney present, Justice Hart stated:

> The worst thing is that we have a doctor who clearly lied
> about the length of time he took to do an IME, clearly.  No
> matter how you slice it, 10, 15, 20 minutes.  It turns out he
> took 1 minute and 56 seconds...
>
> He testified to findings that he obviously could not have had
> in a minute and 56 seconds.  But if he did 10, 20 IME he
> could have had.  And he could have done it, but he didn't do
> the test...
>
> We are wasting our time trying cases over and over and over
> again because a doctor who is making millions of dollars
> doing IME's decides that he is going to lie.

103.    Justice Hart then stated that he would sanction the attorneys who had

retained Dr. Katz in the amount of $10,000 apiece and noted:

> I can only sanction a party or the attorneys.  Since I can't
> sanction Dr. Katz for lying and let the record reflect, I am
> withdrawing my sealing of any prior record in this case.  Dr.
> Katz lied.  I am finding that he lied.  He clearly, his clear
> unequivocal testimony that his testimony that his IME took
> 10, 20 minutes, correct Mr. Hackett?"

104.    Upon, receiving an affirmative answer from Mr. Hackett and further

finding that the second IME only took one minute and fifty-six seconds, Justice Hart

went on:

I can blame the attorneys and the carrier who hired him to do an IME on this case because they should have known what this guy was doing. They should have known. And again the man is literally making millions of dollars doing IME's. Now he gets caught lying. There is no other way to put it. He lied. There is no other way to make it nice. He said the IME took between 10 to 20 minutes. It took a minute and 56 seconds…

So, I will and you can do whatever you want to appeal this record. Mr. Mendelsohn, I am sanctioning your law firm $10,000. You can appeal this. But clearly, for this reason, I can't sanction Dr. Katz. You can appeal this. I want you to appeal it. I want the Appellate Division to make a finding that I am right or wrong, but there is no doubt about the finding that Dr. Katz lied. I want you to appeal that finding so that every lawyer in the state that looks at the Law Journal and looks at the record will be able to see what went on during this trial.

Right or wrong, they are going to come out with a statement of fact. They are going to come out with my finding that he lied. Now, I can't sanction him pursuant to the Court rules, but I can hold him in contempt. I will have to have a hearing for that.

105. Justice Hart, again characterized Dr. Katz's testimony about the second IME as a "lie" and then stated:

I am less interested in the money… *It is the scarlet letter I am interested in*. This gentleman is still doing IME's. He is still being used by defense firms. We have gotten calls to get the record of what went on when Dr. Katz testified…

I can't imagine the amount of extra trials and extra litigation and extra costs and extra everything that is occasioned by having this gentleman part of the system. I don't know if he is a spy with little beady eyes and goes away because he is not here and neither is his attorney. He is going literally on because I can't sanction him. I can't sanction him, but I can hold him in civil contempt after a hearing.

106. Justice Hart did not hold a contempt hearing let alone hold Dr. Katz in contempt despite his threats.

107. Justice Hart again addressed the sanctions that he was levying against the two firms and again invited them to appeal his not-yet-made ruling.

108. That morning, Justice Hart, without Dr. Katz present, called Dr. Katz a liar no less than 25 times and went so far as to tell the attorneys of record, "[You] should almost sue Dr. Katz for causing this problem. I would suggest that you do that…"

109. Upon information and belief, none of the parties to the proceedings before Justice Hart have commenced any action against Dr. Katz.

110. Justice Hart, once again, threatened to commence a contempt hearing against Dr. Katz:

> I would like to sanction Dr. Katz. I would like to put Dr.
> Katz out of the business of doing IME's period. But I can't
> do that in this type of proceeding. I can order an eventual
> [contempt hearing] when they are before me, a civil contempt
> hearing to be done by another Judge. I am not going to do it.
> I will discuss with the powers that be in this building a civil
> contempt hearing with regards to Dr. Katz. That is Michael
> Katz, an orthopedist.

111. Upon information and belief, Justice Hart did not discuss bringing a civil contempt proceeding against Dr. Katz with the Administrative Judge or commence any such proceedings despite this threat.

112. Justice Hart also inaccurately stated that Dr. Katz's own legal counsel admitted that Dr. Katz had committed perjury:

> …I have to again parrot that Dr. Katz' attorney [Mr. Lenihan]
> said probably the stupidest thing that I have ever heard in

Court, I caused him to perjure himself by forcing him to tell the truth. That is quite possibly the dumbest thing I have ever heard. That I caused the witness to perjure himself by forcing him to tell the truth. So, I want the Appellate Division and the Court of Appeals to get that guy's number.

113. Justice Hart repeatedly indicated that he wanted the Appellate Division to review his determinations concerning Dr. Katz, but, upon information and belief, Justice Hart never reduced his comments or conclusions concerning Dr. Katz to an order which would be appealable as of right.

114. Just before the midday break, Justice Hart said, "By the way it is noted that [Dr. Katz] is not here or his attorney." One of the attorneys present then reminded Justice Hart that in the previous proceeding he had not called for the parties or Dr. Katz to be present until two o'clock in the afternoon.

115. In closing the morning's proceedings, in the absence of Dr. Katz and his counsel, Justice Hart continued:

I am not finished with Dr. Katz. I am still not finished with Dr. Katz. Make sure that he and his attorney can find their way here. Because I have to see what I am going to do with him. I would suggest that your carriers reinforce their efforts to never use him again.

116. Upon information and belief, Justice Hart did not take any further action against Dr. Katz other than continue to make additional threats against him.

117. Dr. Katz and Mr. Vozza arrived shortly before the originally-scheduled afternoon calendar call. During the afternoon's proceedings on July 1, Justice Hart informed Mr. Vozza, on-the-record, that "at least one of the defense attorneys agreed that Dr. Katz lied."

24

118.    When Mr. Vozza took issue with Justice Hart's determination that Dr. Katz lied about the length of time that he spent examining the plaintiff, Justice Hart immediately changed course, telling Mr. Vozza, "I am not making a big thing out of 10, 20 minutes…," now suggesting that the real issue was that Dr. Katz could not have completed all of the tests that he testified he had completed.

119.    Upon information and belief, an additional proceeding, of which there is no record, occurred on July 2, 2013, where Justice Hart essentially repeated the same or similar statements concerning Dr. Katz.

120.    By this time, Mr. Vozza had made it clear that Dr. Katz would not be contributing money in any amount towards a settlement. Justice Hart then demanded that Dr. Katz retire instead of providing money for the settlement. Off-the-record, Justice Hart continually pressured Dr. Katz to state on the record he would no longer practice "medical-legal" examinations, repeatedly berated Dr. Katz, stating that "his career was over," and even stated that defendants' counsel wanted to "tear [Dr. Katz] a new asshole."

121.    Justice Hart also persistently repeated that Dr. Katz had "lied" and the transcript was being circulated so that no one would ever hire him again.

122.    As Mr. Vozza continued to object to the court's characterization of Dr. Katz's testimony, Justice Hart made the following comments from the bench:

> Again, I will refer this, unless I don't think Dr. Katz, you know, we have enough problems doing trials. It is a strain on the system, but unless I get some sort of representation from you [Mr. Vozza,] on behalf of Dr. Katz that he is out of the medical/legal business, I am going to refer this to the

Administrative Judge and the District Attorney of Queens [C]ounty [sic] so they can do whatever they want to do. Perjury is a D felony.

123. When Mr. Vozza asked if he could speak with Dr. Katz, Justice Hart continued:

I would strongly suggest that you talk to Dr. Katz. As it is, and I can say this because it has already been said on the record. He will not be doing business with Travelers or AIG anymore. I have a feeling that any attorney or adjuster within earshot or who reads this transcript will not be dealing with Dr. Katz much anymore. It might be an easy way for him to bow out gracefully from harm's way. I would imagine that his number is not going to be called too much in the foreseeable future. It might be a nice way out.

124. After the recess, Justice Hart continued stating:

Let the record reflect that I gave Dr. Katz the option of and I would institute a special proceeding to retire from the medical/legal business. Retire at the time and he has declined. What I am now going to do, I am going to order a full transcript of everything, the trial and the subsequent proceedings. I will present that to both the administrative judge of Queens and the District Attorney. I would recommend to the District Attorney that they explore prosecuting Dr. Katz for perjury."

125. Upon information and belief, Justice Hart was not contemplating a contempt hearing. Justice Hart announced in open court, but off-the-record, that he would be instituting a special proceeding under Article 4 of the CPLR and called the Supreme Court Clerk's Office to demand that someone from the office come and facilitate its filing.

126. Justice Hart stated that he would handwrite a complaint; that he would additionally serve as judge during the proceeding; that the purpose of the proceeding

would be to determine whether Dr. Katz committed perjury; and that the penalty imposed

would be the revocation of Dr. Katz's license to practice medicine.

127. Justice Hart offered no statutory authority supporting his threat to institute a

special proceeding against Dr. Katz while acting as both complainant and judge.

128. Justice Hart continued on the record noting:

> Again counsel, it is not the time so much if the doctor thinks
> he can explain the time. It is not the time problem. It is that
> there are tests that he testified to that he didn't do. That is the
> perjury. You might want to speak to your client again. You
> can interpret the entire thing however many ways you want.
> He testified to things that didn't happen. That is a problem.
> They call that perjury. Again, I am making it very clear on
> the record, the insurance companies here are not going to go
> near him.

> I unsealed the record. Everybody from now on when he
> testifies as to the tests that he performed, it is always going to
> be questioned from now on. After about a month or two,
> nobody is going to go near him anyway. So he is not giving
> up much. What he is giving up is me referring it to the
> District Attorney and to the Administrative Judge. I would
> think that he wants to consider it again. Nobody is going to
> go near him.

129. Upon information and belief, Justice Hart did not commence any special

proceedings or contact the District Attorney or Administrative Judge despite these

threats.

130. Justice Hart later demanded to know whether Dr. Katz was continuing to

perform IME's. Upon receiving an answer in the affirmative, Justice Hart continued:

> It is like a wound that is festering. Every time he does
> another IME. When is it going to stop? He is making 7
> figures a year doing IME's. Then he comes to my part and
> lies. I will give you five more minutes. Trust me, I will go to

27

the Administrative Judge, not that the administrative judge or the acting administrative judge doesn't already know about it, but I will go to the district attorney. It is not the time.

It is that the tape shows that he didn't do the tests that he spent a considerable amount of time talking about that he did. That is the perjury. Yes, he didn't do the tests. It is not just me saying it. It is not just the plaintiff saying it. The defendants are saying it too. Does your client really think if the insurance industry or some of the insurance companies that hired him before when they find out he lied, do you really think they will go near him?

As they distribute the transcript, certainly this morning's transcript, certainly the last transcript, certainly the transcript where his own attorney admitted that he perjured himself, but he only perjured himself because I told him to tell the truth. Imagine his own attorney said: Yes, he perjured himself. But he only perjured himself because I forced him to tell the truth.

131. There is nothing in the record to support Justice Hart's claims that Dr. Katz's attorneys admitted that Dr. Katz perjured himself.

132. The parties were again ordered to appear before Justice Hart on July 8, 2013. Justice Hart opened the proceeding on-the-record by saying:

Firstly, I made a prior ruling that is [a]greed to by at least one defendant that Dr. Katz lied on the stand. Again, the tape of the IME is part of the record. It has been explored ad nauseam. I don't have to go into the ruling or the findings again, but pursuant to that, defendants [] have asked for a new IME because of the fact that the expert that they had retained was found to have lied on the stand.

133. Justice Hart then addressed Dr. Katz's attorney directly:

Dr. Katz has already testified in this action. He has no further right to claim the 5th Amendment. If he is subpoenaed in here by any party, he must come or else he will be subject to contempt of this Court...

28

> If they [subpoena Dr. Katz], he must come in. I don't [w]ant any games. I am telling you right now, no games. If he is subpoenaed, he will come in...

134. Justice Hart's comments about Dr. Katz alleged waiver of his 5th Amendment rights is baseless.

135. Afterwards, Justice Hart said the following, over the course of several minutes:

> He lied. He lied. I would imagine to help either [the defendants] or his carrier. I don't know which one...
>
> I caused him to commit perjury by forcing him to tell the truth. All I want him to do is have him tell the truth...
>
> All he has to do is tell the truth...
>
> I don't want him to testify in the future in any other trials. I am stuck with him...
>
> If he comes and tells the truth, which means he would say instead of the exam taking 10, 20 minutes, it took 1 minute 56 seconds. His finding might have been shall we say exaggerated. The amount of tests that he did might have been somewhat exaggerated...
>
> This might help a settlement of some sort, but, hey, that might be my opinion.

136. Justice Hart also made clear that if Dr. Katz did not come to court when subpoenaed, that the Court would direct the "appropriate sheriff" to "help him" come to court.

137. Justice Hart did not direct a sheriff or any other court officer to bring Dr. Katz to Court despite this threat.

138. Justice Hart continued:

> Maybe I will have the contempt hearing here. He is denying that he lied. He should be happy to get away with me just saying that he lied. Let it go at that. Yes, we will have a finding forever more that a Justice for the Supreme Court of the state of New York said that he lied because he did it. I would suggest you let it go at that.

139.    Justice Hart did not commence any contempt proceedings against Dr. Katz despite this threat.

## II.    Eric Turkewitz's Defamatory Statements Concerning Dr. Katz

140.    Turkewitz is a prominent attorney who primarily represents plaintiffs in personal injury cases. Upon information and belief, Turkewitz is the sole member of the Turkewitz Law firm which has also been named as a defendant in this action.

141.    Turkewitz maintains a popular internet blog called the New York Personal Injury Law Blog. Turkewitz's blog contains numerous references to his personal injury law practice and a prominent link to his Firm's website.

142.    Turkewitz's blog routinely attacks the insurance defense industry including doctors who perform IME's such as Dr. Katz.

143.    Turkewitz attempts to generate interest in his site by posting seemingly provocative or scandalous material without a modicum of journalistic integrity.

144.    Upon information and belief, Turkewitz's blog is primarily intended to generate business and attract potential clients to the Turkewitz Law firm.

145.    Turkewitz has been named as a defendant in this action because he, along with defendant Samson Freundlich, published a series of blog posts in July 2013 concerning the proceedings before Justice Hart.

146.    Turkewitz repeated the false accusations made by Justice Hart concerning Dr. Katz in his blog posts and otherwise made a portion of the transcripts of the proceedings available to the public at large.

147.    Turkewitz, however, was not content to merely "report" on those proceeding and instead made gross misrepresentations and false statements of fact concerning the proceedings in an effort to destroy Dr. Katz's career.

148.    Turkewitz falsely stated and implied, among other things, that Dr. Katz had committed perjury, fraud and was guilty of racketeering.

149.    Turkewitz also falsely stated and implied that Dr. Katz was being investigated by the Attorney General's Office and the Office of Professional Medical Conduct despite the fact there was no evidence of any such investigation when Turkewitz published his blog posts.

150.    Turkewitz's blog posts were intended to create the impression that Dr. Katz had been charged with and/or convicted of criminal perjury or other crimes which would make him unfit to act as an expert witness.

151.    Turkewitz's false statements and mischaracterizations are manifest in his Blog Posts dated July 8, 2013, July 9, 2013, July 10, 2013, July 16, 2013 and January 6, 2014.

152.    Turkewitz statement, in the title to his July 8, 2013 Blog Post, that Dr. Katz's "Victims May Number in the Thousands" is false and misleading.  A copy of Turkewitz July 8, 2013 Blog Post is annexed as Exhibit 1.

153. There is no credible evidence in the record that Dr. Katz perjured himself in the *Bermejo* case let alone any other case and there is nothing to suggest that anyone was victimized by Dr. Katz.

154. Turkewitz sensational headline for his July 8, 2013 Blog Post was intended to garner website traffic and destroy Dr. Katz's reputation.

155. Turkewitz's statement, made in his July 8, 2013 Blog Post, that "Last week a state trial judge unsealed a record showing falsified testimony by an New York orthopedist who conducts up to 1,000 medical-legal exams each year" is false misleading. There is no credible evidence in the record that Dr. Katz falsified his testimony. This statement unfairly and inaccurately implies that Dr. Katz had been charged with and/or convicted of criminal perjury.

156. Furthermore, upon information and belief, Turkewitz did not review the transcript of the April 12, 2013 proceedings before publishing this blog post.

157. Turkewitz's statement, made in his July 8, 2013 Blog Post, that "A surreptitiously made video, however, revealed that he spent a mere one minute and 56 seconds on the exam and could not have made all the findings he testified about within that short time" is false and misleading. The video referred to in this statement did not show or prove that the exam in question was one minute and 56 seconds long. Turkewitz's statement also completely ignores the fact that the plaintiff's own witness Ms. Ramirez testified that the length of the "exam" was approximately three minutes and the length of the "total evaluation" was approximately five minutes.

158.    Turkewitz's statement, made in his July 8, 2013 Blog Post, that "When Dr. Katz offered testimony at trial that was completely inconsistent with the actual events, the evidence was submitted to the court" is false and misleading.  Dr. Katz's testimony was not completely inconsistent with the actual events which Turkewitz would have known if he reviewed the transcripts in questions.

159.    Turkewitz's statement, made in his July 8, 2013 Blog Post, that Dr. Katz "had been caught lying back on April 12th," is false and misleading.  This statement unfairly and inaccurately implies that Dr. Katz was charged with and/or convicted of criminal perjury.

160.    Turkewitz's statement, made in his July 8, 2013 Blog Post, comparing Dr. Katz to Dr. Robert Israel, who, upon information and belief was sanctioned for failing to take adequate, accurate and complete medical histories and by failing to note accurate and complete and appropriate physical exams, is false and misleading.  Dr. Katz was not sanctioned or otherwise disciplined for any of the conduct described in the proceedings before Justice Hart.

161.    Turkewitz's statement in his July 8, 2013 Blog Post, that "Drs. Katz and Israel have no doubt sent New York's insurance carriers frantically scrambling, as the two of them were responsible for thousands of insurance exams each year, the results of which are now all thrown into question," is false and misleading.  Turkewitz statement is false and misleading because there was no evidence that insurance carriers were "frantically scrambling" concerning Dr. Katz's exams when Turkewitz published his blog posts.

162.    Turkewitz's statement in his July 8, 2013 Blog Post, that "The scope and scale of insurance fraud being perpetrated — by the insurance companies themselves — could have resulted in hundreds of millions of dollars in payments being withheld" is false and misleading.  This statement inaccurately and unfairly implies that Dr. Katz has conspired with insurance companies to commit insurance fraud.

163.    Turkewitz's statement in his July 8, 2013 Blog Post, that "The legal fallout may result in any or all of the following: Civil contempt of court; Criminal perjury prosecution by the District Attorney; Civil suits for causing this mistrial by any/all of the attorneys involved; Civil suits based on fraud by past litigants saying they were also victimized by Dr. Katz; Action against his license from the Department of Health-Bureau of Professional Medical Conduct; Racketeering suits for conspiring with insurance companies to commit insurance fraud; and Investigation by the Attorney General into the issue of insurance fraud perpetuated by the insurance industry" are false and misleading. There is no evidence that any civil or criminal proceedings of any nature were commenced against Dr. Katz in any forum relating to the proceedings before Justice Hart when Turkewitz published his blog posts.

164.    Turkewitz's statement in the title to his July 9, 2013 Blog Post, "Dr. Michael Katz's License and Liberty Placed in Jeopardy Due to Lying Over Medical – Legal Exam" is false and misleading.  There was no evidence that Dr. Katz's license or liberty were in jeopardy as a result of the proceedings before Justice Hart.  A copy of the July 9, 2013 Blog Post is annexed as Exhibit 2.

165. Turkewitz's statement in his July 9, 2013 Blog Post, that "The time had come for a local orthopedist to face the music yesterday afternoon after a New York judge found he had lied under oath in April" is false and misleading. This statement unfairly and inaccurately implies that Dr. Katz was charged with and/or convicted of criminal perjury.

166. Turkewitz's statement in his July 9, 2013 Blog Post, that "The court has ordered the trial transcripts be forwarded to the following for further inquiry, investigation and appropriate action: Referral to the Queens Administrative Judge so that Dr. Katz can be held in civil contempt of court for perjury; Referral to the Queens District Attorney for prosecution for perjury; and Referral to the Department of Health – Bureau of Professional Medical Conduct to evaluate his fitness to practice medicate," is false and misleading. Upon information and belief, Justice Hart did not order the trial transcripts be forwarded to and did not otherwise forward the transcripts to the Queens County Administrative Judge, the Queens District Attorney or the Office of Professional Medical Conduct or any other regulatory agency when Turkewitz published his blog post.

167. Turkewitz statement in his July 9, 2013 Blog Post that "Justice Hart unsealed the court record July 1st, made the above referrals today, and Dr. Katz now sits in more legal hot water than he ever could have imagined just one week ago," is false and misleading. This statement unfairly and inaccurately implies that Justice Hart made referrals to the Queens County Administrative Judge, the Queens County District Attorney or the Office of Professional Medical Conduct and that Dr. Katz was charged with and/or convicted of criminal perjury.

168.    Turkewitz's statement in his July 9, 2013 Blog Post that "There is still the prospect of Attorney General Eric Schneiderman investigating the cozy relationship between insurance companies and the doctors that so eagerly do their bidding," is false and misleading.  This statement unfairly and inaccurately implies that the Attorney General was investigating Dr. Katz's dealing with insurance companies.  There is no evidence whatsoever that the Attorney General has any interest in the proceedings before Justice Hart.

169.    Turkewitz's statement in his July 9, 2013 Blog Post that  "And litigation could easily follow in matters where judges and juries had previously relied upon Dr. Katz's reports and testimony to get cases dismissed or to limit damages," is false and misleading.  There is no evidence that any parties have commenced any action against Dr. Katz based on his testimony during the proceedings before Justice Hart.  This statement was solely intended to destroy Dr. Katz's relationship with the insurance carriers.

170.    Turkewitz's statement in his July 9, 2013 Blog Post that "There is little doubt that insurance companies throughout New York are now scrambling to make similar motions for new doctors to examine a variety of litigants, both for Dr. Katz and Dr. Robert Israel, who was slapped with his own sanctions just last month," is false and misleading.  Turkewitz statement is false and misleading because there was no evidence that insurance carriers were "scrambling" concerning Dr. Katz's exams prior to Turkewitz's Blog Posts particularly because Justice Hart did not bring any contempt proceedings against Dr. Katz.

171.   Turkewitz's July 9, 2013 Blog Post also creates a false and misleading impression that Dr. Katz had been charged with and/or convicted of criminal perjury or other crimes by expressly comparing Dr. Katz to a "convicted felon" and a "prisoner." Dr. Katz was not charged with or convicted of any crimes whatsoever nor will he be charged with any crimes in connection with the proceedings before Justice Hart.

172.   Turkewitz's statement in his July 9, 2013 Blog Post that "there appears to be no realistic way that he could testify without perjuring himself or admitting that his prior testimony was false," is false and misleading. This statement fails to recognize that Dr. Katz did not testify concerning the length of the second exam and that Justice Hart's comments concerning the length of the video tape are factually wrong. The statement also completely disregards Justice Hart's additional statements disregarding or minimizing the dispute of about length of the video tape.

173.   Turkewitz rhetorical question in the comment section to his July 9, 2013 blog post that "The US Department of Labor had been hiring Drs. Katz and Israel?" and "How does one sue the US Govt for racketeering?" is false and misleading. This statement falsely implies that Dr. Katz is guilty of racketeering.

174.   Turkewitz reiterated his suggestion that Dr. Katz was guilty of racketeering in a follow up comment to his July 9, 2013 Blog Post stating that his suggestion that Dr. Katz was guilty of racketeering was "logical."

175.   Turkewitz's further statement in the comments to his July 9, 2013 Blog Post that "a mistrial was declared and the good doctor was referred to the District Attorney for possible perjury prosecution, to the Administrative Judge for possible civil

contempt and to the Department of Health – Bureau of Professional Medical Conduct to evaluate his fitness to practice medicine," is false and misleading. There is no evidence whatsoever that such referrals were made when Turkewitz published his blog posts.

176.    Turkewitz's statement in his July 10, 2013 Blog Post referencing Justice Hart's "referral this week of Dr. Katz for civil contempt, criminal perjury and professional misconduct proceedings," is false and misleading. There is, once again, no evidence that Justice Hart actually referred Dr. Katz for civil contempt, criminal perjury and/or professional misconduct hearings when Turkewitz published his blog posts. A copy of the July 10, 2013 Blog Post is annexed as Exhibit C.

177.    Turkewitz's statement in his July 10, 2013 Blog Post that Dr. Katz testified that "his second exam of Mr. Bermejo likely took 10 – 20 minutes (based on his custom and practice)" is false and misleading and otherwise intended to support the implication that Dr. Katz lied during the proceedings before Justice Hart. Dr. Katz plainly testified on five separate occasions that he could not remember the length of the second examination which Turkewitz would have known if he reviewed the transcripts.

178.    Turkewitz's statement in his July 10, 2013 Blog Post that "I've obtained the reports on many of the 'frequent flyer' doctors, of whom Dr. Katz was one of the most frequent," is false and misleading. This statement was intended to impugn Dr. Katz's credibility without any basis in fact.

179.    Turkewitz's statement in his July 16, 2013 Blog Post that Dr. Katz "was busted for lying on the witness stand about his secretly recorded one minute 56 second evaluation. This statement unfairly and inaccurately implies that Dr. Katz was charged

38

with and/or convicted of criminal perjury. The use of the phrase "busted" in particular implies that he was charged with or convicted with a crime. A copy of the July 16, 2013 Blog Post is annexed as Exhibit 4.

180. Turkewitz's statement in his July 16, 2013 Blog Post that "Justice Duane Hart shipped the transcripts off to the DA, the Chief Administrative Judge and the Office of Professional Medical Conduct" is false and misleading. There is, once again, no evidence that Justice Hart sent the transcripts to the District Attorney, the Chief Administrative Judge or the Office of Professional Medical Conduct and there is no evidence that any such investigations relating to the proceedings before Justice Hart were underway when Turkewitz published his blog posts.

181. Turkewitz's statement in his July 16, 2013 Blog Post that "my analysis found that his usual exam is likely under five minutes, which is also contrary to what he testified," is false and misleading because Dr. Katz's normal and customary exams last longer than five minutes. Turkewitz statement is also misleading because, upon information and belief, Turkewitz did not conduct any independent analysis and merely parroted baseless allegations from another website without making any effort to verify those allegations.

182. Turkewitz's statement in his July 16, 2013 Blog Post that "Like the District Attorneys, such as Queens District Attorney Richard A. Brown who already has the Michael Katz perjury file heading toward his office for potential prosecution" is false and misleading. There is no evidence that any such file was sent to the Queens District Attorney.

183. Turkewitz recounted and reiterated the comments he made in his earlier Blog Posts concerning Dr. Katz in his 2013 Year in Review Blog Post dated January 6, 2014. A copy of the January 6, 2014 Blog Post is annexed as Exhibit 5.

184. Turkewitz bragged that his earlier blog posts concerning Dr. Katz had garnered significant attention and that his July 9, 2013 Blog Post concerning Dr. Katz had over 18,000 views.

185. Turkewitz also noted that he knew from certain unidentified sources that Dr. Katz would be "hard-pressed to ever take the witness stand again" as a result of his blog posts. Turkewitz also stated that he had done his part to make sure that Dr. Katz conduct was well know despite that fact that Turkewitz's statements concerning Dr. Katz were grossly unfair and inaccurate.

186. Upon information and belief, defendant Samson Freundlich co-wrote and/or co-authored Turkewitz's blog posts including the July 8, 2013 Blog Post and July 9, 2013 Blog Post and is jointly and severally liable for all of the defamatory comments contained therein for the reasons set forth above.

187. Turkewitz and Freundlich's blog posts were intended to and did create the overall impression that Dr. Katz had been tried and convicted of criminal activity and that he was otherwise unfit to practice in his chosen profession as an expert witness.

188. Turkewitz and Freundlich alleged that Justice Hart referred Dr. Katz for civil contempt, criminal perjury and professional misconduct proceedings or that those proceedings were underway but made no attempt to independently verify whether those referrals took place or whether such proceedings were underway.

189. Upon information and belief, Turkewitz and Freundlich did not read the underlying transcripts of the proceedings before Justice Hart and/or purposely ignored those portions of the transcripts which were inconsistent with their blog posts.

190. Upon information and belief, Turkewitz and Freundlich failed and/or refused to post a transcript of the April 12, 2013 proceedings before Justice Hart because the transcript would show that their statements concerning Dr. Katz were false and misleading.

191. Turkewitz and Freundlich's blog posts do not constitute fair or balanced reporting and they did not otherwise make any effort to correct their false or misleading statements.

192. Upon information and belief, Turkewitz and Freundlich do not regularly read and/or independently fact-check the articles and other material that they post on their website.

193. Turkewitz and Freundlich published their blog posts based on actual malice towards Dr. Katz and with the intention of destroying Dr. Katz's career.

194. Turkewitz and Freundlich did not seek or obtain any comments from Dr. Katz or his representatives concerning the allegations contained in his blog posts or provide Dr. Katz and his representatives with an opportunity to rebut any of the allegations contained in the blog posts.

195. Upon information and belief, Turkewitz and Freundlich do not have any training as journalists and are not affiliated with any legitimate news gathering organization.

196.    Upon information and belief, Turkewitz and Freundlich did not rely on multiple sources or otherwise verify their sources prior to publishing the blog posts.

197.    Upon information and belief, Turkewitz and Freundlich did not maintain appropriate records concerning the proceedings before Justice Hart or sources for their information.

198.    Turkewitz and Freundlich knew, based on their knowledge of the insurance defense industry, that Dr. Katz had existing contracts and/or continuing business relationships with major insurance carriers and third party independent medical examination companies and Turkewitz and Freundlich intended to disrupt those relationships.

199.    Turkewitz and Freundlich's blog posts which were viewed by thousands of individuals over the course of nearly nine months and subsequently disseminated to key members of the insurance defense industry, by Defendant Kassirer, have completely and unequivocally destroyed Dr. Katz's career as an expert witness.

200.    Turkewitz and Freundlich acted at all times with malice and ill will towards Dr. Katz and have damaged Dr. Katz in an amount to be determined at trial but estimated to exceed $10,000,000 plus punitive damages in the amount of $30,000,000.

**III.    Paul L. Kassirer's Defamatory Statements Concerning Dr. Katz**

201.    Defendant Paul L. Kassirer is a Senior Partner at the law firm of Lester Schwab Katz and Dwyer, LLP ("Lester Schwab").

202.    Kassirer leads a legal practice group at Lester Schwab that concentrates on complex cases for self-insured clients, as well as primary and excess products liability

litigation (e.g. heavy construction equipment, motor vehicles, industrial machinery, electrical components, flammable fabrics, firearms and food-borne illness), construction cases under the New York Labor Law, environmental and toxic torts, property loss claims and general liability.

203.　Kassirer has been involved in several highly publicized litigations and is well known throughout the insurance defense industry.

204.　Upon information and belief, Kassirer has long standing ties to several major insurance carriers and third party independent medical examination companies as well as insurance defense oriented associations such as the Defense Association of New York ("DANY").

205.　Kassirer has been named as a defendant in this action because he willfully and maliciously disseminated an email to key members of the insurance defense industry which included a link to defendant Turkewitz's July 8, 2013 Blog Post concerning Dr. Katz.

206.　Upon information and belief, Kassirer sent his email on or about July 12, 2013 to hundreds of his contacts in the insurance defense industry concerning Dr. Katz along with a link to the Turkewitz's July 8, 2013 Blog Post. A copy of Kassirer's July 12, 2013 email is annexed as Exhibit 7.

207.　Kassirer's email initially states that "I am uncertain to whom I should direct this email, but I am sure that you can make sure that it is properly distributed."

208.    Kassirer's comments concerning the distribution of the email make it clear that he intended for his email to be disseminated to numerous individuals including individuals who would be responsible for hiring expert witnesses such as Dr. Katz.

209.    The email continues "Please see the link below re: Orthopedist, DR. MICHAEL KATZ" and directs the recipients to the link to Turkewitz's July 8, 2013 Blog Post.

210.    Kassirer continues stating "Needless to say, we do not use Dr. Katz's services, but <u>many</u> carriers and firms do, ***and what transpired in this case makes him absolutely useless as an examining 'expert*.' " (emphasis added) (underlining in original)

211.    Kassirer's statement that "we do not use Dr. Katz" is patently false as Kassirer's firm Lester Schwab had specifically retained and relied on Dr. Katz as an expert witness both before and after Kassirer sent his July 9, 2013 email.  In fact, one of Kassirer's partners planned to use Dr. Katz as an expert witness for a trial that was scheduled to go forward in August 2013.

212.    Kassirer's email also states "More to the point, even if he is eventually arrested and convicted of perjury, NY law is clear that he is not legally 'unavailable'. Accordingly, whoever has retained him will not be entitled to another IME.  As long as he was licensed and was competent at the time of the exam, he can testify and therefore is not 'unavailable.'  The obvious issue is that he will be destroyed on cross-examination for the reasons set forth in the attached article, so that one's choice is to call him and have him crucified or not call him and receive a missing witness charge."

213.    Kassirer concluded stating "In short, *make sure that no one is retaining him on your companies' matters*. Regards.  PLK." (emphasis added)

214.    Kassirer's email constitutes a false and defamatory statement to the extent it links to Turkewitz' July 8, 2013 Blog Post which in turn contains links to Turkewitz's other Blog Posts concerning Dr. Katz which each contain false and misleading statements concerning Dr. Katz.

215.    Kassirer is therefore chargeable with all of the false and misleading statements contained in Turkewitz's blog posts which are detailed above based on his re-publication and dissemination of the blog posts.

216.    Kassirer's email is also false and defamatory based on his statement that "Needless to say, we do not use Dr. Katz's services, but <u>many</u> carriers and firms do . . ."

217.    Kassirer's email creates the impression that his firm would not stoop to hire an expert witness such as Dr. Katz.  Kassirer's statement is completely false and misleading because Kassirer's colleagues relied on Dr. Katz as an expert witness both before and after Kassirer sent his email.

218.    Kassirer's statement that Dr. Katz was "absolutely useless as an examining 'expert'" also completely ignores the fact that Dr. Katz was not charged with and/or convicted with criminal perjury.

219.    Kassirer failed and/or refused to do a proper legal or factual investigation resulting in his baseless conclusion that Dr. Katz was "absolutely useless as an examining 'expert.'"

220. Kassirer did not give any consideration to whether the unsubstantiated threats made by Justice Hart would or could be admitted or used on cross examination in a subsequent proceeding where Dr. Katz was called as an expert witness.

221. Kassirer's statement that Dr. Katz was "absolutely useless as an examining 'expert.'" is also false and misleading because Kassirer's own colleagues intended to use Dr. Katz as an expert witness notwithstanding the factual allegations contained in Turkewitz's July 8, 2013 Blog Post.

222. Kassirer's partner Alfredo Alvarado retained Dr. Katz as an expert witness prior to the publication of the Turkewitz blog posts in a matter pending in Bronx County Supreme Court and planned to use him as an expert despite the Turkewitz blog posts.

223. The entire tone and impact of Kassirer's email would have changed if Kassirer had been truthful and stated that his firm has in fact used Dr. Katz and continued to use him despite the allegations set forth in the Turkewitz blog posts.

224. Kassirer's July 12, 2014 email spread like wildfire to all corners of the insurance defense industry and shortly thereafter Dr. Katz's received a copy of the email from one of his contacts in the industry.

225. Dr. Katz immediately contacted Kassirer's partner Richard Eniclerico and asked why Lester Schwab and Kassirer in particular were trying to destroy his career.

226. Eniclerico assured Dr. Katz that he appreciated Dr. Katz's long standing relationship with Lester Schwab and that the firm had no intention of destroying his career. Dr. Katz proceeded to read Kassirer's email to Eniclerico word for word.

227. Eniclerico proceeded to bizarrely suggest that Kassirer's email account must have been "hacked" because Lester Schwab "had a lot of enemies." Mr. Eniclerico said he would look into the matter and get back to Dr. Katz but he never did.

228. Dr. Katz has subsequently learned that Kassirer's email has been disseminated to virtually all major insurance carriers and third party independent medical examination companies here in New York.

229. Dr. Katz's entire business came to a halt during the summer of 2013 as a direct result of the Kassirer email.

230. Dr. Katz has been informed by representatives for insurance carriers and third party independent medical examination companies that he is no longer being used as an expert witness as a direct result of Kassirer's email and the Turkewitz blog posts.

231. Dr. Katz has been repudiated, ostracized and completely shut out of the insurance defense industry directly as a result of the false and defamatory statements spread by Kassirer and Turkewitz.

232. Kassirer's July 12, 2013 email, which included a link to Turkewitz's July 8, 2013 Blog Post, was intended to and did create the overall impression that Dr. Katz had been charged with and convicted of criminal activity and that he was otherwise unfit to practice in his chosen profession as an expert witness.

233. Kassirer's July 12, 2013 email stated in no uncertain terms that Dr. Katz was "useless as an 'expert witness' " based on a faulty factual and legal analysis.

234. Kassirer's July 12, 2013 email was intended to and did re-publish the allegations in Turkewitz's July 8, 2013 Blog Post including the false statements that

Justice Hart referred Dr. Katz for civil contempt, criminal perjury and professional misconduct proceedings or that those proceedings were underway, but Kassirer made no attempt to independently verify whether those referrals took place or whether such proceedings were underway.

235.  Upon information and belief, Kassirer did not read the underlying transcripts of the proceedings before Justice Hart and/or purposely ignored those portions of the transcripts which were inconsistent with his blog posts.

236.  Kassirer disseminated his July 12, 2013 email based on actual malice towards Dr. Katz and with the intention of destroying Dr. Katz's career.

237.  Kassirer knew, based on his knowledge of the insurance defense industry, that Dr. Katz had existing contracts and/or continuing business relationships with major insurance carriers and third party independent medical examination companies and Kassirer intended to disrupt those relationships.

238.  Kassirer's email which, upon information and belief, has been viewed by thousands of individuals over the course of nearly nine months has unequivocally destroyed Dr. Katz's career as an expert witness.

239.  Kassirer acted at all times with malice and ill will towards Dr. Katz and has damaged Dr. Katz in an amount to be determined at trial but estimated to exceed $10,000,000 plus punitive damages in the amount of $30,000,000.

## JURY TRIAL DEMAND

240.  Plaintiffs demand a jury trial in this case.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Defamation against Turkewitz, the Turkewitz Law Firm and Freundlich)

241.    Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs 1 through 241 with the same force and effect as if fully set forth at length hereat.

242.    Turkewitz and Freundlich made numerous statements concerning Dr. Katz that were false and misleading as set forth more fully in paragraphs 9 through 40 and 140 through 200.

243.    Turkewitz and Freundlich had actual knowledge that the statements set forth above were false and misleading and/or published those statements with reckless disregard for the truth.

244.    Turkewitz and Freundlich published the false and misleading statements set forth above with the intent that they would be viewed by, among others, insurance carriers and third party independent medical examination companies.

245.    Turkewitz and Freundlich made the false and misleading statements set forth above for the sole purpose of defaming and otherwise damaging Dr. Katz.

246.    The overall tone and tenor of Turkewitz and Freundlich's false and misleading statements implied that, among other things, Dr. Katz was useless as an expert witness.

247.    The overall tone and tenor of Turkewitz and Freundlich's false and misleading statements implied that, among other things, Dr. Katz had been charged and convicted of criminal perjury and other crimes.

248.     Turkewitz and Freundlich's false and misleading statements set forth above were libel *per se* because they tended to injure Dr. Katz in his profession and/or created the impression that he was charged with or convicted of a crime.

249.     Upon information and belief, Turkewitz and Freundlich were at all times acting on behalf of, or at the direction of, or in active participation with Defendant the Turkewitz Law Firm which is jointly and severally liable for the false and misleading statements set forth above.

250.     Plaintiffs have been damaged by defendants' false and misleading statements in an amount to be determined at trial but in no event less than $10,000,000.

251.     In addition, because defendants' defamation was willful, wanton and malicious, Plaintiffs should be awarded punitive damages as determined at trial but in no event less than $30,000,000.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Defamation against Kassirer and Lester Schwab)

252.     Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs 1 through 251 with the same force and effect as if fully set forth at length hereat.

253.     Kassirer made numerous statements concerning Dr. Katz that were false and misleading as set forth more fully in paragraphs 9 through 40 and 201 through 231.

254.     Kassirer had actual knowledge that the statements set forth above were false and misleading and/or published those statements with reckless disregard for the truth.

255.    Kassirer published the false and misleading statements that are set forth above with the intent that they would be viewed by, among others, insurance carriers and third party independent medical examination companies.

256.    Kassirer made the false and misleading statements set forth above for the sole purpose of defaming and otherwise damaging Dr. Katz.

257.    The overall tone and tenor of Kassirer's false and misleading statements implied that, among other things, Dr. Katz was useless as an expert witness.

258.    The overall tone and tenor of Kassirer's false and misleading statements implied that, among other things, Dr. Katz had been charged with and convicted of criminal perjury and other crimes.

259.    Kassirer's false and misleading statements set forth above were libel *per se* because they tended to injure Dr. Katz in his profession and/or created the impression that he was charged with or convicted of a crime.

260.    Upon information and belief, Kassirer was at all times acting on behalf of, at the direction of, or in active participation with defendant Lester Schwab which is jointly and severally liable for the false and misleading statements set forth above.

261.    Plaintiffs have been damaged by defendants' false and misleading statement in an amount to be determined at trial but in no event less than $10,000,000.

262.    In addition, because defendants' defamation was willful, wanton and malicious, Plaintiffs' should be awarded punitive damages as determined at trial but in no even less than $30,000,000.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Injurious Falsehood against Turkewitz,
### the Turkewitz Law Firm and Freundlich)

263.　Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs 1 through 262 with the same force and effect as if fully set forth at length hereat.

264.　Turkewitz and Freundlich published numerous falsehoods concerning Dr. Katz as set forth more fully above in paragraphs 9 through 40 and 140 through 200.

265.　Turkewitz and Freundlich's statements, set forth above, are false and misleading and were intended to create a false impression concerning Dr. Katz's reputation and professionalism.

266.　When Turkewitz and Freundlich made the statements set forth above, their intent in publishing such statements was to maliciously, wantonly, and willfully injure Dr. Katz's reputation and business.

267.　Turkewitz and Freundlich made the statements set forth above of and concerning Dr. Katz, knowing that they were false or with reckless disregard of the truth, to maliciously, wantonly, and willfully injure Dr. Katz.

268.　By reason of the foregoing, Dr. Katz has sustained serious injuries including injury to his reputation and business.

269.　Upon information and belief, Turkewitz and Freundlich were at all times acting on behalf of, or at the direction of, or in active participation with Defendant the Turkewitz Law Firm which is jointly and severally liable for the false and misleading statements set forth above.

270. Plaintiffs have been damaged by defendants' false and misleading statements in an amount to be determined at trial but in no event less than $10,000,000.

271. In addition, because defendants' conduct was willful, wanton and malicious, Plaintiffs should be awarded punitive damages as determined at trial but in no event less than $30,000,000.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(Injurious Falsehood against Kassirer and Lester Schwab)**

272. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs 1 through 271 with the same force and effect as if fully set forth at length hereat.

273. Kassirer published numerous falsehoods concerning Dr. Katz as set forth more fully above in paragraphs 9 through 40 and 201 through 231.

274. Kassirer's statements, set forth above, are false and misleading and were intended to create a false impression concerning Dr. Katz's reputation and professionalism.

275. When Kassirer made the statements set forth above, his intent in publishing such statements was to maliciously, wantonly, and willfully injure Dr. Katz's reputation and business.

276. Kassirer made the statements set forth above of and concerning Dr. Katz, knowing that they were false or with reckless disregard of the truth, to maliciously, wantonly, and willfully injure Dr. Katz.

277. By reason of the foregoing, Dr. Katz has sustained serious injuries including injury to his reputation and business.

278. Upon information and belief, Kassirer was at all times acting on behalf of, or at the direction of, or in active participation with Defendant the Lester Schwab which is jointly and severally liable for the false and misleading statements set forth above.

279. Plaintiffs have been damaged by defendants' false and misleading statements in an amount to be determined at trial but in no event less than $10,000,000.

280. In addition, because defendants' conduct was willful, wanton and malicious, Plaintiffs should be awarded punitive damages as determined at trial but in no event less than $30,000,000.

### AS AND FOR A FIFTH CAUSE OF ACTION
#### (Tortious Interference with Contract against Turkewitz, the Turkewitz Law Firm and Freundlich)

281. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs 1 through 280 with the same force and effect as if fully set forth at length hereat.

282. Turkewitz and Freundlich were aware, based on their experience with the insurance defense industry, that Plaintiffs had contractual relationships with insurance carriers and third party independent medical companies as set forth more fully above.

283. Plaintiffs' contracts with insurance carriers and third party independent medical companies were economically and materially valuable.

284. Upon information and belief, several insurance carriers and third party independent medical companies terminated and/or suspended their contractual

relationships with Plaintiffs based on the false and misleading statements made by Turkewitz and Freundlich as set forth more fully above.

285.    Plaintiffs have been unable obtain the full benefit and advantage of their existing contracts and/or renew such contracts based on Turkewitz and Freundlich's false and misleading statements set forth more fully above.

286.    As a direct consequence of the false and misleading statements made by Turkewitz and Freundlich as set forth more fully above Dr. Katz has been unable to work as an expert witness as contemplated by Plaintiffs numerous contractual relationships with insurance carriers and third party independent medical examination companies.

287.    Plaintiffs allege that but for Turkewitz and Freundlich's false and misleading statements as set forth more fully above, Plaintiffs would have benefitted from his ongoing contractual relationships with the insurance carriers and third party independent medical examination companies.

288.    The intentional and wrongful acts of Turkewitz and Freundlich include, but are not limited to false statements and misrepresentations concerning civil and criminal proceedings commenced against Dr. Katz and his suitability as an expert witness.

289.    Upon information and belief, Turkewitz and Freundlich were at all times acting on behalf of, or at the direction of, or in active participation with Defendant the Turkewitz Law Firm which is jointly and severally liable for the tortious conduct described herein.

290.  Plaintiffs have been damaged by defendants' tortious interference with their existing contracts in an amount to be determined at trial but in no event less than $10,000,000.

291.  In addition, because defendants' tortious interference was willful, wanton and malicious, Plaintiffs should be awarded punitive damages as determined at trial but in no even less than $30,000,000.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Tortious Interference with Contract against Kassirer and the Lester Schwab)

292.  Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs 1 through 291 with the same force and effect as if fully set forth at length hereat.

293.  Kassirer was aware, based on his extensive experience in the insurance defense industry, that Plaintiffs had contractual relationships with insurance carriers and third party independent medical examination companies as set forth more fully above.

294.  Plaintiffs' contracts with insurance carriers and third party independent medical examination companies were economically and materially valuable.

295.  Upon information and belief, several insurance carriers and third party independent medical examination companies terminated and/or suspended their contractual relationship with Plaintiffs based on the false and misleading statements set forth more fully above.

296. Plaintiffs have been unable obtain the full benefit and advantage of their existing contracts and/or renew such contracts based on Kassirer's false and misleading statements set forth more fully above.

297. As a direct consequence of the false and misleading statements made by Kassirer as set forth more fully above, Dr. Katz has been unable to work as an expert witness as contemplated by Plaintiffs' numerous contracts relationships with insurance carriers and third party independent medical companies.

298. Plaintiffs allege that but for Kassirer's false and misleading statements as set forth more fully above, Plaintiffs would have benefitted from their ongoing contractual relationships with the insurance carriers and third party independent medical companies.

299. The intentional and wrongful acts of Kassirer include, but are not limited to, false statements and misrepresentations concerning civil and criminal proceedings commenced against Dr. Katz and his suitability as an expert witness.

300. Upon information and belief, Kassirer was at all times acting on behalf of, or at the direction of, or in active participation with Defendant Lester Schwab which is jointly and severally liable for the tortious conduct described herein.

301. Plaintiffs have been damaged by defendants' tortious interference with their existing contracts in an amount to be determined at trial but in no event less than $10,000,000.

302. In addition, because defendants' tortious interference was willful, wanton and malicious, Plaintiffs should be awarded punitive damages as determined at trial but in no even less than $30,000,000.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Tortious Interference with Business Advantage against Turkewitz, the Turkewitz Law Firm and Freundlich)

303. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs 1 through 302 with the same force and effect as if fully set forth at length hereat.

304. Turkewitz and Freundlich were aware, based on their experience with the insurance defense industry, that Plaintiffs had substantial business relationships with insurance carriers and third party independent medical examination companies as set forth more fully above.

305. Plaintiffs' relationships with insurance carriers and third party independent medical examination companies were economically and materially valuable.

306. Turkewitz and Freundlich knowingly and intentionally interfered with Plaintiffs' business relationships with the insurance carriers and third party independent medical examination companies solely out of malice, or alternatively, by using dishonest, unfair or improper means to interfere with those business relationships.

307. Turkewitz and Freundlich's interference caused injury to the relationship between Plaintiffs and the insurance carriers and third party independent medical examination companies.

308.     As a direct consequence of Turkewitz and Freundlich's interference, Dr.
Katz has been unable to work as an expert witness despite Plaintiffs long standing
relationship with insurance carriers and third party independent medical examination
companies.

309.     Upon information and belief, Turkewitz and Freundlich were at all times
acting on behalf of, or at the direction of, or in active participation with Defendant the
Turkewitz Law Firm which is jointly and severally liable for the tortious conduct
described herein.

310.     Plaintiffs' have been damaged by defendants' tortious interference in an
amount to be determined at trial but in no event less than $10,000,000.

311.     In addition, because defendants' tortious interference was willful, wanton
and malicious, Plaintiffs should be awarded punitive damages as determined at trial but in
no even less than $30,000,000.

**AS AND FOR A EIGHTH CAUSE OF ACTION**
**(Tortious Interference with Business Advantage**
**against Kassirer and Lester Schwab)**

312.     Plaintiffs repeat and reallege each and every allegation set forth in the
foregoing paragraphs 1 through 311 with the same force and effect as if fully set forth at
length hereat.

313.     Kassirer was aware, based on his experience in the industry, that Plaintiffs
had substantial business relationships with insurance carriers and third party independent
medical companies as set forth more fully above.

314. Plaintiffs' relationships with insurance carriers and third party independent medical companies were economically and materially valuable.

315. Kassirer knowingly and intentionally interfered with Plaintiffs' business relationship with the insurance carriers and third party independent medical examination companies solely out of malice, or alternatively, by using dishonest, unfair or improper means to interfere with those business relationships.

316. Kassirer's interference caused injury to the relationship between Plaintiffs and the insurance carriers and third party independent medical examination companies.

317. As a direct consequence of Kassirer's interference Dr. Katz has been unable to work as an expert witness despite Plaintiffs long standing relationships with insurance carriers and third party independent medical examination companies.

318. Upon information and belief, Kassirer was at all times acting on behalf of, or at the direction of, or in active participation with Defendant Lester Schwab which is jointly and severally liable for the tortious conduct described herein.

319. Plaintiffs have been damaged by defendants' tortious interference in an amount to be determined at trial but in no event less than $10,000,000.

320. In addition, because defendants' tortious interference was willful, wanton and malicious, Plaintiffs should be awarded punitive damages as determined at trial but in no even less than $30,000,000.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Prima Facie Tort against Turkewitz,
### Turkewitz Law Firm and Freundlich)

321.    Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs 1 through 320 with the same force and effect as if fully set forth at length hereat.

322.    Turkewitz and Freundlich intentionally inflicted harm on Plaintiffs as described above without excuse or justification by their acts of abuse and harassment and by maliciously publishing defamatory, false and derogatory statements about Dr. Katz.

323.    Turkewitz and Freundlich knowingly and intentionally set out to destroy Dr. Katz's career as a defense expert as set forth more fully above.

324.    Turkewitz and Freundlich's actions were willful and were taken without any reasonable cause or justification.

325.    Turkewitz and Freundlich took such actions with the deliberate intent of injuring Plaintiffs.

326.    As a direct result of Turkewitz and Freundlich's conduct, Dr. Katz's lucrative career as an expert witness has been destroyed and Plaintiffs have suffered damages including but not limited to special damages.

327.    Upon information and belief, Turkewitz and Freundlich were at all times acting on behalf of, or at the direction of, or in active participation with Defendant the Turkewitz Law Firm which is jointly and severally liable for the tortious conduct described herein.

328.    Plaintiffs have been damaged by defendants' tortious conduct in an amount to be determined at trial but in no event less than $10,000,000.

329.    In addition, because defendants' tortious interference was willful, wanton and malicious, Plaintiffs should be awarded punitive damages as determined at trial but in no even less than $30,000,000.

### AS AND FOR A TENTH CAUSE OF ACTION
**(Prima Facie Tort against
Kassirer and Lester Schwab)**

330.    Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs 1 through 329 with the same force and effect as if fully set forth at length hereat.

331.    Kassirer intentionally inflicted harm on Plaintiffs as described above without excuse or justification by his acts of abuse and harassment and by maliciously publishing defamatory, false and derogatory statements about Dr. Katz.

332.    Kassirer knowingly and intentionally set out to destroy Dr. Katz's career as a defense expert as set forth more fully above.

333.    Kassirer's actions were willful and were taken without any reasonable cause or justification.

334.    Kassirer took such actions with the deliberate intent of injuring Plaintiffs.

335.    As a direct result of Kassirer's conduct, Dr. Katz's lucrative career as an expert witness has been destroyed and Plaintiffs have suffered damages including but not limited to special damages.

336. Upon information and belief, Turkewitz and Freundlich were at all times acting on behalf of, or at the direction of, or in active participation with Defendant the Turkewitz Law Firm which is jointly and severally liable for the tortious conduct described herein.

337. Plaintiffs have been damaged by defendants' tortious conduct in an amount to be determined at trial but in no event less than $10,000,000.

338. In addition, because defendants' tortious interference was willful, wanton and malicious, Plaintiffs should be awarded punitive damages as determined at trial but in no even less than $30,000,000.

WHEREFORE, Plaintiffs, Michael Katz, M.D. and Michael J. Katz MD PC , respectfully demand judgment against Defendants as follows:

a. On the first cause of action, awarding Plaintiffs compensatory damages in an amount to be proven at trial, but estimated to exceed $10,000,000 and punitive damages in the amount of $30,000,000;

b. On the second cause of action, awarding Plaintiffs compensatory damages in an amount to be proven at trial, but estimated to exceed $10,000,000 and punitive damages in the amount of $30,000,000;

c. On the third cause of action, awarding Plaintiffs compensatory damages in an amount to be proven at trial, but estimated to exceed $10,000,000 and punitive damages in the amount of $30,000,000;

d.	On the fourth cause of action, awarding Plaintiffs compensatory damages in an amount to be proven at trial, but estimated to exceed $10,000,000 and punitive damages in the amount of $30,000,000;

e.	On the fifth cause of action, awarding Plaintiffs compensatory damages in an amount to be proven at trial, but estimated to exceed $10,000,000 and punitive damages in the amount of $30,000,000;

f.	On the sixth cause of action, awarding Plaintiffs compensatory damages in an amount to be proven at trial, but estimated to exceed $10,000,000 and punitive damages in the amount of $30,000,000;

g.	On the seventh cause of action, awarding Plaintiffs compensatory damages in an amount to be proven at trial, but estimated to exceed $10,000,000 and punitive damages in the amount of $30,000,000;

h.	On the eighth cause of action, awarding Plaintiffs compensatory damages in an amount to be proven at trial, but estimated to exceed $10,000,000 and punitive damages in the amount of $30,000,000;

i.	On the ninth cause of action, awarding Plaintiffs compensatory damages in an amount to be proven at trial, but estimated to exceed $10,000,000 and punitive damages in the amount of $30,000,000;

j.	On the tenth cause of action, awarding Plaintiffs compensatory damages in an amount to be proven at trial, but estimated to exceed $10,000,000 and punitive damages in the amount of $30,000,000; and

k.    granting Plaintiffs the costs and disbursements of this action and such other

and further relief as the Court deems just and proper.

Dated:  Uniondale, New York
        April 14, 2014

                        RUSKIN MOSCOU FALTISCHEK, P.C.


                        By:_____
                            Jonathan C. Sullivan, Esq.
                            *Attorney for Plaintiffs*
                            1425 RXR Plaza
                            East Tower, 15th Floor
                            Uniondale, New York 11556
                            (516) 663-6600

# VERIFICATION

STATE OF NEW YORK  )
                     )    ss.:
COUNTY OF QUEENS  )

       Michael Katz, M.D., being duly sworn, deposes and says:

       I am the plaintiff in the above-captioned action, and I have read the foregoing verified complaint, which is true to my knowledge, except as to those matters therein alleged upon information and belief, which matters I believe to be true based upon my review of the underlying agreement, correspondence, records, files and other papers relevant to this action, and based on my personal discussions with individuals involved in the facts alleged.

                                                       _____
                                                  MICHAEL KATZ, M.D.

Sworn to before me this
__14__ day of April, 2014.

_____
NOTARY PUBLIC

CHRIS PACINI
Notary Public • State of Florida
My Comm. Expires Nov 21, 2014
Commission # EE 44037