**EXHIBIT B**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
MICHAEL J. KATZ, M.D. and                              Docket No. 16-cv-4389
MICHAEL J. KATZ, M.D., P.C.,

                              Plaintiffs,              **AMENDED**
                                                      **VERIFIED COMPLAINT**

          -against-

TRAVELERS a/k/a TRAVELERS INSURANCE
COMPANY a/k/a THE TRAVELERS COMPANIES,
INC., its relevant servants, agents or employees and
relevant associated, affiliated or subsidiary corporations
and EXAM WORKS, INC., and its relevant servants,
agents or employees and relevant associated, affiliated
or subsidiary corporations,

                              Defendants.
----------------------------------------------------------------X

          Plaintiffs, by Zisholtz & Zisholtz, LLP, their attorneys, complaining of the defendants,

respectfully allege:

## PARTIES

          1.          Plaintiff, Michael J. Katz, M.D. ("Dr. Katz"), is a medical doctor duly licensed to

practice medicine in the State of New York and a resident in the County of Nassau, State of New

York.

          2.          Plaintiff, Michael J. Katz, MD PC ("Michael J. Katz PC") is a professional

corporation duly organized and existing under and by virtue of the laws of the State of New York.

          3.          Upon information and belief, the defendant, Travelers a/k/a Travelers Insurance

Company a/k/a The Travelers Companies, Inc. ("Travelers") and its relevant servants, agents or

employees and its relevant associated, affiliated or subsidiary corporations were and still are either domestic or foreign corporations duly authorized to do business within the State of New York.

4.     Upon information and belief, the defendant, ExamWorks, Inc. ("ExamWorks") and its relevant servants, agents or employees, and its relevant associated, affiliated or subsidiary corporation are domestic or foreign corporations duly authorized to do business within the State of New York.

5.     That at all times herein mentioned, Travelers  acted by and through its relevant servants, agents or employees and relevant associated, affiliated or subsidiary corporations.

6.     Defendant, Travelers, is in the business of, including but not limited to, issuing insurance policies and defending their assureds on claims for alleged damages resulting in personal injuries allegedly sustained through alleged negligence of their assureds.

7.     At all times herein mentioned, ExamWorks was in the business of providing physicians or names of physicians to conduct independent medical examinations (IME) in connection with claims for personal injury that were instituted against clients and customers of Travelers and other insurance companies.

8.     In effect, ExamWorks was a clearinghouse for eligible and ineligible physicians in the field of IME and medical testimony in liability and workers' compensation cases.

9.     To enable ExamWorks to provide qualified physicians to conduct IME examinations and to testify in Court or Workers' Compensation hearings, Exam Works maintained lists of physicians who were qualified or not qualified for such purposes.

## FACTS

10.    Michael Katz, M.D. is an accomplished, well-known and, until events re-countered herein, a well-respected, physician who spent decades building a substantial successful orthopedic practice and gradually transitioned that practice into a career as an expert witness in the area of orthopedic medicine.

11.    Dr. Katz has testified in countless personal injury and medical malpractice cases as an expert witness, most often for defendants, over a period of more than twenty years and developed a unique ability to communicate his medical findings to juries.

12.    At one point, Dr. Katz was one of the most sought after expert witnesses in the field of orthopedic medicine.

13.    Dr. Katz's long and successful career was destroyed virtually overnight by the defendants herein.    14.    In July, 2013, the case entitled *Bermejo v. Amsterdam & 76th Associates, LLC, et. al.*, Index No. 23985/2009 appeared for trial in the Supreme Court, Queens County, before the late Justice Duane Hart.

15.    One of the defendants in that action was a corporation known as Ibex Construction Inc., insured by the defendant, Travelers.

16.    Travelers, through ExamWorks, engaged Dr. Katz, who conducted an IME of the plaintiff.

17.    Dr. Katz conducted two IME examinations. The first lasted approximately 45 minutes and the time consumed by the second became an issue.

18.    At the trial, it was revealed that on the second IME examination, Patrick J. Hackett, Esq., counsel for the plaintiff, Bermejo, surreptitiously, illegally and unethically videotaped the second IME.

19.    When Dr. Katz was called upon to testify, Mr. Hackett asked Dr. Katz how much time he spent conducting the second IME.

20.    Dr. Katz testified to the effect that he could not remember, at which point the late Justice Duane Hart intervened and pressed Dr. Katz claiming he could not accept Katz's answer of "I don't know."

21.    Justice Hart demanded that Dr. Katz put a time limit or time frame on how much time was spent on the second IME and despite repeated statements by Dr. Katz that he did not know, Justice Hart insisted on receiving a number.

22.    Justice Hart, however, interrupted Dr. Katz's testimony stating "I cannot accept an 'I don't know.' You have been doing this for awhile[sic]. I will have to insist on what your custom and practice would be as to what type of, the length of an exam of this type." Dr. Katz replied, "I think a range of between ten and 20 minutes would be appropriate."

23.    Mr. Hackett then disclosed that he had secretly recorded the second IME and claimed that it showed that the IME, lasted only one minute and fifty-six seconds. Bermejo's counsel argued that Dr. Katz perjured himself even though Dr. Katz never testified concerning the length of the second IME, and only testified concerning his custom and practice generally.

24.    Mr. Hackett not only misconstrued the nature of Dr. Katz's testimony, but also misrepresented the length of the recording. The recording lasted for five minutes and four seconds, not one minute and fifty-six seconds. The video also begins some time after the

Bermejo entered the exam room. It is also not clear how much longer Dr. Katz and Bermejo remained in the exam room together after the video terminated.

25.    The surreptitious and misleading videotape should have resulted in an immediate mistrial, but Justice Hart inexplicably concluded that Dr. Katz lied concerning the length of the examination despite the fact that he clearly testified he could not remember how long the examination took. Justice Hart proceeded to berate Dr. Katz both on and off the record during numerous subsequent proceedings and inexplicably demanded indirectly that Dr. Katz contribute money reportedly $750,000 towards a settlement with plaintiff. Justice Hart called Dr. Katz, among other things, a"no good liar" and a"thief" and implied that he was a "spy" with "little beady eyes."

26.    Justice Hart threatened to commence contempt proceedings against Dr. Katz and to refer him to the Administrative Judge, the Queens County District Attorney and the Office of Professional Medical Conduct if Dr. Katz did not contribute hundreds of thousands of dollars towards settlement. Justice Hart also warned Dr. Katz that if word of the proceedings ever spread to the insurance companies Dr. Katz's reputation as an expert witness would be ruined. Justice Hart told Dr. Katz that he would unseal the record in Bermejo if Dr. Katz didn't contribute to the settlement.

27.    Dr. Katz adamantly refused to contribute to the settlement because he had done nothing wrong and there was certainly no basis for him to pay any money to a plaintiff in an action in which he was not even a party. Justice Hart then demanded that Dr. Katz agree to retire from his work as an expert witness if he would not contribute to the settlement. Justice Hart suggested that he would commence a special proceeding against Dr. Katz to force him to give up

his license to practice medicine. Justice Hart suggested that he could act as the plaintiff and the trier of fact in such a proceeding.

28.     Dr. Katz again refused to contribute to the settlement or to retire from his work as an expert witness because he did not perjure himself.

29.     Justice Hart would later change his strategy and suggest that he was "not making a big thing" out of the length of the exam and that the real issue was whether Dr. Katz could have performed all of the tests he testified to during the second IME.

30.     The bottom line is that Dr. Katz cannot be prosecuted for civil contempt or criminal perjury because the record clearly shows that he did not perjure himself. Justice Hart, however, proceeded to unseal the record in the Bermejo matter and invited the attorneys in the Courtroom to spread the word that Dr. Katz had been caught lying. The defendants in this case gladly accepted Justice Hart's invitation and in so doing spread false and malicious lies concerning Dr. Katz.

31.     Justice Hart plainly threatened to ruin Dr. Katz's career, but the real damage to Dr. Katz's career was inflicted by defendants herein.

32.     Dr. Katz has been repudiated, ostracized and completely shut out of the insurance defense industry directly as a result of defendants' improper and unlawful conduct.

## DR. KATZ'S FACTUAL BACKGROUND

33.     Dr. Katz had established himself as one of the premier expert witnesses in the field of orthopedic medicine by the time he was retained in the Bermejo case. Dr. Katz graduated from Queens College of the City University of New York with honors, and then attended the Albert Einstein College of Medicine, where he similarly graduated with honors. While in

medical school, Dr. Katz was recognized in the area of biomedical research and was a Jonas Salk Scholar.

34.     After successfully completing his residency program at the Hospital of the University of Pennsylvania, Dr. Katz went on to build a successful orthopedic practice in Flushing, Queens. He remains a board certified orthopedic surgeon and continues to maintain his private orthopedic practice.

35.     Dr. Katz's research in the area of bone loss has been used by the National Aeronautics and Space Administration (NASA) in its space travel programs. His research has also been instrumental in the development of osteoporosis medications.

36.     Dr. Katz began to supplement his orthopedic practice in 1992 by accepting forensic consulting assignments in the federal court system and he quickly became a highly regarded expert witness in the area of orthopedic medicine. Dr. Katz provided his services as an expert witness by and through plaintiff Michael J. Katz MD PC.

37.     For two decades, Dr. Katz frequently appeared as an expert witness in personal injury and medical malpractice litigations. During this time, approximately 80% of his expert testimony was done on behalf of defendants and he was most often retained on behalf of insurance companies. He earned a reputation as a professional expert witness.

### The Proceedings Before Justice Duane Hart

38.      In the Bermejo case the first IME took place on May 23, 2011 and, according to Dr. Katz's testimony at trial, the first examination lasted approximately forty-five minutes, due in part to the fact that plaintiff s attorney, Patrick Hackett, Esq., became "explosive" and "highly combative" during the examination.

7

39.     Mr. Hackett apparently took issue with the amount of time documented by Dr. Katz for the first IME and, during the next scheduled IME, on March 4,2013, he secretly recorded the examination.

40.     Dr. Katz specifically asked Mr. Hackett to turn off all recording devices at the March 4, 2013 examination.  Mr. Hackett, however, surreptitiously recorded a portion of the examination despite Dr. Katz's request.

41.     The Bermejo case did not settle and a jury trial commenced in March, 2013. When called to testify before a jury at the trial on April 12,2013, Dr. Katz described various tests that he conducted on Bermejo. Dr. Katz examined the plaintiff *twice* and described certain tests that he completed on two different occasions, nearly two years removed from each other.

42.     As to his first examination, Dr. Katz testified that he performed at least fourteen tests of the plaintiff.

43.     During the first IME, Dr. Katz examined the plaintiff s back, right shoulder, right elbow, right leg, right knee, right ankle and right foot.

44.     With respect to the plaintiff s back, Dr. Katz performed a proactive test where the plaintiff lay flat and lifted his leg to determine whether there was any sciatic nerve damage. Dr. Katz also tested his range of motion bending forward, backward and to each side.

45.     Moving to the plaintiff's shoulder, Dr. Katz further tested the plaintiff s range of motion for lifting upward, lifting forward, backward extension, and internal and external rotations.

46.     He also tested the tendency of the plaintiff's shoulder to dislocate and performed two proactive tests:  the O'Brien Test to determine whether there was a torn labrum and the Hawkins Kennedy Test for impingement of the shoulder.

47.      Dr. Katz individually tested the range of motion, as well as the physical formation, of the plaintiff s elbow, leg, knee, foot, and ankle. He additionally tested the stability and condition of the three major ligaments of the knee, took and compared the pulses of both feet, and noted various physical observations throughout the examination.

48.     During a portion of the direct examination related to the length of the first IME, Justice Hart inexplicably called a brief recess and told the attorneys that he observed a strange look upon the face of a person sitting in the gallery and opined that Mr. Hackett may want to call her as a rebuttal witness based upon her expression.

49.     Dr. Katz testified that during the second IME, that he completed seven tests, focusing on the plaintiff's right shoulder.

50.     Dr. Katz tested the plaintiff's range of motion as he had in the first IME and also repeated the O'Brien and Hawkins Kennedy Tests.

51.     He additionally performed the Hornblower and lift-off tests, which involve motion of the shoulder joint against light resistance, and took measurements for atrophy and force generation.

52.     During cross examination by Mr. Hackett, Dr. Katz was questioned about both examinations and particularly about the length of time he spent examining the plaintiff on both occasions.

53.     Mr. Hackett pressed Dr.Katz concerning the length of the second examination. As he was continually pressed for a definitive length of time, Dr. Katz answered: "Tha's uncertain.";  "I don't think I have a record. I don't think I have it recorded, no. I don't think it's recorded."; "I don't really recall at this point."; "I don't really have, you know, an allocated time"; and "Quite frankly, I don't know."

54.     Dr. Katz thus essentially stated, five separate times, that he did not and could not recall the amount of time he spent with the plaintiff during the second IME.

55.     Nonetheless, Justice Hart intervened and told Dr. Katz, "I cannot accept an 'I don't know.' You have been doing this for awhile[sic]. I will have to insist on what your custom and practice would be as to what type of, the length of an exam of this type." Dr. Katz replied, "I think a range of between ten and 20 minutes would be appropriate." Dr. Katz completed his testimony and left the courtroom without further incident.

56.     Upon the completion of Dr. Katz's testimony, Mr. Hackett called an employee from his law office, Yury Ramirez, who was present during both IME's in her capacity as a translator for the plaintiff s attorneys. Ms. Ramirez, the same woman whose facial expression in the gallery caused Justice Hart to interrupt the proceedings earlier, contradicted Dr. Katz's accounts of the examinations he performed, particularly as to the time of the IME's.

57.     Ms. Ramirez described in particular the length of the "exam" as approximately three minutes and the length of the "total evaluation" as approximately five minutes.

58.     At the end of Ms. Ramirez's testimony, through re-direct, Mr. Hackett brought the existence of the video to the attention of the court and defendant's trial counsel. Justice Hart dismissed the jury for the day and Michael Reilly, Esq., counsel to defendant, Ibex Construction,

Travelers insured, made an application for a mistrial. Justice Hart called a recess to offer the attorneys an opportunity to review the video.

59. Upon information and belief, after the recess, Mr. Hackett alleged off-the-record that the video showed that Dr. Katz's examination lasted only one minute and fifty-six seconds and further alleged that Dr. Katz had perjured himself.

60. The video of the IME lasts five minutes and four seconds, not the one minute and fifty-six seconds as alleged by Mr. Hackett.

61. Furthermore, the video obviously begins some time after Mr. Bermejo, Mr. Hackett and Ms. Ramirez entered the room and it is not clear how much longer Dr. Katz and Mr. Bermejo remained in the room together after the video terminated.

62. Justice Hart, however, resolutely adopted Mr. Hackett's representation that the examination lasted one minute and fifty-six seconds throughout all future proceedings despite the fact that Mr. Hackett's conclusions was demonstrably and factually wrong.

63. Justice Hart also proceeded to mischaracterize Dr. Katz's prior testimony concerning the length of the second IME. At the end of the proceedings on April 12, 2013, Justice Hart stated the following about the surreptitious recording of the IME: "Well, I've got to admit. . . if anyone had dealt with Dr. Katz in the past based on his testimony it would of [sic] been reasonable for them to have a tape because he is testifying [to] a 45 minute IME. What universe does he live in? If I ever see a doctor do a 45 [minute] IME it will be the first time."

64. That weekend, Dr. Katz was contacted by Mr. Reilly, Travelers trial attorney, who advised him that he should return to court Monday, April 15, because after his testimony,

11

the clandestine video had been produced. Dr. Katz appeared, as requested, the following Monday, April 15, 2013.

65.     Justice Hart suggested that the parties should settle the matter and in a bizarre twist called for Dr. Katz to contribute money towards a settlement as well, stating, off-the-record, that Dr. Katz's career doing IME work might be over, calling him a "no good liar," and told him to retain a lawyer.

66.     Dr. Katz left the court and contacted the firm of Kern Augustine Conroy Schoppmann, P.C., who dispatched David Vozza, Esq. to meet him at court.

67.     Prior to Mr. Vozza's arrival, Justice Hart indicated several more times, off-the-record, that Dr. Katz should contribute to a settlement to avoid punishment for the perceived perjury. He threatened Dr, Katz with criminal prosecution and imprisonment multiple times, off-the-record, throughout the morning.

68.     Justice Hart did not commence any criminal proceedings or incarcerate Dr. Katz despite these threats.

69.     Justice Hart told Dr. Katz that he needed to contribute to the settlement or his career would be ruined. He stated, on the record, that:

> So the question is, do you want to settle it? I would suggest, and that's why everybody's here and even if the doctor wants to contribute because clearly...The doctor's career doing IME's might be over.  If
> he gets caught in a lie on something that's material at trial his future use to anyone is useless, correct? That will follow the doctor forever.

70.     Justice Hart continued, on the record, noting that:

> So this is truly a pox on everybody's house because I'm going to grant a mistrial unless you can settle it. And unless you can settle it, and this goes - I put in a call for the third-party for the D/J action because they might be part of this, unless

12

> you can figure out a way to settle it I will declare a mistrial
> and post mistrial I will have a sanctions hearing and I will,
> Doctor, be turning the record over to the district attorney. So,
> you got a choice. You can collectively get yourselves out of
> this problem or I will do what I will do.

71.     Upon information and belief, Justice Hart did not turn the record of the

proceedings before him over to the district attorney despite this threat.

72.     During a brief recess, Justice Hart continued to berate Dr. Katz and invited the

attorneys present to do the same. Back on-the-record, Justice Hart told Dr. Katz that he needed

an attorney "right now" and went on to say:

> I would strongly suggest you do not do anything because you're in
> more trouble than you think. It's probably that your career doing
> IME's is over. It's possible, unless this case is settled, that I might
> be taking more - the attorneys have a duty basically not to do
> anything with regards to the district attorney. If I find out or if I
> even suspect  something is going on I have a duty to get in touch
> with the district attorney and getting in touch with the district
> attorney is not a good thing for you in this case. Understood?

73.     Upon information and belief Justice Hart did not contact the District Attorney

despite this threat.

74.     Upon Mr. Vozza's arrival, Justice Hart announced, in open court, but off-the-

record, "Your client is a liar and a thief." Justice Hart continued to berate Dr. Katz off-the-record

in the presence of his attorney before instructing the court reporter to begin transcribing again

75.     Back on-the-record, Justice Hart stated:

> I'm going to second call this while you figure out how you
> can settle this case so I can seal this record so that I don't
> have to send things over to the district attorney, so that I don't
> have to remove counsel from this case, so that defendant isn't
> put in a position where they have to go forward on the RSD
> case with no orthopedist and so the disclaiming carrier for the
> third-party defendant isn't caught holding a three to six
> million dollar bag. All of those are occurring not without the

13

realm of happening, correct. They can all happen in this case.
Parties can be sanctioned, people can go to jail. Am I making
it up? No.

76.    Upon information and belief, Justice Hart did not send the transcript of the

proceedings to the District attorney despite the fact that the record was subsequently unsealed.

77.    Thereafter, Mr. Vozza and Dr. Katz met in the hallway with Richard

Mendelsohn, Esq., counsel for the co-defendant, Amsterdam &.76th Associates, LLC.,who asked

for a monetary contribution of $750,000 from Dr. Katz. When Mr. Vozza asked him to identify a

legal basis for Justice Hart's demand that Dr. Katz contribute to the settlement, Mr. Mendelsohn

responded by asking how much the loss of Dr. Katz's career would cost.

78.    After the parties and Dr. Katz returned to the courtroom, Justice Hart declared:

> So you got until really about 4:00 o'clock[sic] this afternoon
> to try and settle this because if I have to deal with this case
> tomorrow stuff will start happening... Because again, I am
> not making the determination at this point if he is lying or not
> but if someone determines that the doctor was lying or if I
> think that there is a hint that he was lying I'm going to be the
> least of his problems. My friends in my former office in the
> district attorney they might have a conversation with you,
> [Mr.Vozza], his malpractice carrier will have a conversation,
> the State Department of Health would have a conversation
> with him, the other the[sic] defendants would have a
> conversation with him and I don't think arry of these
> conversations are going to be beneficial to him...

79.    Upon information and belief Justice Hart did not contact District Attorney's

office, Dr. Katz's malpractice carrier or the State Department of Health despite these threats.

80.     Furthermore, upon information and belief, none of the defendants in the Bermejo case have commenced any action or lodged any complaints against Dr. Katz based on his testimony.

81.     The parties and Dr. Katz were ordered to return before Justice Hart the following day, April 16, 2013.

82.     Justice Hart, as he had the previous day, continued to exert a great deal of pressure upon Dr. Katz to provide a personal contribution to settle the Bermejo case, stating that if the matter was settled, he would seal the record. The amount suggested by Justice Hart was in the hundreds of thousands of dollars.

83.     Justice Hart wondered, on the record, "whether to blame Dr. Katz for his profound inability to tell time when he's doing an IME" despite the fact that Dr. Katz never testified concerning the specific length of the second IME'

84.     Justice Hart further stated:

> And Dr. Katzf's] inability to successfully tell time might be the biggest problem of all. I would strongly suggest though, I am not in anybody else's courtroom, but since I have Dr. Katz['s] counsel here I would strongly suggest that they reassess his future testimony at any trials until this issue and a few others are resolved.

85.     During the court appearance, despite stating that he would seal the record in exchange for a settlement, Justice Hart actively invited other attorneys who were present, or even in the courtroom on unrelated business, to order copies of the transcript in order to "spread the word" concerning Dr. Katz's alleged perjury.

86.     Despite the immense pressure placed upon Dr. Katz by Justice Hart, Dr. Katz adamantly refused to agree to contribute to the parties' settlement.

87.    Justice Hart adjourned the matter to July 12,2013 for trial. Dr. Katz was represented that day by another attorney from Mr. Vozza's office, Sean Lenihan, Esq. Justice Hart again repeated his position that Dr. Katz " might want to contribute to this to get out of my way, because I'm not thrilled with him."

88.    After Justice Hart referred to Dr. Katz as "Typhoid Mary" and accused him of "getting caught red-handed in an out-and-out lie," Mr. Lenihan repeatedly attempted to direct the court's attention to Dr. Katz's trial testimony, as well as to the video itself, to correct the judge's mischaracterization.  However, Justice Hart consistently ignored Mr. Lenihan's efforts and persisted.

89.    When Mr.  Lenihan countered that "the characterization of Dr. Katz's testimony as an outright lie...is unfair" because "after [Dr. Katz] originally testified,...he did not know [how long the second examination took], he did not remember, your Honor was not satisfied with that and wouldn't let that go. You pressed him to give an answer.. ,He told you what he thought the time frame was," Justice Hart stated, "I'm sorry, when did you learn how to tell time?" and went on to say, "And he gave a laundry list of tests that he did...Did he perform those tests in whatever time he did [sic] that he testified to? No."

90.    Then, in an attempt to illustrate to Justice Hart that Dr. Katz had initially answered that he could not recall the length of time he spent conducting the second IME and that the ten to twenty minute estimation came from Justice Hart's leading question, Justice Hart took

exception and oddly claimed that Mr. Lenihan was accusing Justice Hart of causing the perjury by requiring Dr. Katz to tell the truth.

91.     Prior to July 22, 20I3,the parties and Dr. Katz were ordered to appear before Justice Hart, though due to a clerical error, Dr. Katz was not informed that the time of the appearance had been changed from the afternoon's calendar to a morning appearance.

92.     Without Dr. Katz or his attorney present, Justice Hart stated:

> The worst thing is that we have a doctor who clearly lied about the length of time he took to do an IME, clearly. No matter how you slice it, 10, 15,20 minutes. It turns out he took 1 minute and 56 seconds...
>
> He testified to findings that he obviously could not have had in a minute and 56 seconds. But if he did 10, 20 IME he could have had. And he could have done it, but he didn't do the test...
>
> We are wasting our time trying cases over and over and over again because a doctor who is making millions of dollars doing IME's decides that he is going to lie.

93.     Justice Hart then stated that he would sanction the attorneys who had retained Dr. Katz in the amount of $10,000 apiece and noted:

> I can only sanction a party or the attorneys. Since I can't sanction Dr. Katz for lying and let the record reflect, I am withdrawing my sealing of any prior record in this case. Dr. Katz lied. I am finding that he lied. He clearly, his clear unequivocal testimony that his testimony that his IME took 10, 20 minutes, correct Mr. Hackett?"

94.     Upon receiving an information from Mr. Hackett and further finding that the second IME only took one minute and fifty-six seconds, Justice Hart went on:

> I can blame the attorneys and the carrier who hired him to do an IME on this case because they should have known what this guy was doing. They should have known. And again the man is literally making millions of dollars doing IME's. Now

17

he gets caught lying. There is no other way to put it. He lied. There is no other way to make it nice. He said the IME took between 10 to 20 minutes. It took a minute and 56 seconds'..

So, I will and you can do whatever you want to appeal this record. Mr. Mendelsohn, I am sanctioning your law firm $10,000. You can appeal this. But clearly, for this reason, I can't sanction Dr. Katz. You can appeal this. I want you to appeal it. I want the Appellate Division to make a finding that I am right or wrong, but there is no doubt about the finding that Dr. Katz lied. I want you to appeal that finding so that every lawyer in the state that looks at the Law Journal and looks at the record will be able to see what went on during this trial.

Right or wrong, they are going to come out with a statement of fact. They are going to come out with my finding that he lied. Now, I can't sanction him pursuant to the Court rules, but I can hold him in contempt. I will have to have a hearing for that.

95.     Justice Hart, again characterized Dr. Katz's testimony about the second IME as a "lie" and then stated:

I am less interested in the money. .. *It is the scarlet letter* I am interested in. This gentleman is still doing IME's. He is still being used by defense firms. We have gotten calls to get the record of what went on when Dr. Katz testified...

I can't imagine the amount of extra trials and extra litigation and extra costs and extra everything that is occasioned by having this gentleman part of the system. I don't know if he is a spy with little beady eyes and goes away because he is not here and neither is his attorney. He is going literally on because I can't sanction him. I can't sanction him, but I can hold him in civil contempt after a hearing.

96.     Justice Hart did not hold a contempt hearing let alone hold Dr. Katz in contempt despite his threats.

18

97.     Justice Hart again addressed the sanctions that he was levying against the two firms and again invited them to appeal his not-yet-made ruling.

98.     That morning, July 1, 2013, Justice Hart, without Dr. Katz present, called Dr. Katz a liar no less than 25 times and went so far as to tell the attorneys of record, "[You] should almost sue Dr. Katz for causing this problem. I would suggest that you do that. . ."

99.     Upon information and belief, none of the parties to the proceedings before Justice Hart have commenced any action against Dr. Katz.

100.    Justice Hart, once again, threatened to commence a contempt hearing against Dr. Katz:

> I would like to sanction l)r. Katz. I would like to put Dr.
> Katz out of the business of doing IME's period. But I can't
> do that in this type of proceeding. I can order an eventual
> [contempt hearing] when they are before me, a civil contempt
> hearing to be done by another Judge. I am not going to do it.
> I will discuss with the powers that be in this building a civil
> contempt hearing with regards to Dr. Katz. That is Michael
> Katz, an orthopedist.

101.    Upon information and belief, Justice Hart did not discuss bringing a civil contempt proceeding against Dr. Katz with the Administrative Judge or commence any such proceedings despite this threat.

102.    Justice Hart also inaccurately stated that Dr. Katz's own legal counsel admitted that Dr. Katz had committed perjury:

> ...I have to again parrot that Dr. Katz' attorney [Mr. Lenihan]
> said probably the stupidest thing that I have ever heard in
> Court, I caused him to perjure himself by forcing him to tell
> the truth. That is quite possibly the dumbest thing I have ever
> heard. That I caused the witness to perjure himself by forcing
> him to tell the truth. So, I want the Appellate Division and
> the Court of Appeals to get that guy's number.

19

103.  Justice Hart repeatedly indicated that he wanted the Appellate Division to review his determinations concerning Dr. Katz, but, upon information and belief, Justice Hart never reduced his comments or conclusions concerning Dr. Katz to an order which would be appealable as of right.

104.  Just before the midday break, Justice Hart said, "By the way it is noted that [Dr. Katz] is not here or his attorney." One of the attorneys present then reminded Justice Hart that in the previous proceeding he had not called for the parties or Dr. Katz to be present until two o'clock in the afternoon.

105.  In closing the morning's proceedings, in the absence of Dr. Katz and his counsel, Justice Hart continued:

> I am not finished with Dr. Katz. I am still not finished with
> Dr. Katz. Make sure that he and his attorney can find their
> way here. Because I have to see what I am going to do with
> him. I would suggest that your carriers reinforce their efforts
> to never use him again.

106.  Upon information and belief, Justice Hart did not take any further action against Dr. Katz other than continue to make additional threats against him.

107.  Dr. Katz and Mr. Vozza arrived shortly before the originally-scheduled afternoon calendar call. During the afternoon's proceedings on July 1, Justice Hart informed Mr. Vozza, on-the-record, that "at least one of the defense attorneys agreed that Dr. Katz lied."

108.  When Mr. Vozza took issue with Justice Hart's determination that Dr. Katz lied about the length of time that he spent examining the plaintiff, Justice Hart immediately changed course, telling Mr.Yozza,"I am not making a big thing out of 10, 20 minutes...," now suggesting

that the real issue was that Dr. Katz could not have completed all of the tests that he testified he had completed.

109.    Upon information and belief an additional proceeding, of which there is no record, occurred on July 2,2013, where Justice Hart essentially repeated the same or similar statements concerning Dr. Katz.

110.    By this time, Mr. Vozza had made it clear that Dr. Katz would not be contributing money in any amount towards a settlement.  Justice Hart then demanded that Dr. Katz retire instead of providing money for the settlement.  Off-the-record, Justice Hart continually pressured Dr. Katz to state on the record he would no longer practice "medical-legal" examinations, repeatedly berated Dr, Katz, stating that "his career was over."

111.    Justice Hart also persistently repeated that Dr. Katz had "lied" and the transcript was being circulated so that no one would ever hire him again.

112.    As Mr. Vozza continued to object to the court's characterization of Dr. Katz's testimony, Justice Hart made the following comments from the bench:

> Again, I will refer this, unless I don't think Dr. Katz, you know, we have enough problems doing trials. It is a strain on the system, but unless I get some sort of representation from you [Mr, Vozza,] on behalf of Dr. Katz that he is out of the medical/legal business, I am going to refer this to the Administrative Judge and the District Attorney of Queens [County [sic] so they can do whatever they want to do. Perjury is a D felony.

113.    When Mr. Vozza asked if he could speak with Dr. Katz, Justice Hart continued:

> I would strongly suggest that you talk to Dr. Katz. As it is, and I can say this because it has already been said on the record. He will not be doing business with Travelers or AIG anymore. I have a feeling that any attorney or adjuster within earshot or who reads this transcript will not be dealing with Dr. Katz much anymore. It might be an easy way for him to

bow out gracefully from harm's way. I would imagine that
his number is not going to be called too much in the
foreseeable future. It might be a nice way out.

114.    After the recess, Justice Hart continued stating:

Let the record reflect that I gave Dr. Katz the option of and I
would institute a special proceeding to retire from the
medical/legal business. Retire at the time and he has
declined. What I am now going to do, I am going to order a
full transcript of everything, the trial and the subsequent
proceedings. I will present that to both the administrative
judge of Queens and the District Attorney. I would
recommend to the District Attorney that they explore
prosecuting Dr. Katz for perjury."

115.    Upon information and belief, Justice Hart was allegedly contemplating a

contempt hearing. Justice Hart announced in open court, but off-the-record, that he would be

instituting a special proceeding under Article 4 of the CPLR and called the Supreme Court

Clerk's Office to demand that someone from the office come and facilitate its filing.

116.    Justice Hart stated that he would handwrite a complaint; that he would

additionally serve as judge during the proceeding; that the purpose of the proceeding would be to

determine whether Dr. Katz committed perjury; and that the penalty imposed would be the

revocation of Dr. Katz's license to practice medicine.

117.    Justice Hart offered no statutory authority supporting his threat to institute a

special proceeding against Dr. Katz while acting as both complainant and judge.

118.    Justice Hart continued on the record noting:

Again counsel, it is not the time so much if the doctor thinks
he can explain the time. It is not the time problem. It is that
there are tests that he testified to that he didn't do. That is the
perjury. You might want to speak to your client again. You
can interpret the entire thing however many ways you want.
He testified to things that didn't happen. That is a problem.
They call that perjury. Again, I am making it very clear on

22

the record, the insurance companies here are not going to go near him.

I unsealed the record. Everybody from now on when he testifies as to the tests that he performed, it is always going to be questioned from now on. After about a month or two, nobody is going to go near him anyway. So he is not giving up much. What he is giving up is me referring it to the District Attorney and to the Administrative Judge. I would think that he wants to consider it again. Nobody is going to go near him.

119.    Upon information and belief, Justice Hart did not commence any special

proceedings or contact the District Attorney or Administrative Judge despite these threats.

120.    Justice Hart later demanded to know whether Dr. Katz was continuing to perform

IME's. Upon receiving an answer in the affirmative, Justice Hart continued:

It is like a wound that is festering. Every time he does another IME. When is it going to stop? He is making 7 figures a year doing IME's. Then he comes to my part and lies. I will give you five more minutes. Trust me, I will go to the Administrative Judge, not that the administrative judge or the acting administrative judge doesn't already know about it, but I will go to the district attorney. It is not the time.

It is that the tape shows that he didn't do the tests that he spent a considerable amount of time talking about that he did. That is the perjury. Yes, he didn't do the tests. It is not just me saying it. It is not just the plaintiff saying it. The defendants are saying it too. Does your client really think if the insurance industry or some of the insurance companies that hired him before when they find out he lied, do you really think they will go near him?
As they distribute the transcript, certainly this morning's transcript, certainly the last transcript, certainly the transcript where his own attorney admitted that he perjured himself, but he only perjured himself because I told him to tell the truth.

Imagine his own attorney said: Yes, he perjured himself. But he only perjured himself because I forced him to tell the truth.

23

121.    There is nothing in the record to support Justice Hart's claims that Dr. Katz's attorneys admitted that Dr. Katz perjured himself.

122.    The parties were again ordered to appear before Justice Hart on July 8, 2013. Justice Hart opened the proceeding on-the-record by saying:

> Firstly, I made a prior ruling that is [a]greed to by at least one defendant that Dr. Katz lied on the stand. Again, the tape of the IME is part of the record. It has been explored ad nauseam. I don't have to go into the ruling or the findings again, but pursuant to that, defendants [ ] have asked for a new IME because of the fact that the expert that they had retained was found to have lied on the stand.

123.    Justice Hart then addressed Dr. Katz's attorney directly:

> Dr. Katz has already testified in this action. He has no further right to claim the 5th Amendment. If he is subpoenaed in here by any party, he must come or else he will be subject to contempt of this Court...
> If they [subpoena Dr. Katz], he must come in. I don't [w]ant any games. I am telling you right now, no games. If he is subpoenaed, he will come in...

124.    Justice Hart's comments about Dr. Katz alleged waiver of his 5th Amendment rights are baseless.

125.    Afterwards, Justice Hart said the following, over the course of several minutes:

> He lied. He lied. I would imagine to help either [the defendants] or his carrier. I don't know which one...
> I caused him to commit perjury by forcing him to tell the truth. All I want him to do is have him tell the truth...
> All he has to do is tell the truth...
>
> I don't want him to testify in the future in any other trials. I am stuck with him...
>
> If he comes and tells the truth, which means he would say instead of the exam taking 10,20 minutes, it took 1 minute 56 seconds. His finding might have been shall we say exaggerated. The amount of tests that he did might have been

24

somewhat exaggerated. . .
This might help a settlement of some sort, but, hey, that might
be my opinion.

126.     Justice Hart also made clear that if Dr. Katz did not come to court when

subpoenaed, that the Court would direct the "appropriate sheriff' to "help him"come to court.

127.     Justice Hart did not direct a sheriff or any other court officer to bring Dr. Katz to

Court despite this threat.

128.     Justice Hart continued:

Maybe I will have the contempt hearing here. He is denying
that he lied. He should be happy to get away with me just
saying that he lied. Let it go at that. Yes, we will have a
finding forever more that a Justice for the Supreme Court of
the state of New York said that he lied because he did it. I
would suggest you let it go at that.

129.     Justice Hart did not commence any contempt proceedings against Dr. Katz

despite this threat.

## Roles Played By The Defendants Herein

130.     As indicated herein, ExamWorks is a clearinghouse which provides insurance

companies and trial counsel for the insurance companies in negligence cases, the names and

information of physicians who can conduct IME's and testify in liability and workers'

compensation cases.

131.     Upon information and belief, ExamWorks maintains two lists, one for eligible

physicians and one under a category of "Do Not Use".

132.     On the eligible list, ExamWorks indicates which physicians are available to conduct the IME and to testify on the liability and workers' compensation cases. On the "Do Not Use" list, ExamWorks notifies prospective users as to which physicians listed there were not qualified to testify for whatever reasons they may be.

133.     For well over 20 years, Dr. Katz was on the ExamWorks eligible list while conducting hundreds of IME's, testifying in hundreds of liability and workers' compensation cases to clients referred to him or approved by ExamWorks, and, indeed, generating over one million dollars per year in income.

134.     Upon information and belief, Travelers is ExamWorks most important and influential client fully capable and, in fact, dictating to ExamWorks terms and conditions of maintaining their relationship and directing ExamWorks to post Dr. Katz's name on the "Do Not Use List" to all existing and future prospective clients seeking the services of Dr. Katz in accordance with the plan and scheme devised herein against Dr. Katz.

135.     When the fiasco developed with Justice Hart, Travelers was placed in a very precarious position.  Travelers was compelled to defend its insured, IBEX, without the benefit of an IME and without the benefit of a medical expert.

136.     Justice Hart had denied Travelers and its co-defendant the right to conduct another IME of the plaintiff.

137.     Thus, Travelers was at the mercy of the plaintiff.

138.     Travelers instead of supporting Dr. Katz and defending his position that he did not commit perjury and instead of challenging the findings of Justice Hart,  succumbed to Justice Hart's intimidation and joined in trying to destroy Dr. Katz.

139.     The defendants, jointly and severally, devised a plan and scheme to ruthlessly and aggressively disseminate throughout the negligence defense industry, the false and irresponsible allegations and accusations leveled against Dr. Katz by Justice Hart so that anyone in the industry including but not limited to All State Insurance Company and State Farm Insurance Company, knew that Dr. Katz was on the "Do Not Use List".

140.     At the time that the defendants, jointly and severally, in attemtping to destroy Dr. Katz believing that such action would be beneficial to Travelers, Dr. Katz had on its books hundreds of scheduled IME's and scores of scheduled liability and workers' compensation cases cleared through ExamWorks.

141.     The gross value of the IME examinations and the scheduled trial and workers' compensation testimony at the time that Dr. Katz was blacklisted was in excess of approximately 1.5 million dollars all of which were cancelled with the possible exception of one or two exceptions.

142.     The conduct of the defendants, jointly and severally, reduced Dr. Katz's income to virtually zero.

### The Appellate Division Decision

143.     The defendants alignment against Dr. Katz following the lead of Justice Hart is most unfortunate.

144.     As a result of the rulings by Justice Hart, in his incomprehensible, reckless and irresponsible false allegations against Dr. Katz, the parties in the Bermejo case took appeals.

27

145.    By a decision dated November 18, 2015, a copy of which is annexed hereto and made a part hereof marked Exhibit "A", the Appellate Division, Second Judicial Department, wholly exonerated Dr. Katz.

146.    In spite of this unanimous exoneration, the defendants, herein, jointly or severally, failed and refused  to recall, recant or otherwise withdraw the vile, venomous and vicious false allegations that they so quickly circulated in July, 2013.

147.    ExamWorks has not restored Dr. Katz to the eligibility list and neither defendant has issued statements to the defense industry that the Appellate Division declared Dr. Katz to be innocent of any wrongdoing.

## Defendants Could Have Mitigated Damages

148.    By an Order dated November 18, 2015, the Appellate Division, Second Judicial Department totally exonerated Dr. Katz.

149.    Instead of adopting the holdings of the Appellate Division and recalling the defamatory statements of Justice Hart, the defendants continued to blacklist and maintain Dr. Katz on the "Do Not Use List" maintained by ExamWorks.

150.    The defendants could have reinstated Dr. Katz to the eligibility list and could have restored his reputation with the defense industry.

151.    In spite of the ability and opportunity to do so, the defendants continued to list Dr. Katz on the "Do Not Use List" to the date of these presents.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Tortious Interference with Contract)

152.    Plaintiffs repeat, reiterate and reallege each and every allegation heretofore had herein contained in paragraphs "1" through "151" with the same force and effect as if fully set forth at length herein.

153.    On or about July 15, 2013, Justice Hart declared a mistrial in the Bermejo case.

154.    The defendants, jointly and severally, entered into a plan and scheme to follow the lead established by Justice Hart and to destroy the career, reputation and contractual rights and interests of Dr. Katz.

155.    In furtherance of that scheme and plan, the defendants, jointly and severally, instead of quietly and gradually phasing Dr. Katz's services out of participation in IME and workers' compensation programs, wilfully, deliberately and maliciously extensively transmitted and disseminated throughout the entire negligence defense industry, including but not limited to All State Insurance Company and State Farm Insurance Company.

156.    The information clearly and unequivocally indicated that Dr. Katz was no longer eligible to conduct IME's or to testify in negligence case or on workers' compensation cases and was on the "Do Not Use List".

157.    The defendants were aware of and knew who had engaged Dr. Katz to conduct IME reports and who had engaged to Dr. Katz to testify at either a liability or workers' compensation trial.

158.    Immediately upon the dissemination of the information, hundreds of scheduled IME's were cancelled and scores of appointments for schedule testimony were terminated by the

negligence defense industry, including but not limited to All State Insurance Company and State Farm Insurance Company.

159. Virtually every scheduled appointment for an IME's and for testimony was cancelled, including but not limited to All State Insurance Company and State Farm Insurance Company.

160. Plaintiffs' contracts with insurance carriers and third party independent medical Companies including but not limited to All State Insurance Company and State Farm Insurance Company were economically and materially valuable.

161. Virtually all insurance carriers and third party independent medical companies including but not limited to All State Insurance Company and State Farm Insurance Company immediately terminated and/or suspended their contractual relationships with Plaintiffs based on the false and misleading statements made by the defendants herein.

162. Plaintiffs have been unable obtain the full benefit and advantage of their existing contracts and/or renew such contracts based on defendants' false and misleading statements.

163. As a direct consequence of the false and misleading statements made by defendants, as set forth more fully above, Dr. Katz has been unable to work as an expert witness as contemplated by Plaintiffs numerous contractual relationships with insurance carriers and third party independent medical examination companies, including but not limited to All State Insurance Company and State Farm Insurance Company.

164. Plaintiffs allege that but for defendants' false and misleading statements as set forth more fully above, Plaintiffs would have benefitted from their ongoing contractual relationships with the insurance carriers and third party independent medical examination

companies, including but not limited to All State Insurance Company and State Farm Insurance Company.

165.    The intentional, malicious and wrongful acts of defendants include, but are not limited to false statements and misrepresentations concerning civil and criminal proceedings commenced against Dr. Katz and his suitability as an expert witness.

166.    Upon information and belief, defendants were at all times acting on behalf of, or at the direction of, or in active participation with each other, who are jointly and severally liable for the tortious conduct described herein.

167.    Plaintiffs have been damaged by defendants' tortious interference with their existing contracts including but not limited to All State Insurance Company and State Farm Insurance Company in an amount to be determined at trial but in no event less than $10,000,000.

168.    In addition, because defendants' tortious interference was willful, wanton and malicious, Plaintiffs should be awarded punitive damages as determined at trial but in no even less than $30,000,000.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Tortious Interference with Business Advantage)

169.    Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "151" with the same force and effect as if fully set forth at length herein.

170.    Defendants were aware, based on their experience with the insurance defense industry and with Plaintiff, that Plaintiffs had substantial business relationships with insurance carriers and third party independent medical examination companies as set forth more fully above.

171.    Plaintiffs' relationships with insurance carriers and third party independent

31

medical examination companies including but not limited to All State Insurance Company and State Farm Insurance Company were economically and materially valuable.

172. Defendants knowingly, maliciously and intentionally interfered with Plaintiffs' business relationships with the insurance carriers and third party independent medical examination companies including but not limited to All State Insurance Company and State Farm Insurance Company solely out of malice, or alternatively, by using dishonest, unfair or improper means to interfere with those business relationships.

173. Defendants' interference caused injury and the termination of to the relationship between Plaintiffs and the insurance carriers and third party independent medical examination companies including but not limited to All State Insurance Company and State Farm Insurance Company all of whom were and are known to the defendants by virtue of the lists maintained by ExamWorks.

174. As a direct consequence of defendants' interference, Dr. Katz has been unable to work as an expert witness despite Plaintiffs long standing relationship with insurance carriers and third party independent medical examination companies including but not limited to All State Insurance Company and State Farm Insurance Company and has been denied assignments in hundreds of cases from the insurance carriers who had been employing Dr. Katz for 20 to 25 years.

175. Upon information and belief, defendants were at all times acting on behalf of, or at the direction of, or in active participation of each other which is jointly and severally liable for the tortious conduct described herein.

176.    Plaintiffs' have been damaged by defendants' tortious interference with long standing business relationship in an amount to be determined at trial but in no event less than $10,000,000.

177.    In addition, because defendants' tortious interference was willful, wanton and malicious, Plaintiffs should be awarded punitive damages as determined at trial but in no even less than $30,000,000.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Prima Facie Tort)

178.    Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs "1" through " 151" with the same force and effect as if fully set forth at length herein.

179.    Defendants intentionally inflicted harm on Plaintiffs as described above without excuse or justification by their acts of abuse and harassment and by maliciously publishing defamatory, false and derogatory statements about Dr. Katz.

180.    Defendants knowingly and intentionally set out to destroy Dr. Katz's career as a defense expert as set forth more fully above.

181.    Defendants' actions were willful, malicious and were taken without any reasonable cause or justification.

182.    Defendants took such actions with the deliberate intent of injuring Plaintiffs.

183.    As a direct result of defendants' conduct, Dr. Katz's lucrative career as an expert witness has been destroyed and Plaintiffs have suffered damages including but not limited to special damages consisting of not only termination of existing assignments but black listing Dr. Katz and preventing insurance companies and independent defendants from employing his

33

services in future cases as they had been doing from 20 to 25 years and reduction of income to virtually zero from at least one million dollars annually.

184. Upon information and belief, defendants were at all times acting on behalf of, or at the direction of, or in active participation with each other, who are jointly and severally liable for the tortious conduct described herein.

185. Plaintiffs have been damaged by defendants' tortious conduct in an amount to be determined at trial but in no event less than $10,000,000.

186. In addition, because defendants' tortious interference was willful, wanton and malicious, Plaintiffs should be awarded punitive damages as determined at trial but in no even less than $30,000,000.


## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST TRAVELERS A/K/A TRAVELERS INSURANCE COMPANY A/K/A TRAVELERS COMPANIES, INC.
### (Breach of Contract)

187. That heretofore and on April 12, 2013, April 15, 2013, April 16, 2013, June 12, 2013, July 1, 2013 and July 8, 2013, Dr. Katz was engaged by the defendant, Travelers to conduct IME examinations and to testify in various trials being defended by Travelers.

188. That fees generated for such services rendered and testimony given was $93,000 no part of which as been paid, although payment has been duly demanded.

189. That by virtue of the foregoing, the plaintiff is entitled to judgment against Travelers in the sum of $93,000 with interest thereon, or what is appropriate.

**WHEREFORE**, Plaintiff demands judgment on the First Cause of Action against the defendants, jointly and severally, in a compensatory sum of not less than $10,000,000 in punitive damages in a sum of not less than $30,000,000 for such other sum or sums that may be determined at the trial of this action; on the Second Cause of Action in a sum of not less than $10,000,000 in compensatory damages and not less than $30,000,000 in punitive damages or such sum or sums that may be ultimately determined at the trial of this action; on the Third Cause of Action in the sum of not less than $10,000,000 in compensatory damages and not less than $30,000,000 in punitive damages or such other sum or sums as may be determined by the triers of fact; on the Fourth Cause of Action against the defendant, Travelers a/k/a Travelers Insurance Company, a/k/a The Travelers Companies, Inc., in the sum of $93,000, together with together with interest thereon and the costs and disbursements of this action.

**ZISHOLTZ & ZISHOLTZ, LLP**

By:_____
Gerald Zisholtz
Attorneys for Plaintiffs
Office & P. O. Address
170 Old Country Road, Suite 300
Mineola, New York 11501
(516) 741-2200

md
W:\Katz, Michael\FINAL VERSION.2.wpd